# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GORDIE DANIELS,

        Plaintiff,                 Case No. 8:18-cv-03088-SCB-JSS

   v.

HSN, INC. HSNi, LLC, and QURATE
RETAIL, INC. d/b/a QURATE RETAIL
GROUP,

        Defendants.

_____

## DEFENDANTS' MOTION TO STRIKE AND/OR EXCLUDE
## EXPERT TESTIMONY AND REPORT OF CRAIG KRONENBERGER

Defendants HSNi, LLC ("HSNi"), HSN, Inc. ("HSN") and Qurate Retail, Inc. d/b/a Qurate

Retail Group (collectively, "Defendants") by and through their undersigned counsel and pursuant

to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993), hereby submit

this Motion to Strike and/or Exclude the Expert Report, Testimony and Opinions of Craig

Kronenberger, and in support thereof state as follows:

### INTRODUCTION

This defamation action arises out of an unauthorized e-mail that Plaintiff circulated to the

entirety of HSN's on-air guests and vendors—to and including guests and vendors that HSN no

longer worked with—on the morning of May 17, 2018, during which he disclosed the e-mail

addresses of each recipient to the distribution list, including many high profile celebrities and

entertainers (the "New Direction E-mail" or "E-mail").  On May 22, 2018, a *Page Six* reporter e-

mailed HSNi Head of Corporate Affairs Jill Bratina (Kermes) informing her that the online news

outlet planned on running an article regarding the New Direction E-mail. In response, Kermes

informed the reporter that the E-mail was not "authorized, reviewed or approved for distribution"

(the "Statement").  *Id.  Page Six* published its article containing the Statement online on May 22, 2018.

Plaintiff has retained Kronenberger to provide an expert opinion as to: (1) the dissemination, reach, and engagement surrounding HSN's Statement online, and (2) the costs of a digital campaign to purportedly "correct" the effect of the Statement.  However, Kronenberger's approach to rendering these opinions does not even begin to satisfy the admissibility requirements set forth in *Daubert* and its progeny.  Kronenberger testified on at least three (3) different occasions since 2015 regarding the rehabilitation of an individual's "online reputation,"[1] and despite the similar circumstances in each case, Kronenberger has employed three (3) *different methodologies* using *at least five (5) different formulas* to render his campaign costs, making arbitrary changes along the way that were never subjected to peer review, are not generally accepted in any industry, do not have any established rate of error and are, simply put, of Kronenberger's own creation.  For the reasons cited herein, Defendants respectfully request that Kronenbergers' expert testimony, opinion, and report be excluded.

## MEMORANDUM OF LAW

### A.    Standard for Admissibility of Expert Testimony

Federal Rule of Evidence 702 provides that an expert may testify in the form of opinion or otherwise if:

> (a) the expert's scientific or technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[1] One of the cases he testified to was sealed.  *See* Kronenberger, Ex. 2 at p. 3.  Deposition transcripts will be cited as follows: [Deponent Surname] at [Page:Line].  Deposition Exhibits will be cited as follows: [Deponent Surname], [Exhibit Number].

In *Daubert,* the Supreme Court set forth the criteria for the admissibility of scientific expert testimony under Rule 702 by instructing judges to conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and or whether that reasoning or methodology properly can be applied to the facts in issue."[2]  The Supreme Court later clarified, in *Kumho Tire,* that this "gatekeeping" obligation was applicable to all expert testimony—including that which is not based on 'scientific' knowledge but is instead based on "technical" or "other specialized" knowledge.[3]  In *Rink v. Cheminova, Inc.,* the Eleventh Circuit established three (3) factors that must be established prior to presenting purported expert testimony to the jury:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.[4]

Plaintiff, as the party seeking to introduce the expert testimony, bears the burden of satisfying these criteria by a preponderance of the evidence.[5]  Even if a witness is qualified as an expert on a particular issue, the process or methodology employed by the expert must still be reliable under *Daubert* and its progeny.[6]  Citing the Committee Notes to the 2000 Amendments of Rule 702, the Eleventh Circuit explained in *United States v. Frazier* that:

> [I]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion,

---

[2] *Daubert,* 509 U.S. at 592-93 (1993).
[3] *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999).
[4] *Rink v. Cheminova,* 400 F.3d 1286, 1291-92 (11th Cir. 2005).
[5] *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1306 (11th Cir. 1999).
[6] *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1342 (11th Cir. 2003)("[O]ne may be considered an expert but still offer unreliable testimony.")

and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"[7]

Expert testimony is also "properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves."[8]

### B.    Kronenberger's Opinions and Methodology as to Calculating Advertising Costs are Unreliable and Would Not Assist the Trier of Fact.

In his report, Kronenberger alleges that the cost of a digital campaign designed to reach the audience to whom HSN's Statement was disseminated with a "corrective message," would be at least $3,748,015.[9] When an expert reaches an economic conclusion such as this, *Daubert* lists the following considerations to determine whether the methodology is sufficiently reliable: (1) whether the theory or technique has been subjected to peer review and publication; (2) the rate of error; and (3) whether the methodology has been generally accepted.[10]

As set forth below, Kronenberger's methodology does not even begin to approach meeting any of these criteria, and any opinions or testimony from Kronenberger regarding his calculation of said costs should excluded. In testifying as an expert on behalf of plaintiffs in three (3) different cases since 2015, including the instant case, Kronenberger has proffered *three (3) different methodologies* incorporating at least five (5) different formulas to allegedly calculate the costs of a digital[11] campaign to rehabilitate a plaintiff's online reputation, which has resulted in significantly escalating costs of rehabilitation. To understand how baseless and unreliable

---

[7] 387 F.3d 1244, 1261 (11th Cir. 2004)(citations omitted).
[8] *Hibiscus Assocs. v. Bd. of Trs. Of Policemen & Firemen Ret. Sys.,* 50 F.3d 908, 917 (11th Cir. 1995).
[9] Kronenberger, Ex. 2 at p. 25.
[10] 509 U.S. at 592-94.
[11] Plaintiff's expert report is limited to the cost of a *digital* campaign to reach the purported audience of the alleged defamatory statement. Kronenberger, Ex. 2 at p. 25.

4

Plaintiff's calculations are, Defendant will summarize Kronenberger's calculations for each case, as well as the arbitrary changes to his methodology that have occurred from case-to-case.[12]

>    i.    *The Kifle Report*

In *Ahmed v. Kifle*, Case No. 1:12-cv-02697-SCJ (N.D. Ga.)[13] Kronenberger was retained to calculate the cost of a digital campaign to rehabilitate the reputation of a plaintiff after the defendant published and re-published a negative news article about him, which was picked up by other news outlets. Kronenberger at 182:14-21, Ex. 14, p. 1. To do so, Kronenberger employed a "Cost-Per-Engagement ('CPE') advertising formula. *Id.* at 13. For the Court's edification, online advertising is generally priced in one of three ways: (1) Cost-Per-Click ("CPC"), where an advertiser will pay the host website/company a fee every time their advertisement is clicked on by a viewer, (2) Cost-Per-Impression ("CPM"), wherein an advertiser pays each time (or some fixed number of times, e.g., 1000) an advertisement is displayed on the host's website, and (3) Cost-Per-Action ("CPA"), where an advertiser pays the host every time the viewer interacts with the advertisement by signing up for a free trial of a product, registering for a free download, or purchasing the product. Giddens at 144:4-145:13, Ex. 14.[14] A fourth hybrid method of advertising—similar to Cost-Per-Click—is "Cost-Per-Engagement" advertising. Kronenberger

---

[12] Defendants cannot properly outline all of the inexplicable differences in methodology that Kronenberger has employed in the three cases due to space limitations, but will endeavor to apprise the Court of the more egregious and pertinent alterations here.

[13] Kronenberger's expert report in *Kifle* was filed on January 20, 2015 and can be located at ECF No. 77-1. The *Kifle* report is also included as Exhibit 14 to Kronenberger's deposition here.

[14] The costs for these different advertising types can vary significantly based on: (1) the service or product being advertised, and (2) the host website/company's pricing plans. *See .e.g.*: Wordstream, Facebook Advertising Benchmarks, https://www.wordstream.com/blog/ws/2017/02/28/facebook-advertising-benchmarks (last visited December 2, 2019). For example, according to Wordstream—a data analytics provider cited by Kronenberger as the source of one of the calculations in the *Daniels* report—Facebook's average Cost-Per-Click across all industries is $1.72. *Id.*, last visited November 26, 2019 at 4:34 p.m. However, there is a significant variation in Cost-Per-Click advertising rates among different industries, with the lowest being reported in the apparel industry ($.45 per click), and the highest in the finance and insurance industries ($3.77 per click). *Id.* The average Cost-Per-Action, according to Wordstream, is $18.68 across all industries, with the technology sector costing $55.21 per customer action, and the education industry costing just $7.85 per customer action. *Id.*

defined "engagement" to be "clicks, views or shares."   Kronenberger, Ex. 14 at p. 13. Kronenberger found that the average Cost-Per-Engagement was $1.50 across all channels, although he did not disclose his source for this figure in the report itself.  *Id.*[15]  In order to determine the total cost of the *Kifle* advertising campaign, Kronenberger determined the total number of times between March 2012 and January 2015 the negative article about the plaintiff was "clicked on, viewed, or shared"—13,380 times—and then multiplied it by the Cost-Per-Engagement of $1.50. *Id.* Kronenberger then multiplied this number by a factor of three (3) "to ensure we reach the right audience." *Id.*  This last multiplier allegedly represented the number of times an advertising campaign must be repeated in order to "drive [the] impact" with the reader.  *Id.* at 204:8-205:22. However, Kronenberger did not disclose the source of this multiplier in his *Kifle* report, nor could he recall the source of the multiplier during his deposition when questioned in this case (the "*Daniels*" case).  *Id.* at 204:11-17.   Kronenberger estimated that the total cost of the *Kifle* advertising campaign would be calculated as follows:

**13,380 engagements[16] x $1.50 x 3(frequency multiplier)= $60,210.**

*Id.,* Ex. 14 at p. 13. Therefore, Kronenberger estimated the total costs of the advertising campaign to be $69,240 ($60,210 to "reach and engage" the requisite number of people, and $9,030 to manage it). *Id.*  Kronenberger alleged that this estimated cost would include "(1) the advertising dollars needed to change the perception of those engaged with the negative content, and (2) the costs to repair and rebuild [the plaintiff's] reputation in search engines." *Id.* at pp. 12-13.  This would also include, "the development of new content around [plaintiff's] reputation, on-going

---

[15] The $1.50 figure in *Kifle* is similar to the current cost-per-click of $1.72 for Facebook advertising across all industries.

[16] In *Kifle,* Kronenberger originally defined engagements as "clicks, views, and shares." Kronenberger, Ex. 14 at p. 13.  This definition changed by the time of the *Daniels* report, wherein he defined engagements as "everything from likes, shares, [and] comments," omitting clicks and views from the definition.  Kronenberger at 30:23-31:11.

management of the content in order to building the [search engine] ranking around it, working with legal support to gather take-down notices and work with publishers on removing negative content and on-going reporting and monitoring of progress." *Id.* at p. 14.

### ii. The Gizmodo Report

When Kronenberger provided his expert report in the case of *Jason Miller v. Gizmodo Media Group, LLC*, Case No. 1:18-cv-24227-CMA (S.D. Fla. 2019)—which also involved creating a digital campaign to rehabilitate a plaintiff's online reputation after a purportedly defamatory news article—Kronenberger drastically altered his "Cost-Per-Engagement" formula and *added* another formula entitled Advertising Value Equivalency ("AVE"), which resulted in a drastically inflated cost calculation of $63,372,471.65. *See generally,* Kronenberger at 169:4-11, Ex. 13 at pp. 18-23 (the "Gizmodo Report"). Defendant will address these changes in turn.

In *Gizmodo,* Kronenberger retained a similar formula structure for calculating the Cost-Per-Engagement; that is, multiplying a total number of "engagements" with an article mentioning the plaintiff by an average cost, but changed the cost multiplier from **$1.50 to $18.68**—increasing it by more than a factor of twelve (12) without explanation. *Id.*, Ex. 13 at p. 20. Upon closer inspection, Kronenberger actually changed the advertising rate from a "Cost-Per-Click" rate (roughly $1.50 in *Kifle*) to a "Cost-Per-Action" rate, even though there was no discernible difference in the type of advertising to be employed in the two cases. *Id.* Kronenberger was unable to explain *why* he switched to using a CPA pricing model after *Kifle*—or even the difference between CPE and CPA advertising—only stating that "there's more metrics" and "it's just different than what it was in 2014." *Id.* at 218:13-25.[17] However, the difference between the two

---

[17] *See Frazier,* 387 F.3d at 1261 ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.").

advertising models is substantial, as CPA advertising requires an advertiser to pay only after the viewer takes some additional affirmative step to engage with the advertisement, such as purchasing a product. Giddens at 144:4-145:9; *Id.*, Ex. 14. There would be no conceivable way to employ a CPA advertisement for the rehabilitation of an individual's online reputation, nor does Kronenberger even attempt to explain how such advertising would be deployed in his report. Giddens at 145:10-13; *see generally* Kronenberger Exs. 2 and 13. Instead, Kronenberger appears to have altered his formula merely for the inflated pricing structure related to CPA advertisements.

Kronenberger also added *another* calculation using a tool called Google Keyword Planner, wherein he "captured all of the keywords and ran [them] through Google Keyword Planner to determine estimated cost per click.," and then "[u]sed $1.50 average cost per click when no recommendation was available." Kronenberger, Ex. 13 at p. 21. Here, the $1.50 CPE figure in *Kifle* has been used as a "Cost-Per-Click" value in *Gizmodo. Id.* Although unclear, Kronenberger stated that he "determined how much Google would charge to run an ad for each keyword and the estimated amount of traffic it would drive to that page," and ended up with a figure of $8,134.80 per month. *Id.* However, Kronenberger abandoned this approach for his report in *Daniels*, and did not provide *any* Cost-Per-Click advertising estimation in the instant case. *See* Kronenberger, Ex. 2.

In *Gizmodo,* Kronenberger also *increased* the *Kifle* "frequency" multiplier from three (3) to five (5) without explanation; now claiming that the five (5) times multiplier was the "lowest frequency" required. *Id.*, Ex. 13 at 22. A "frequency" multiplier is inapplicable to the CPA advertising in *Daniels*, since the party does not pay for the advertisement until a specified action occurs, thus negating the need for any re-run of the advertisement. *See* Giddens at 144:23-145:13, Ex. 14. In other words, the advertiser only pays once the product is purchased or the application is

8

downloaded, and no additional advertisement would be required to "drive the impact" of the consumer. *Id.*

In addition to the inexplicable changes to the *Kifle* CPE formula, in *Gizmodo* Kronenberger added the additional AVE calculation, which he purportedly borrowed from the company "Cision/Trendkite."[18]   Kronenberger Ex. 13 at p. 19.   Kronenberger failed to cite any source documents from Cision/Trendkite for his formula.  *See id.*  Cision/Trendkite has also *publically denounced the use of AVE formulas*, as discussed herein.[19]  Despite this, Kronenberger wrote in his *Gizmodo* report that the Cision/Trendkite AVE formula was "endorsed" by the two companies and is used by "many fortune 100 companies around the world."[20] *Id.,* Ex. 13 at p. 19. Kronenberger's *Gizmodo* AVE calculation was as follows:

> Ad Value Equivalency = Readership (Unique Visitors Per Month)
> *Average Potential Article Readership (2.35%) * Average Ad Cost
> ($.08).

*Id.*  AVE formulas have been around since the 1940s for the specific purpose of calculating the *value* of "earned media"—that is, media that is garnered through newspaper articles or public discussion and is *not* paid for[21]—by attributing an average newspaper advertising cost multiplied by the column space the earned media occupied.[22]  The purpose of AVEs was to allow those in the

---

[18] Cision Ltd is a self-characterized as a "leading global provider of *earned* media software and services to public relations and marketing communications professionals." *See* https://www.cision.com/us/about/news/2019-press-releases/cision-appoints-david-krantz-to-board-of-directors-300888825/(last visited November 26, 2019 at 5:35 p.m. ). The distinction between *earned* media and *paid for* advertising is an important one, and is discussed *infra* at p. 10 of this Motion.

[19] *See infra* at pp. 10-12.

[20] Kronenberger failed to cite his sources for this proclamation.

[21] Kronenberger at 20:15-21.

[22] Talkwalker, Advertising Value Equivalency, https://www.talkwalker.com/blog/advertising-value-equivalency, (last visited November 26, 2019 at 5:58 p.m.)  *Talkwalker* was the platform Kronenberger claimed he used to pull his *reach* and *sentiment* data in the *Daniels* report.  While Defendants question using blogs as purported reliable sources, Kronenberger stated that these blogs were reliable sources of information related to the platforms' products, and that he regularly followed the blogs of several of the platforms he uses in his calculations, including *Ahrefs* and *Moz.*  Kronenberger at 16:20-18:10.  In his report in both *Gizmodo* and *Daniels,* Kronenberger cites the *Talkwalker* blog as his sole source of information relating to the use of the platform.  *See, e.g.,* Kronenberger Ex. 2 at p. 21. *See*

public relations field to provide a dollar value for positive, earned and unpaid for media. *Id.* In contrast, advertising costs are easily determinable, particularly with respect to online digital content, by determining where the advertisement will be hosted (e.g., Facebook or Twitter), and the cost of the type of advertisement to be placed (e.g., Cost-Per-Click, Cost-Per-Action, or Cost-Per-Impression). *Id.*; *see* Giddens 119:3-120:10; 143:10-145:12; 148:21-150:20.

In addition, AVEs are much derided, even within the public relations industry when being used for their *intended* purpose, as the formulas are inherently unreliable and inaccurate, are not a true measure of the value of earned media since they cannot adjust for negative media exposure,[23] and are inapplicable to online/digital content.[24] Several renowned public relations associations have denounced the use of AVEs, characterizing them as "arbitrary 'weighting' schemes aimed at enhancing the alleged value of editorial[25] coverage," and stating they "measure nothing other than the vanity of those reporting them." *Id.* The Chartered Institute of Public Relations stated that "Anyone attempting to use them (AVEs) today is fooling themselves, fooling their clients, and failing the profession. AVEs have no place in modern, professional, PR Practice." *Id.* The International Association for the Measurement and Evaluation of Communication ("AMEC"), a UK-based global trade association which characterizes itself as the "world's largest media intelligence and insights professional organization,"[26] launched a global initiative to eradicate the use of AVEs within the public relations industry, noting, in pertinent part, that: (1) AVEs are likely

---

*also* Kronenberger, Ex. 15 (Trendkite—the company allegedly cited for Kronenberger's AVE calculation-describing AVEs as a "mirage of a metric" that was traditionally used to calculate what earned media coverage or editorial coverage *would have cost if it were advertising.*)

[23] The press is supposed to be free from financial pressures in generating editorial coverage, such as a news article; therefore, editorial coverage can be either positive or negative. Kronenberger, Ex. 16, ¶ 10.

[24] *Id.* at ¶ 18.

[25] The use of "editorial" coverage here is synonymous with earned media and refers to content published by a third party, such as magazines, journals, newspapers and other online sources, which is distinct and separate from paid advertising. Kronenberger Ex. 16, ¶¶ 3, 21 (explaining difference between editorial coverage and paid advertising).

[26] *See* www.amecorg.com (last visited November 27, 2019 at 6:54 p.m.)

to generate a high "financial" number in excess of the cost/budget of the *public relations*[27] campaign; (2) AVEs are often used with multipliers to inflate their value despite having no credible, peer reviewed research supporting the use of a multiplier; (3) there is no agreed upon methodology to measure AVE, and each provider has their own methodology; and (4) AVEs do not work in digital and social media because online advertising works differently than how it does in the printed press, given that online advertising is based on paid-for exposures rather than guaranteed runs in publications, making any meaningful attribution of AVE to online editorial or earned content "impossible." *See generally,* Kronenberger, Ex. 16.  In addition, AMEC stated that AVEs are entirely inappropriate when incorporating paid advertising into a communications campaign—which is exactly what Kronenberger is attempting to do. *Id.* at p. 2, ¶ 20.[28] This illustrates the problem here: AVEs *cannot* be used to calculate the *actual* costs of paid media, nor is it an acceptable practice within the advertising *or* public relations industries to do so.  *Id.*; Giddens at 119:3-12; Kronenberger Exs. 15, 16.

The issues with Kronenberger's *Gizmodo* calculations do not end there.  Kronenberger's *Gizmodo* AVE calculation appeared in his report as follows:[29]

> **Ad Value Equivalency** = Readership (**Unique Visitors Per Month**) x Average Potential Article Readership (**2.35%**) x Average Ad Cost (**$.08**). = $5,220,336.

Kronenberger, Ex. 13 at 19.  However, Kronenberger somehow calculated that the articles containing the alleged defamatory statement at issue had a total, potential reach of 1.9 ***trillion*** readers.  *Id.,* Ex. 13 at p. 11.  Given that the total population of the Earth is only slightly above 7.6

---

[27] Note that this is separate and distinct from an advertising campaign for which the costs would be easily determinable.  *See, e.g.,* Giddens Tr: 118:13-119:10.

[28] Quoting AMEC, "When, for example, a communications professional is incorporating *paid media* into their campaign, how can it make any sense to then measure 'Paid [Advertising]' with an AVE?" *Id.* at p. 2, ¶ 20.

[29] Kronenbeger alleged that his *Gizmodo* calculation was as follows:  Ad Value Equivalency = Readership (Unique Visitors Per Month) x Average Potential Article Readership (2.35%) x Average Ad Cost

billion,[30] it was unclear how Kronenberger arrived at such an astronomical number.  It was also

unclear from the *Gizmodo* report whether Kronenberger used this figure in his AVE calculations.

However, by solving for the Unique Monthly Visitor total using his AVE formula, we can

determine that the *Gizmodo* Unique Visitors Per Month figure equaled:

$$\frac{\$5,220,336}{((.0235)(.08 \text{ Average Ad Cost}))}$$

**= 2,776,774,468 Unique Monthly Visitors.**

Accordingly, Kronenberger alleged that the websites hosting the article(s) at issue in *Gizmodo* had

a monthly unique visitor total of 2,775,774,468.  For reference, CNN.com only had 169 million

unique visitors across *all its platforms* in September of 2019.[31]

The next factor in Kronenberger's AVE calculation was an average advertising cost of

$.08.  According to Kronenberger, this number was the average advertising cost per thousand

impressions (or CPM) of $8, which he alleged—*as of April of 2019*—was "a representative

average [cost] across different media type(s) and outlet sizes across the Internet." Kronenberger,

Ex. 13 at 19. Kronenberger failed to cite any source for the average advertising cost of $.08.[32]

    *iii.*    *The Daniels Report*

Just a few months later in September of 2019, Kronenberger completed his expert report

here, using *the same basic formulas* he used in April in *Gizmodo*, albeit again with *substantial*

and inexplicable changes to his methodology. In *Daniels,* Plaintiff adopted another company's

AVE formula—*Meltwater*—abandoning the Cision/Trendkite formula he claims to have used in

*Gizmodo*—even though Meltwater explicitly provides that *its* AVE calculation is used to

---

[30] https://www.census.gov/popclock/ (last visited November 25, 2019 at 4:34 p.m.)

[31] http://cnnpressroom.blogs.cnn.com/2019/11/18/cnn-digital-leads-all-competitors-1-in-global-and-domestic-unique-visitors-mobile-video-millennials-politics-and-social/ (last visited November 25, 2019 at 5:59 p.m.)

[32] Regardless, Defendants will not dispute the Gizmodo average advertising cost of $.08 for purposes of this Motion.

determine a value or return on investment for earned media—not costs.[33]  Meltwater's own website characterizes its AVE formulation as "enable[ing] marketing and PR professionals to measure ROI [Return on Investment] through a number of methods, including AVE and many different metrics in line with the Barcelona Principles.  We believe that PR is evolving, and along with it, so are the ways to measure ROI."  Kronenberger, Ex. 10. In order to use Meltwater's AVE formulation, Meltwater provides the following instructions:

> How do we calculate AVE?
> The reach numbers are the unique visitors of each source based on monthly activity.  This is delivered to us by our partner SimilarWeb[34]…
> The AVE number uses a formula based on this number to derive a value.  See the formula below
> X (the reach/unique visitor figure) * .025 (standard error, assuming that 2.5% of any given audience will view a particular *article*[35] * .37 (37 cents is the dollar **value** for each visitor).
> The last figure can be adjusted if you want to place more or less value on each viewer.

Kronenberger, Ex. 12 (emphasis added).  The language and purpose of Meltwater's formula is clear: it is used to calculate the value or return on investment for unpaid, earned media in a news article or press release*, not the <u>*actual cost*</u> for paid advertising.[36]  Giddens at 108:14-20; Kronenberger Ex. 12.  Meltwater even allows the user of the AVE formula to adjust the last figure of $.37 per *visitor*[37] if the user wants to place "more or less value on each viewer" of the

---

[33] Kronenberger Exs. 10, 12.

[34] Although prescribed by *Meltwater* to calculate the reach figure for its AVE formula, Kronenberger did not use *SimilarWeb*—another technology company that provides marketing data and analytics—and instead substituted the *SimilarWeb* calculations with those of another platform named *TalkWalker* (or *Ahrefs*), without explanation.  *See* Kronenberger, Ex. 12.

[35] Again, Meltwater refers to "article" rather than "advertisement" as the AVE formulation is *only* a method of calculating the value of *unpaid for* earned media, such as media that appears in news articles, not paid-for advertisements.

[36] Indeed, in Kronenberger's report in Daniels, he specifically alleges that "AVE provides an industry benchmark to help PR professionals understand the *value of earned media.*"  Kronenberger, Ex. 2 at p. 22.

[37] Again, Meltwater is not referring to "cost-per-click", "cost-per impression," or "cost-per-action," which are terms reserved for advertising costs. Giddens at 143:8-145:9. Instead, Meltwater sets forth an arbitrary *value* of $.37 per visitor, which the user can adjust as he/she sees fit, making any rate of error calculation impossible.

article, cutting against any acceptable scientific application of the formula. *Id.* Meltwater also cautions users of its AVE formula,[38] providing that it merely gives a "best estimate and it does not measure an exact value." *Id.* In line with Meltwater's precautionary statement, Kronenberger was not aware of any established error rate for Meltwater's AVE calculation. Kronenberger at 167:16-18. Despite the clear purpose of the Meltwater formula, Kronenberger mistakenly conflated "value" with "cost," and "article" with "advertisement", thereby transforming the Meltwater AVE calculation into something it was never intended to be—a method of calculating the actual costs for ***paid for advertisements***. Kronenberger at 149:3-150:9 (admitting his interchangeable use of "cost" and "value").

Then, despite the Meltwater formula's prescription that its "reach" or "unique monthly visitors" be calculated using the platform SimilarWeb, Kronenberger *created his own modified version of the formula* using the *total, potential*[39] reach from another platform—he believes[40]-- named *Talkwalker*. Kronenberger Ex. 2. Kronenberger failed to identify any peer reviewed sources or studies, or even a *Meltwater* blog article accepting such a modification of *Meltwater's* AVE formula. *Id.* at 164:25-165:3; Ex. 2 at p. 22 ("We altered the formula to more accurately represent the actual[41] number of people reached. Instead of factoring in average monthly reach per outlet, we factored in the actual number of people reach based on the time frame

---

[38] The AVE widget is the application used to calculate the Meltwater AVE, although it appears that Kronenberger merely borrowed the formula and did not use the actual Meltwater application to derive his improper cost calculations.

[39] In his report, Kronenberger misleadingly characterizes this as the "actual" reach—meaning the number of individuals who actually read the article. However, at deposition Kronenberger admitted that this was actually a "potential" reach figure—meaning the total potential readership of the article based on the popularity of the site. Kronenberger at 167:4-9.

[40] Kronenberger at 160:1-161:13 (testifying he did not use *Talkwalker* and instead used *Ahrefs*)

[41] *See* n. 28, *supra.*

observed."[42]).  Kronenberger admitted that there was no established error rate for his "modified" AVE formula.  *Id.* at 167:16-24.

Even assuming that Kronenberger could arbitrarily substitute the unique monthly visitor total from *SimilarWeb* with a total, potential reach calculation from *Talkwalker or Ahrefs*[43] into Meltwater's AVE—a proposition for which Kronenberger has failed to cite any source in support—there are significant problems with the manner in which Kronenberger calculates the total, potential reach.  *See* Giddens, Ex. 2 at p. 9; Kronenberger Ex. 3.  For example, Kronenberger located 12 URLs[44] which purportedly discussed the New Direction E-mail.[45] Two (2) of these URLs linked to PageSix.com, and had the same total potential reach of 9,933,333. *Id.*  Additionally, two (2) more URLs linked to a German site called 123ru.net, with the same possible reach of 230,769. *Id.* Two (2) more URLs both linked to tbo.com, with the exact same potential reach of 241,176.  *Id.*  Even though the reach for the two (2) PageSix.com URLs referred to the same potential number of *Page Six* readers, Kronenberger added the reach of the two (2) URLs for PageSix.com together, *erroneously doubling* his reach calculation for PageSix.com.  Kronenberger made the same "error" with the reach calculations of 123ru.net and

---

[42] Kronenberger does not define the "timeframe" he refers to here. Moreover, Kronenberger was unsure over what timeframe for which *Ahrefs* pulled the reach data, making any comparison to the Unique **Monthly** Visitor total impossible.  Kronenberger at 164:12-166:4.

[43] Kronenberger was not exactly sure during his deposition as to where his reach calculation came from.  In his report and during part of his testimony, he stated that the reach calculation came from the platform *Talkwalker*. Kronenberger, Ex. 2 at p. 10; Kronenberger at 79:18-80:19.  However, his total calculation of reach was included in his report from *Ahrefs*, and Kronenberger later changed his testimony to state that the reach calculation was, indeed, provided by Ahrefs. Kronenberger at 160:1-161:13; Kronenberger Ex. 3, abbreviated *Ahrefs* report.  Kronenberger was also not aware of any treatises or accepted application of *Ahrefs* as a component of determining advertising costs.  Kronenberger at 113:4-22.

[44] URL is an acronym for uniform resource locator, which is the address of a resource (such as a document or website) on the Internet that consists of a communications protocol followed by the name or address of a computer on the network and that often includes additional locating information (such as directory and file names).  *Merriam-Webster.com/dictionary/URL,* last visited 11/26/2019 at 9:55 a.m.

[45] One of these URLs with domain root *homeshoppingista.wordpress.com* predated the alleged defamatory statement since it was published on May 20, 2018.  The Statement was not made until May 22, 2018.

tbo.com. Giddens, Ex. 2 at 9-10.  Furthermore, URLs 6, 7 and 9 all redirected to the *exact same URL* on the Tampa Bay Times website, a fact that Kronenberger failed to identify in his report. *Id.*[46]  While Kronenberger testified that the reach of each separate URL must be added together to calculate a total, potential reach, this conclusion defies logic (nor is it acceptable for purposes of Meltwater's formula).  Kronenberger at 83:5-87:9; 87:23-88:7; 89:11-90:2.  For example, if you were to total the reach of every URL linking to PageSix.Com, assuming Kronenberger's reach total of 9,933,333, each new article would *double the potential reach* of PageSix.Com, and after just 1,000 articles—a number which PageSix.Com has almost certainly surpassed—its "reach," would exceed the total of our world's population.[47]  This is how in *Gizmodo,* Kronenberger was able to calculate a total potential reach of 1.9 trillion, despite there only being 7.7 billion people on Earth.[48]

The Meltwater formula also had a substantially higher multiplier of $.37 versus the $.08 advertising cost multiplier provided in Kronenberger's *Gizmodo* formula.  For the Court's comparison, the two (2) formulas, which were provided just a few months apart, were as follows:

| *Gizmodo* (April 2019) | *Daniels* (September 2019) |
|---|---|
| **AVE = Unique Visitors Per Month * Average Potential Article Readership (2.35%**) * Average Ad Cost **($.08)** | (*Meltwater* Formula)<br><br>**AVE = Unique Visitors Per Month * Average Potential Article Readership (2.5%**) * Average Visitor Value ($.**37**). |

---

[46] Despite being faced with the undisputable facts, during his deposition, Kronenberger maintained that these three URLs *did not* re-direct back to the same article.  Kronenberger at 84:9-87:3.  However, these URLs do, in fact, all re-direct to a *single* URL of https://www.tampabay.com/business/lawsuit-spells-out-tumultuous-time-during-hsn-and-qvc-merger-20181204/

Defendant has provided the three URLs for the Court's ease in verifying that these hyperlinks all re-direct to the same website:

1.     https://tbo.com/business/lawsuit-spells-out-tumultuous-time-during-hsn-and-qvc-merger-20181204/
2.     https://www.tbo.com/business/lawsuit-spells-out-tumultuous-time-during-hsn-and-qvc-merger-20181204/
3.     https://www.tampabay.com/business/lawsuit-spells-out-tumultuous-time-during-hsn-and-qvc-merger-20181204/

[47] 9,933,333 x 1,000 URLs with the same reach = 9,933,333,000 potential readers.

[48] *See supra* at p. 12.

(Kronenberger's Revised Formula)

**AVE = Total, Potential Reach from Ahrefs or Talkwalker** x **Average Potential Article Readership (2.5%)** x **Average Visitor Value ($.37)**.

Kronenberger was incapable of explaining why, in April, the AVE formula had a multiplier of $.08 and then, in September, he chose a multiplier of $.37—a more than four (4) factor increase. Kronenberger's only explanation was that in the *Gizmodo* case, he used a Cision tool to pull certain information, so he used the Cision formula to "continue with their process." Kronenberger at 171:18-172:14. However, Kronenberger had no explanation as to why he used Cision's process in April for *Gizmodo* but not in September for *Daniels*:

> **Counsel:** Well, what specifically drove you to use the Meltwater formula in the Daniels case?  I mean what's the difference between the two [between the Meltwater and Cision formula].
> **Kronenberger:**  Well, I've typically use(d) Meltwater.  If you look back to the Ethiopian Review case [*Kifle*], I have use(d) the Meltwater formula as well.
> **Counsel:** Do you know whether or not that Meltwater formula when you used it previously had this .37 value?
> **Kronenberger:**  I can't really say without looking at it.  And if there were—if it did change, **the formulas change often**.  Our industry changes often, so I don't really know.

*Id.* at 172:9-20 (emphasis added).  Despite Kronenberger's testimony, he *did not* use Meltwater's formula in *Kifle*, nor *did he use an AVE calculation at all.  Id.*, Ex. 14 at p. 13.  In fact, Meltwater is not even mentioned in either the *Kifle* or *Gizmodo* reports.  *See id.,* Exs. 13, 14. Kronenberger also did not use Meltwater's data analytics to pull any of the underlying data in *Daniels,* so there was no need to use the Meltwater formula—rather, it is apparent that Kronenberger simply selected the formula due to the higher multiplier of $.37, which would

produce a higher valuation for Plaintiff.[49]   Indeed, when questioned as to what the $.37 value represented in the *Meltwater* formula, Kronenberger was unable to give a specific answer.  At first, he testified that it was the "value per visit based on the advertising value of the amount of space an advertisement takes up on a given webpage."  *Id.* at 171:21-25.  When asked to identify the specific correlation between the value and the amount of advertising space, Kronenberger was unable to answer.  *Id.* at 173:1-10.  Kronenberger also conceded that the $.37 value was adjustable if the user wanted to place more or less *value* on a particular *visitor*—not more or less value for additional web space; clearly an indicia that value is *not* used to calculate actual costs. *Id.* at 173:6-175:22.

The last factor Kronenberger used in determining his purported "cost" calculations was his frequency multiplier, which increased from a multiple of three (3) in *Kifle* to a multiple of five (5) by *Daniels*.  In his report, Kronenberger cited a study from Nielsen that was conducted in Australia to determine the number of times an advertisement for different products and services must be to run to maximize "resonance" with the consumer. *Id.* at 207:24-208:10; Ex. 17.  Despite presenting this article to Kronenberger during his deposition, Kronenberger could not recall the supporting source for his multiplier of five (5) in *Daniels*.  *Id.*  Incredibly, when questioned specifically whether Exhibit 17 was the source of the frequency multiplier in *Daniels*, Kronenberger responded, "I do not know."  *Id.*  Kronenberger also admitted that he was not aware of any studies that have been conducted to determine the frequency needed to rehabilitate an individual's reputation when an alleged defamatory statement is at issue.  *Id.* at 205:23-206:10.  When asked, generally, how he determined that the five (5) times multiplier was a fair,

---

[49] *See* Kronenberger, Ex. 2 at p. 10; Kronenberger at 79:16-80:11; and 127:14-128:8 (Kronenberger testifying that he was unsure as to whether his reach calculation came from the *Talkwalker* tool or *Ahrefs*, but in any event, made no mention of Meltwater's data analytics).

reliable, and accurate frequency multiplier for the *Daniels* case, Kronenberger said he "obviously sourc[ed] research," but then admitted that because online reputational damage is a "new area, there's not been any research to look into it." *Id.* at 210:13-24.

In sum, Kronenberger has testified as an expert for plaintiffs in three (3) different lawsuits (*Kifle, Gizmodo, and Daniels*), all involving alleged defamatory statements that appeared in online news articles.  Despite the substantial similarities between these lawsuits, Kronenberger used three (3) wildly different methodologies, and at least five (5) different formulas to calculate the costs of his purported online reputation rehabilitation campaign, making arbitrary changes to his methodology along the way that have no basis in science, were not subjected to peer review, do not have an established error rate, and are, quite simply, of his own creation.[50] Indeed, Kronenberger admitted that his assessment in *Daniels* was born of his own methodology that he purportedly developed; that he uses different platforms to pull information "depend[ing] on the situation,"[51] that he has never published his methodology in any peer reviewed journals "nor do[es] [he] want to publish it,"[52] that he has not established any rate of error for his calculations, nor is he familiar with the rate of error for the platforms he uses to collect his data (*e.g., Talkwalker, Ahrefs, Moz*[53]) or the formulas he used to render his cost calculations (*Cision/Trendkite, Meltwater*).[54] Kronenberger has also failed to establish that his

---

[50] *See Affiliati Network, Inc. v. Wanamaker*, Case No. 1:16-cv-24097-UU, 2017 U.S. Dist. LEXIS 217403, *10, 17-18 (S.D. Fla. Aug. 14, 2017)(excluding expert testimony on similar grounds); *Grupo Televisa, S.A. v. Telemundo Communs. Grp., Inc.,* No. 04-20073-CIV-2005 U.S. Dist. LEXIS 45883 at *5 (S.D. Fla. Aug. 17, 2005)(same).
[51] Kronenberger at 48:10-49:10.
[52] Kronenberger at 49:16-19.
[53] When asked whether he was familiar with any studies using *Moz* to determine advertising costs, Kronenberger responded, "Yeah. Myself." Kronenberger at 114:7-9. When asked if he was familiar with anyone else using *Moz* as a tool to determine advertising costs, he responded "I do not know." *Id.* at 114:10-11.
[54] Kronenberger 46:24-50:19; 167:16-18 ("Q: Do you know whether there's an established error rate with respect to Meltwater's AVE formula?  A: No."); 167:19-24 ("Q: Do you know whether there's an established error rate with respect to your revised AVE formula? A: No. Because you would have to, in theory, come up with an error rate.")

use of the AVE formula is accepted within the industry for the manner in which he is using it, which is to calculate actual costs for a hypothetical *paid for* advertising campaign.  *See Id.,* Exs. 15, 16.  Advertising costs are easily determined and do not require controversial formulas from a separate and distinct discipline.  Giddens Tr: 118:13-119:10.  Accordingly, Kronenberger's methodology for calculating the costs of his online rehabilitation campaign does not even approach meeting the admissibility standard set forth in *Daubert*.

### C.  Kronenberger's Methodology for Determining the Impact of HSN's Statement Is Unreliable

In his report, Kronenberger allegedly assesses the digital impact that HSN's *Statement* had on Plaintiff's online reputation.  Kronenberger, Ex. 2 at pp. 17-21.  However, when the *PageSix* article was published, HSN's Statement comprised just six words of an article that otherwise characterized Plaintiff's E-mail as "condescending and disrespectful," and included several responses from the recipients of the E-mail, including one who responded to Plaintiff's E-mail in derogatory fashion. *Page Six Article,* ECF No. 25-1 at HSNi0000450-451.  The *PageSix* article also discussed a purported "culture clash" between HSN and QVC.  *Id.*

However, Kronenberger took no consideration as to how these other topics and comments—which were not provided by HSN—may have impacted his conclusions as to Plaintiff's online reputation or the public's perception of Plaintiff.  In his report, Kronenberger stated as follows:

> Based on the level of dissemination, reach, *and engagements*[55] surrounding the defamatory statement in the news outlets, search results, and on *social media platforms*, the cost of a digital campaign to correct the defamatory statement would be at least $3,748,015.

---

[55] Kronenberger defined engagements as "likes, shares, or comments."

20

*Id.*, Ex. 2 at p. 5.  When asked whether he evaluated the engagements to the news articles to determine whether they referred to the defamatory statement, Kronenberger responded that he had not.  Kronenberger at 74:4-10.  When asked whether he isolated any of the comments to the news articles to determine whether there were any that were positive towards Plaintiff, Kronenberger responded that he had, indeed, looked through all of them, and they were all negative.[56]  *Id.* at 74:11-15. However, even a layman can determine that this was not the case.  Some of the comments expressed support for Mr. Daniels, stating "I hope you win your lawsuit,"[57] "[HSN and QVC hosts] should close [their] mouths and take some constructive criticism,"[58] and "WOW I AGREE WITH HIM."[59]  Most of the comments were not directed at Plaintiff, and instead were critical of HSN, QVC, or their hosts and guests.[60]  Furthermore, none of the comments specifically referred to HSN's Statement, or Plaintiff's purported lack of authorization for sending the New Direction E-mail. *Giddens,* Ex. 2 at pp. 9, 36-52.

Kronenberger later testified that the engagements/comments to the articles—even when positive towards Plaintiff—could not be evaluated as part of his impact analysis, despite explicitly stating in his report that he reviewed them for this purpose.  *Kronenberger* at 78:3-8; Ex. 2 at p. 21.[61] Ironically, in *Gizmodo*, Kronenberger did conduct an analysis of the comments/engagements.  Quoting from that report:

> As part of our analysis, we also reviewed specific comments made about the Article and other stores it generated.  Overall, the comments *show a negative impact on Miller's reputation, including*

---

[56] Kronenberger admitted that he did not use any particular criteria to determine whether or not an engagement was negative towards Plaintiff.  Kronenberger at 100:14-101:4.

[57] *Id.* at p. 51, engagement 3; *See* Giddens Ex. 2 at pp. 36-52.

[58] *Id.* at p. 48, engagement 12; *See* Giddens Ex. 2 at pp. 36-52.

[59] *Id.* at p. 46, engagement 6; *See* Giddens Ex. 2 at pp. 36-52.

[60] *See, e.g., id.* at pp. 46-50, engagements 1, 2, 3, 6, 7, 8, 9, 12, 17, 22, 23.

[61] *See id.*("Sentiment is categorized per mention by the interpretation of keywords present both in post/article content *and the associated comments/engagements.*")

> *expressions of disgust, hatred, and anger.  A small sample of these comments includes[...].*

Kronenberger, Ex. 13 at p.16.  However, in *Daniels*, Kronenberger testified that reviewing the comments to determine the impact on Plaintiff's reputation was improper. *See* Kronenberger at 78:3-8.  Defendants can only surmise that this was because most of the engagements/comments were either not specifically directed toward Daniels or showed support for his actions. *See* Giddens Ex. 2, pp. 36-52.

Kronenberger used an analytics tool named *Talkwalker* to conduct a "sentiment" analysis and allegedly reached the conclusion that  "sentiment accrued for the *Page Six* article was overwhelmingly negative towards Gordie Daniels."  Kronenberger, Ex. 2 at p. 21.  In support of his use of *Talkwalker* for this purpose, Kronenberger cited *Talkwalker's* blog entitled "Sentiment Analysis Guide."  *Id.*, Ex. 2 at p. 21.[62]  This guide covers the basics of the platform's sentiment analysis tool, which uses natural language processing to "analyze online social conversations and determine deeper context—positive, negative, or neutral." *Id.*  The guide provides clear examples that a particular brand or product can have a negative sentiment score *even when that particular brand or product is not specifically criticized/derided.  Id.*[63]  In the guide's example, a *Talkwalker* analysis was conducted for a three (3) month period for Diet Coke, resulting in a negative sentiment.  *Id.*  However, by analyzing the *Talkwalker* results, the author was able to determine that Diet Coke was merely mentioned in a post criticizing Donald Trump, which resulted in Diet Coke's sentiment score decline. *Id.*  Accordingly, the only way to properly analyze whether a sentiment score is accurate *and* directed toward a particular brand or topic is to manually review

---

[62] Kronenberger provided a hyperlink in his report to the following URL: https://www.talkwalker.com/blog/sentiment-analysis-guide.  *See also* Kronenberger, Ex. 11.

[63] *See id.,* Section entitled "The best sentiment analysis tool."

both the posts/articles *and* the associated engagements—which Kronenberger claims to have done in his report. However, Kronenberger testified that he did not, in fact, review the engagements when rendering his conclusions regarding public sentiment, and even alleged that it would be improper to do so. *Id.* at 153:9-154: 16.[64] Kronenberger's report is also void of any analysis of the articles' engagements/comments. *See generally, id.,* Ex. 2.

Furthermore, the *Talkwalker* sentiment report, even had it been conducted properly, would not assist the trier of fact, as only seven (7) outlets published stories regarding the New Direction E-mail, and only five (5) of those articles generated any reader comments/engagement. Giddens, Ex. 2, pp. 36-52. These engagements can easily be reviewed in a matter of minutes, and the jury can formulate their own opinions as to whether, and to what extent, Plaintiff's reputation was harmed. *Id. Kronenberger's* only source for the *Talkwalker* sentiment analysis noted, "While the results are great, humans interpreting humans is always going to bring the best conclusion […]"[65] *Talkwalker's* sentiment analysis is better used when an automation tool is required to analyze a *large volume of content*, making its application inappropriate here. *Id.* The trier of fact does not need the *Talkwalker* tool to assist in determining whether the articles and associated comments were negative towards Plaintiff.[66] The introduction of this evidence would, at best, be misleading, since *Talkwalker*: (1) cannot parse out whether negative sentiment was directed towards the Plaintiff, HSN and QVC, the on-air guests, or some combination of the four[67]; (2) Kronenberger's

---

[64] Kronenberger went back and forth as to whether he actually reviewed the engagements (comments) to the articles in *Daniels,* but ultimately testified that he reviewed only the articles to conduct his sentiment analysis. *Id.* at 153:9-154: 16; 156:10-157:22.
[65] https://www.talkwalker.com/blog/sentiment-analysis-guide (last visited November 27, 2019 at 5:37 p.m.), Kronenberger, Ex. 11.
[66] *Wanamaker,* 2017 U.S. Dist. LEXIS 217403, at *15 (excluding expert opinions where they involved no "scientific, technical, or other specialized knowledge…beyond the understanding and experience of the average citizen.")(citations omitted)
[67] Kronenberger at 41:3-19.

sentiment conclusion did not include an analysis of the articles' engagements, even though his report alleged otherwise; and (3). Kronenberger was also not familiar with any established rate of error with respect to *Talkwalker* tool.[68]

### D.    Kronenberger's Report Contains Arguments and Legal Conclusions That Plaintiff's Lawyers Can Make in Closing Arguments.

Expert testimony is only admissible if it concerns matters beyond the understanding of the average lay person.[69] . "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.[70]

Here, Kronenberger's cites as the basis of his opinions a series of arguments and claims that have been lifted from Plaintiff's Complaint and Plaintiff's Motion to Compel, while also concluding that HSN's Statement was "defamatory," and repeatedly referring to the Statement throughout his report as the "defamatory statement." *See, e.g.,* Kronenberger Ex. 2 at pp. 5-12. ECF No. 1; ECF No. 23. Accordingly, Kronenberger is merely re-casting the arguments and conclusions of Plaintiff's lawyers in his own words, which is improper, needlessly cumulative, and would only serve to mislead the trier of fact. [71]

### <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court enter an Order excluding the expert testimony, opinions and report of Craig Kronenberger as: (1) they are based on an unreliable an unfounded methodology that has not been subject to peer review, has no established rate of error, and is not accepted within any industry; and (2) they will not assist the

---

[68] Kronenberger at 50:5-19.
[69] *Frazier*, 387 F.3d 1244 at 1262 (citations omitted).
[70] *Id.* at 1262-63 (citing Weinstein's Federal Evidence, § 702.03[2][a]),
[71] *Frazier*, 387 F.3d 1244 at 1262; Fed. R. Evid. 403.

trier of fact, and instead will only serve to confuse and mislead the jury in their determination as to whether and to what extent Plaintiff has suffered reputational damage.

Dated this 4th day of December, 2019.    By:/s/*Dawn Siler-Nixon*
                                         Dawn Siler-Nixon
                                         Florida Bar No. 993360
                                         E-mail:  dsiler-nixon@fordharrison.com
                                         Nicholas S. Andrews
                                         Florida Bar No. 0105699
                                         E-mail: nandrews@fordharrison.com
                                         FORD & HARRISON LLP
                                         101 E. Kennedy Blvd., Suite 900
                                         Tampa, FL  33602
                                         (813) 261-7800  Telephone
                                         (813) 261-7899  Facsimile

                                         Attorneys for Defendants

### CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 3.01(g), counsel certifies that he conferred with Plaintiff's counsel regarding the relief sought herein, and Plaintiff's counsel does not agree to the relief sought in this motion.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 4, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system will which send a notice of electronic filing to all parties of record.

                                         /s/  *Dawn Siler-Nixon*
                                         Dawn Siler-Nixon