*Gordie Daniels*

*v.*

*HSN, Inc., HSNi, LLC & Qurate Retail, Inc.*

## *EXPERT REPORT OF CRAIG KRONENBERGER*

Prepared for

Shane B. Vogt & Kenneth G. Turkel
Bajo Cuva Cohen Turkel, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
and
Cynthia Sass & Amanda Biondolino
601 West Martin Luther King, Jr. Blvd.
Tampa, FL 33603

Submitted By



Stripe Reputation, Inc.
1190 North Highland Ave
Atlanta, GA 31106

**September 16, 2019**



**EXHIBIT 3**

# I.   INTRODUCTION

## A.   The Assignment

Bajo Cuva Cohen Turkel, P.A. and Sass Law Firm (the "Firms") retained Stripe Reputation, Inc. to provide expert opinions concerning the online or digital reputation of Gordie Daniels ("Daniels") in connection with a claim for defamation against HSN, Inc., HSNi, LLC, and Qurate Retail, Inc. (collectively, "Defendants") in the case styled *Gordie Daniels v. HSN, Inc., HSNi, LLC, and Qurate Retail, Inc.; United States District Court, Middle District of Florida, Tampa Division, Case No. 8:18-cv-03088-SCB-JSS* (the "Lawsuit").  Specifically, the Firms asked Stripe to evaluate the volume, reach, and authority of online content and conversation involving Daniels and determine the cost of a digital campaign designed to reach the audience to which the defamatory statement at issue in the Lawsuit was disseminated with the message that the defamatory statement is not true.

This report is submitted as of September 16, 2019 ("Report Date").  The findings herein reflect our analysis of the information provided to us and our independent research as of the Report Date.  We reserve the right to amend, expand, and/or supplement this report should additional information or data be made available.

This report was prepared primarily by Craig Kronenberger, with the assistance of individuals employed by Stripe Reputation acting under his supervision.

## B.   Expert Qualifications

Over the course of my 22-year career, I have developed extensive knowledge, education, experience, and training in the digital media, public relations and online reputation management fields.  I am proficient in using multiple industry-standard technologies that help evaluate the performance and impact of content across social media, news media, email, and search engines.  I currently am engaged with an average of 10 reputation management or crisis assignments per week. Throughout my career, I have extensively studied the impact and damage caused by the dissemination of online content, and developed significant knowledge, experience, and expertise in understanding how information disseminates online and its long-term impact on a brand or individual's reputation.

I am currently the owner and CEO of Stripe Reputation, a leading global consultancy firm in the field of reputation management and crisis.  Stripe Reputation provides services in a wide array of digital marketing and reputation management strategies

and services, such as digital measurement and analytics, paid media management, crisis and issues management, new media analysis and monitoring, and search engine optimization, among others.   My reputation management work has included companies such as Coca-Cola, General Electric and Hyundai, as well as individuals such as Paul Allen and the Koch family.

Prior to Stripe Reputation, I was Global Managing Director of Strategic Growth at Edelman, the world's largest public relations firm, with more than 5,000 employees in 65 cities and affiliates in more than 35 cities.  At Edelman, I was responsible for leading global teams in the areas of Search Engine Management, Digital Crisis and Risk, Paid Media, Research, and Insights.

Prior to Edelman I held managing positions with iCrossing and Digitas-Modem Media, where I led search engine management strategy for brands such as Delta Airlines, Home Depot, Sony, Coca-Cola, CNN and Marriott.  At Digitas-Modem Media, I was named Global Practice Lead for Search Marketing, where I was instrumental in building search practices in Europe and Asia.  My digital marketing experience also includes search marketing strategy and global governance for Hewlett Packard, Coca-Cola, Unilever, Kraft and General Motors.

### C.    Expert Testimony

During the previous four years, I have testified as an expert at trial or by deposition in the following cases:

- *ELIAS KIFLE VS ETHIOPIAN REVIEW, INC.*
  *Court: United States District Court, Northern District of Georgia*
  *Case No.:  1:12-cv-02697*
  *Nature of Suit: Assault, Libel, and Slander*

- *JASON MILLER VS. GIZMODO MEDIA, KATHERINE KRUEGER, WILL MENAKER*
  *Court:  United States District Court, Southern District of Florida*
  *Case No.:  1:18-cv-24227-CMA*
  *Nature of Suit: Defamation*

- *OPDEWEEGH VS. CAUFF*
  *Court:  Eleventh Judicial Circuit, Miami-Dade County, Florida*
  *Case No.:  [Sealed]*
  *Nature of Suit:  Defamation*

3

**D.     Compensation**

Stripe was retained on July 15, 2019, to assess Daniels' online reputation and provide a written expert report and testimony.  Stripe agreed to provide reputation analysis for a fixed fee of $9,000.00, which $3,000 has been paid.  For all other work performed on this assignment, Stripe's services are billed at the rateof$450/HR.

4

## II.   STATEMENT OF OPINIONS

I have reached the following opinions on this assignment:

1.     The defamatory statement published about Daniels through a May 22, 2018 *Page Six* article titled "HSN stars livid over exec's 'condescending and disrespectful' email[1]" was heavily circulated online.  The *Page Six* article had a potential reach of at least 9.9 million, drove a spike in engagements[2] to at least 48, and led to additional coverage by other media outlets that linked to the *Page Six* article, which resulted in a total of 126 engagements.  Prior the *Page Six* story, Daniels was not the singular focus of any news coverage and had received only minimal attention across digital channels.  After the Defendants failed to correct and apologize for the defamatory statement, resulting in the Lawsuit, additional news coverage followed that generated 131 engagements, with a potential reach of 2.3 million.

2.     Based on the level of dissemination, reach, and engagement surrounding the defamatory statement in news outlets, search results, and on social media platforms, the costs of a digital campaign to correct the defamatory statement would be at least **$3,748,015.**

---

[1] https://pagesix.com/2018/05/22/hsn-stars-livid-over-execs-condescending-and-disrespectful-email/

[2] "Engagements" are instances of people commenting on, sharing or liking an article or social media post.

## III.   Basis of Opinions

### A.   Overview of the Parties[*]

In May 2018, Daniels was working as the Supervisor of On-Air Development for the Home Shopping Network. [Complaint ¶ 26] He was considered a "highly successful," "strong," "solid," and "fully proficient" employee who recruited, trained, and managed celebrities and professionals who sold products on the Home Shopping Network. [Complaint ¶¶ 17-34; HSNi 0000016, HSNi00000007]

Defendants own and operate QVC and the Home Shopping Network.  QVC purchased HSN in July of 2017, a $2.1B deal, in an effort to merge TV presence with the effort of creating an online experience.[33]   HSN broadcasts to 95 million households in the U.S., and QVC to 100 million.[4]  Currently,  their sales figures amount to approximately $1.37B YTD, and are projected to rank only behind Amazon and Walmart in the eCommerce space in the coming years.[5]

### B.   Overview of the Lawsuit[*]

Shoppers claims "QVC and HSN each have their own personality."[6]  One viewer considered QVC to be a bigger corporation and a more professional network, while HSN used to look like it was 'broadcasting out of somebody's living room or something.'"

---

[*] The Overview of the Parties and Lawsuit is provided for background purposes and derives from the Complaint or other documents cited herein.

[3] https://www.racked.com/2017/12/13/16721530/hsn-qvc-merger-tv-shopping-ecommerce; https://variety.com/2018/biz/news/liberty-interactive-qurate-retail-group-qvc-hsn-1202714220/

[4] Id.

[5] https://www.marketplace.org/2017/07/06/it-s-not-just-tv-anymore-qvc-merges-rival-hsn-create-mega-online-presence/

[6] https://www.post-gazette.com/business/money/2017/07/24/QVC-HSN-merger-shoppers/stories/201707180002

Following Qurate's acquisition of HSN, it began to implement directives and training to bring HSN in line with QVC's on-air standards. [Complaint ¶ 67]  As part of this change in direction, Daniels was tasked with re-training HSN hosts and talent through written directives and training sessions known as "summits".   [Complaint ¶¶ 69-70]

Daniels' team, including his supervisor Tim Bruno, Senior Vice-President David Caputo, and others, met regularly about, discussed, and agreed upon the plan to implement QVC's directives for the Home Shopping Network.  [Complaint ¶ 69]  Caputo and Bruno also agreed, and Bruno directed, that in addition to the training at summits, Daniels should outline Qurate's new direction in an email to the talent addressing problems Qurate wanted resolved, so changes could begin immediately.  [*Id.*]

Consistent with this agreed-upon plan, and at the direction of his supervisors, Daniels drafted correspondence to communicate Qurate's directives. [Complaint ¶¶ 69-70]  In April 2018, Daniels first provided a draft email to Bruno and Elyse Zaccaro (HSN Vice President of Production) for their comments and approval.  [HSN 000154-56; Complaint ¶ 71]  In response, Bruno expressed concern talent may not read the entire email and suggested shortening it and using bullet points; but never expressed concern to Daniels over the substance of the draft. [Complaint ¶ 72; HSN 000154]  In response, Daniels proposed a "do's and don'ts" list; an idea Bruno liked and agreed with.  [*Id.* ¶ 73]

A couple of weeks later, on May 16, 2018, Bruno attended a meeting with HSN President, Mike Fitzharris, and others, during which Fitzharris "chewed them a new one" over HSN's on-air performance.   [Complaint ¶¶ 76-77]   Bruno immediately followed up with Daniels about the urgent need to implement the plan

to re-train HSN's talent and hosts.  [Complaint ¶¶ 77-79]  Daniels explained to Bruno that he shortened his draft email, put it in bullet point format, and made it into the "do's and don'ts list" he previously discussed with Bruno that Bruno agreed was a good idea.  [Complaint ¶ 77]  Bruno then told Daniels to send the email. [Complaint ¶ 79]

On the morning of May 17, 2018, Daniels did what he was told and sent the email under the subject line "HSN Guest Direction 2018 – Please Read" (the "New Direction Email").  [HSNi0000728; HSNi0000583-854]  Within minutes, one of the recipients forwarded the New Direction Email to Bruno, stating he was looking forward to the changes Daniels outlined and could not wait to see the new HSN become better and more productive; but to please not distribute his email because he is being copied on everyone's reply.  [HSN 000819]  Bruno responded by apologizing, but thanking him for his support.  [*Id.*]  Numerous hosts, guests, and employees sent Daniels messages expressing gratitude for and approving the content of the New Direction Email.  [Complaint ¶¶ 82-84]  Daniels also forwarded a copy of the New Direction Email to Bruno under the subject "Guest Messaging that Went Out", which Bruno reviewed and replied, "Looks good."  [Complaint ¶¶ 80-81; HSN 000281]

A few of the New Direction Email recipients were upset, one of whom posted the email online.  [Complaint ¶ 85; HSN 000307]   Defendants' HR Department commenced an investigation, and their public relations team, led by Jill Kermes, started planning a media strategy to deal with the situation.  [HSN 000187, 287, 291-92]  Kermes drafted an apology email for HSN President, Fitzharris, and started putting together a media statement in case the New Direction Email "leaked." [HSN 000287-300]  Internally, Defendants' management and executives reviewed

the draft apology email, which Fitzharris wanted to be "more aggressive" than the apology email Bruno suggested. [*Id*.] Fitzharris eventually sent the apology email, which seemed to address the concerns of the few talent and vendors who complained. [HSN 000175] However, after being posted on LinkedIn, the New Direction Email also was being discussed on QVC online forums. [HSN 000303-309]

As part of their internal investigation, Defendants interviewed Daniels and Bruno, reviewed emails related to the New Direction Email, and began relaying information to Defendants' management and executives about the situation. [HSN 000187-91] Defendants' management and executives expressed doubt about Bruno's version of events. For example, they doubted Bruno's claim that he didn't approve the New Direction Email, particularly given his email telling Daniels the New Direction Email "looks good." [HSN 000169] They also believed Bruno was aware of what was in Daniels' New Direction Email, and were "perplexed" by Bruno's claim that he had only skimmed the New Direction Email (especially since it was bold, underline, red font, etc.) and was claiming not to have read it but still responded in the positive. [HSN 000169] Fitzharris himself "struggl[ed] to understand" Bruno's version of events when Bruno said "looks good" after receiving a copy of the New Direction Email. [HSN 000170]

On May 22, 2018, the *New York Post* reached out to HSN for comment on a story it was writing about the New Direction Email, and specifically mentioned Daniels by name in this request. [HSN 000369-70] Kermes quickly responded by telling the *New York Post* reporter Daniels' New Direction Email "was not authorized, reviewed or approved for distribution." [HSN 000371] In emails between the *New York Post* reporter and Kermes, the reporter revealed the context for the story was the "culture clash" between HSN and QVC since QVC's acquisition,

specifically mentioned that "sources say QVC appears to be gradually taking over HSN 'memo by memo,'" and asked for clarification of whether the "Dos and Don'ts" were QVC rules.  [HSN 000386-87]  In response, Kermes stated "we disagree with the premise of your story, and as you note the email did come from an HSN employee [Daniels]."  [HSN 000396]  Once the *New York Post/Page Six* article was published, Fitzharris seemed surprised it "call[ed] out Gordie by name," but told Kermes he planned on using the article as an example of "how the actions of everyone can cause brand damage."  [HSN 000411]

### C.     The *Page Six* Article

Page Six is a content creation pillar[7] of the *New York Post*.  Its May 22, 2018 Article specifically identified Daniels and included Defendants' statement that his New Direction Email "was not authorized, reviewed or approved for distribution." The *Page Six* article drove a significant spike in engagements to 48. Prior to the *Page Six* story, Gordie Daniels was not the singular focus of any news coverage and had received minimal coverage and attention across digital channels.

The *Page Six* article had a potential reach of 9.9M, according to data from *TalkWalker*, a leading social media and analytics tool. The *Page Six* coverage was further picked-up by seven outlets resulting in a total of 126 engagements.

### D.     Lawsuit Coverage

The Lawsuit resulted in the publication of a December 5, 2018 *Tampa Bay Times* article, "*Lawsuit spells out tumultuous time during HSN and QVC merger*." This article generated 131 engagements, with a potential reach of 2.3M.  A quote

---

[7] *Page Six* is a branch of the NewYork Post that delivers news covering celebrities and pop culture. They have large Facebook (366K+ followers) and Twitter (243K followers) audiences. For information beyond what is already contained in this document, see 'PageSix Domain Analysis' overview, sourced from AHrefs.

from the *Tampa Bay Times* article directly references Daniels' New Direction Email and the defamatory statement:

> The now infamous email was first obtained by Page Six, the New York Post celebrity gossip website, in late May of 2018. The Page Six story quoted a company spokesperson who said the email "was not authorized, reviewed or approved for distribution." It also published quotes from anonymous network celebrities who responded to the email "in shock" and described it as "condescending.

### E.   Daniels' Online Reputation

I reviewed Daniels' digital reputation during the 17 (starting January 1st, 2017) months prior to, as well as following, the *Page Six* Article.   The tasks performed to conduct this analysis include:

- Utilization of the *TalkWalker* platform to gather public mentions of Gordie Daniels and the email controversy related to QVC/HSN,

- Evaluation of Google Search Trends and Results for plaintiff's name, 'Gordie Daniels',

- Analysis of the URLs for various articles in which the both New Direction Email is mentioned and Gordie Daniels' name is implicated via SEO tools, specifically *Ahrefs* and *Moz*,

- Manual scraping of social media platforms to confirm data gathered on mentions and engagement of Gordie  Daniels in reference to the New Direction Email, primarily relegated to Facebook and Twitter, and

- Calculated estimated cost of digital campaign to correct defamatory statement using industry leading insights from authorities such as: *Meltwater*, *Nielsen*, and *Wordstream*.

Before the *Page Six* article, there were 17 mentions and 100 engagements across news outlets and social media platforms related to "Gordie Daniels," all of

which generated either positive or neutral sentiment, according to *TalkWalker's* sentiment tool and Stripe Reputation's analysis. This minimal traction resulted from a November 2017 *MarketScreener* article that mentioned Daniels amongst other HSN talent and executives. Recent news in April 2019[8] covering Daniels' new employment only generated two mentions and three engagements.

By comparison, the digital conversation about Daniels driven by the *Page Six* Article generated three times more mentions (7 mentions) and more than 40 times more engagement (126 engagements).

Analysis of Google search trends for the time period from April 1, 2018 to August 1, 2019 connected to search terms for "Gordie Daniels", which is the search term utilized to create the graphic below*, shows a spike in search interest related to Daniels temporally associated with the defamatory statement and *Page Six* Article. At the same time, "Gordie Daniels" saw an increase in search queries for his name. In December 2018, following the publication of *Tampa Bay Times* article, "Gordie Daniels" again saw correlated spikes in search inquiries. Also, Google search results for "Gordie Daniels" returned three negative results on the first page of search results in an August 2019 search.

---

[8] 1) *HSN exec slaps QVC in 'disrespectful' email* (https://123ru.net/english/149539914/);
2) *HSN stars livid over exec's 'condescending and disrespectful' email*
(https://123ru.net/english/149394526/); 3) *Tensions flare after QVC-HSN merge; stars 'in shock' over insulting, condescending memo* (https://www.bizpacreview.com/2018/05/23/tensions-flare-after-qvc-hsn-merge-stars-in-shock-over-insulting-condescending-memo-637400); 4) *Tension between HSN and QVC comes to a head over 'condescending' email: Report* (https://www.aol.com/article/entertainment/2018/05/23/tension-between-hsn-and-qvc-comes-to-a-head-over-condescending-email-report/23441652/); 5) *HSN stars livid over exec's 'condescending and disrespectful' email* (https://gossipbucket.com/page-six/1324019/hsn-stars-livid-over-execs-condescending-and-disrespectful-email/); 6) *Direct link to video content only from Page Six, entitled: HSN exec called out for sending 'disrespectful' email* (https://pagesix.com/tv/hsn-exec-slaps-qvc-in-disrespectful-email/).

**Search Trends for "Gordie Daniels"\***



### F.    Materials Considered

In connection with forming my opinions in this case, I considered the following facts and data:

(1)    Court Filings

- Complaint
- Answer and Affirmative Defenses
- Motion to Compel
- Response to Motion to Compel

(2)    Documents

- All HSNi Docs cited above are hosted here: https://www.dropbox.com/sh/4ha2ceocbjp5guh/AAAC O6IiRIfDZ5thUKlQOPnYa?dl=0

(3)    *TalkWalker*

- *TalkWalker*, one of the world's leading social data intelligence companies, uses cutting edge technology to provide actionable social media insights.
- These are the terms utilized to acquire data within *TalkWalker*:

13

https://docs.google.com/document/d/13zLFrcS22Ru4M
pZ6lZVeOq3HIRUcurayW_X-zwtOW2Y/edit?usp=sharing

(4)   *LinkedIn*

- *LinkedIn* is an American business and employment-oriented service that operates via websites and mobile apps for show-casing users their professional identity

- There was no specific data reviewed on this platform due to the instance of authors' deleting posts related to the issue.

(5)   Google Trends

- Google Trends is a search trends feature that shows how frequently a given search term is entered into Google's search engine relative to the site's total search volume over a given period of time.

- 'Gordie Daniels' was the search term utilized when examining results from Google Trends

(6)   *Ahrefs*

- *Ahrefs* is trusted by SEO and marketing professionals worldwide as the ultimate toolset for SEO, powered by industry-leading data.

- Each URL mention here was entered into Ahref's domain evaluation tool:

  https://drive.google.com/file/d/1PwbEISDwAT8bvo_by6
  PtFkYgcankmHdp/view?usp=sharing

(7) *Moz*

- SEO tool that includes keyword research, link building, site audits, and page optimization insights in order to help companies to have a better view of the position they have on search engines and how to improve their ranking

- Each URL mention here was entered into *Moz's* domain evaluation tool:
  https://drive.google.com/file/d/1PwbEISDwAT8bvo_by6 PtFkYgcankmHdp/view?usp=sharing

(8) *Meltwater*

- *Meltwater* develops and markets media monitoring and business intelligence software.

- *Meltwater* 'Advertising Value Equivalency' formula:
  https://support.meltwater.com/hc/en- us/articles/234959628-Advertising-Value-Equivalency- AVE-

## G. Methodology

We researched all mentions of Gordie Daniels across all digital media in the months leading up to and following the publication of the article using **TalkWalker**, a data collection tool for news media and social media. We used the following search terms contained in the following document: Gordie Daniels taxonomy export.docx.

We compiled every mention of Gordie Daniels into a dataset produced with this report. Our dataset included public mentions on Facebook, Twitter, news

articles, and blogs. From the dataset we manually we went through each mention to ensure the it was related to the New Direction Email and to evaluate its content.

We also traced the content back to the *Page Six* article published on May 22, 2018. Chronologically speaking, the post of the *Homeshoppingista* blog (published May 21st, as shown in the timeline as a part of the Digital Audit), preceded the *Page Six* article. However, the story did not achieve widespread awareness or circulation until it was covered by *Page Six*.  Thus, we identify *Page Six* as the primary source for disseminating content related to Gordie's email controversy.

Our analysis also included looking at how social media, articles and posts linked backed to other material.  We also looked at how the content impacted search results using several tools.  *Ahrefs*, a digital toolset for competitor research, was used for gathering backlinks for each link associated with this story to determine how many times each link had been cited. *Moz*, an inbound marketing and analytics toolkit, was our source for establishing page and domain authority for each URL, allowing us to examine how well the story ranked in search results.  An analysis comparing the authority of sites linked to the *Page Six* article and industry averages allowed us to examine the sites linked ability to rise in Google rankings, should the life cycle of the story extend.

Our audit of digital mentions provided the basis for precise calculations of how many people were reached by the *Page Six* article, and how many had engaged with the *Page Six* article online.  Finally, we evaluated the cost of correcting Defendants' defamatory statement in the *Page Six* Article based on all the data we accumulated. The damages we calculated are the minimum estimate of financial value for media coverage reasonably necessary to correct the defamatory statement since we cannot see any mentions that were deleted or not public.

16

## IV.    Understanding Digital Reputation

According to the 2019 Edelman Trust Barometer, traditional media and search engines are tied for the most trusted sources of information (65 percent). Trust in online news media is also fairly high at 55 percent. With these channels being the top three most trusted sources of information, one can begin to appreciate the impact of digital media and search results on reputation.



The Edelman Trust Barometer is a trust and credibility survey; the 19th addition of the annual report was published in 2019. Research is conducted by Edelman Intelligence, a global insight and analytics consultancy. The findings of the Edelman Trust Barometer are presented each year at the World Economic Forum in Davos, Switzerland. The study has been quoted in many top-tier media outlets including The New York Times, The Wall Street Journal, Forbes and  Fast Company, among many others.

## V.    Impact of the Defamatory Statement

The below graph represents all mentions related to "Gordie Daniels" (Additional Taxonomy/Boolean search logic: 'Gordie Daniels taxonomy

17

export.docx'). from the beginning of 2018 through February of 2019. Utilizing the search terms and logic input to filter through vast stores of information publicly available on the internet, we provide the results distilled by the *TalkWalker* information platform below. Results show that conversation related to Daniels has historically been low but spiked in May 2018.  All mentions in 2018 of Gordie Daniels in digital channels are related to the New Direction Email, with a majority deriving from the *Page Six* story.



We also evaluated search results for "Gordie Daniels."  An August 2019 Google search for "Gordie Daniels" lists the *Tampa Bay Times* article from December 3rd as the second result on the first page, and the *Page Six* article and a republication on AOL in the fifth and sixth positions respectively.



## A.   Social Media Traction

*Page Six* has a large Facebook presence with more than 360K followers. On May 22 and again on May 23, *Page Six* shared the story with its Facebook community, generating 95 engagements (86 shares and seven likes). Due to Facebook privacy rules, we are unable to assess the content's traction on private Facebook pages. That is to say, while we aim to track as much information revolving around the issue as possible, we can only do so insofar as the conversation pertains

to the public sphere; conversations over private channels, in closed groups, or stemming from deleted conversations are all excluded. The result is that the total effect of any conversation is larger than what is represented by publicly available data.

Additionally, *Page Six* shared the article twice on Twitter to its community of 240.4K followers, resulting in 17 engagements on the tweets.



## B.  Analysis of Sentiment

'Sentiment' as defined in *TalkWalker* is essentially the judgment or outlook readers appear to have on a given mention based on the mention's content and

engagement.  Net sentiment is an evaluation of the relative share of negative or positive content - a negative number indicates a negative net sentiment, and a positive number indicates positive net sentiment overall. Sentiment is categorized per mention by the interpretation of keywords present both in post/article content and the associated comments/engagements. The interpretation is informed twofold: (1) by *TalkWalker's* algorithm; and (2) by our own manual review - each and every mention was reviewed manually by Stripe's Analyst team. This manual process also helps to refine and improve *TalkWalker's* algorithm. Additional information is available here, via *TalkWalker's* sentiment analysis guide: https://www.talkwalker.com/blog/sentiment-analysis-guide.

Sentiment accrued from the *Page Six* article was overwhelmingly negative towards Gordie Daniels, with no news searches ranking positive. The only positive news coverage for Gordie Daniels since the beginning of 2018 stems from the April 2019 announcement of his new role at Y102/WHHY-FM as a radio co-host.



## VI.   COST OF CAMPAIGN TO CORRECT DEFAMATORY STATEMENT

### A.   Advertising Value Equivalency

To calculate the cost of reaching the potential audience that may have been informed by the defamatory statement, we calculated Advertising Value Equivalency (AVE) to the subsequent media coverage.  Our formula is based on the calculation used by **_Meltwater_**, a media and competitive intelligence tool used to measure digital media influence.  AVE provides an industry benchmark to help PR professionals understand the value of earned media.  It measures the cost of media article if it were an advertisement online.  This allows us to estimate how much it would cost to reach the same potential audience with a correction about Gordie Daniels and allow us to inform audiences that may have seen the defamatory statement that it is untrue.  We altered the formula to more accurately represent the actual number of people reached.  Instead of factoring in average monthly reach per outlet, we factored in the actual number of people reached based on the time frame observed. This is specific to quantifying the value of media coverage, so we excluded the number of people reached by social media, blogs, and forums, and only included the number of people reached by news outlets.  While we are using the actual reach, we still incorporated the standard error (.025) to account for the statistic incorporated into the original formula; that is, 2.5% of any given audience will view a particular article on average.  We used a $0.37 value per visit based on the advertising value of the amount of space an advertisement takes up on a given web page. (Meltwater Formula).

> **Original _Meltwater_ AVE Formula:**
>
> X(estimated average reach/unique monthly visitor figure) x .025 x .37

**Our Revised AVE Formula:**

X(actual reach/unique visitor figure for distinct month
span) x .025 x .37)

The 0.25 factored into the formula assumes that 2.5% of any given audience
will view a particular article on average, and $0.37 is the dollar value per
visitor. Based upon this formula [**78,569,212 x .025 x .37**] = 726,765, hence we
estimate the minimum cost of a campaign to address news coverage of the
defamatory statement alone to be $726,765.

**B.    Frequency of Advertisement to Ensure a Perception Change**

In advertising, the effective frequency is the number of times a person must
be exposed to an advertisement message before a response is made and
consideration takes place. To ensure we reach and sufficiently expose the audience
to content correcting the defamatory statement, we need to increase the
frequency of the advertising by five-to-nine times. This improves the likelihood that
someone sees, engages with, or becomes aware of the corrective content. For
purposes of this assignment, we used the lowest frequency of 5X.

*SOURCES:*

*Source – Nielsen, How frequency of exposure can maximize the resonance of your
digital campaigns.*

*https://www.nielsen.com/au/en/insights/news/2017/how-frequency-of-exposure-
can-maximise-the-resonance-of-your-digital-campaigns.html*

**C.    Social Media Engagement Cost Calculation**

We identified several mentions on social media and 259 engagement across
those social channels. In order to determine the reputational impact, we looked at

the average cost-per-action (CPA) of $18.68 and applied it to the total engagements across all social posts on social media.[9]

*The total social media engagement times the average CPA is $4.838.12.*

APPROACH

- Used *TalkWalker* to capture mentions from the launch of the *Page Six* (May 22, 2018) article to Jan 1, 2019.

- Calculated the total engagements from social sources including Facebook, Instagram, YouTube, LinkedIn, Pinterest, Google+, Twitter, Forums, Blogs.

- Applied to total to industry benchmark of $18.68.

SOURCES

- *Source: TalkWalker - Leading monitoring and listening tool for social media, news and forums.* https://app.talkwalker.com

- *Source: Industry - Wordstream 2018 $18.68 across multiple industries is the average CPA = Cost per action or cost per acquisition.*

### D.    Professional Fees

To implement a digital campaign designed to reach the audience exposed to the defamatory statement, we must do the following:

1)    Ask publishers or individuals to take down defamatory content that was published or shared;

2)    Develop new content correcting the false statement;

3)    Develop strategies for Daniels to rebuild his personal and professional reputation; and

---

[9] Note: this number accounts only for public engagements, whereas total private engagements would serve to increase summary calculation and cannot account for deleted posts on LinkedIn related to the issue.

4)   Implement and manage advertising campaigns in channels most likely to reach the audiences exposed to the *Page Six* Article and other related content.

We estimate the amount reasonably necessary to complete these tasks would involve 12 months of labor from an agency specializing in reputation management, billed at $7,500 per month for professional fees, thus $90,000 total, which would include the development of new content and campaigns, ongoing management of content in order to build the ranking around it, working with legal support to gather take-down notices, and engaging publishers to remove content. Professional Fees would also cover ongoing reporting and monitoring of progress and running a paid media campaign.

### E.   Total Cost Calculations

Based on the AVE and social media engagement cost calculations and professional fees ($726,765 + $4,838) X 5) + $90,000), the total cost of a digital campaign designed to reach the audience to which the defamatory statement was disseminated with a corrective message is at least **$3,748,015**.


Dated: September 16, 2019.

Craig Kronenberger
Stripe Reputation, Inc.