# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GORDIE DANIELS,

        Plaintiff,

        v.

Case No. 8:18-cv-03088-SCB-JSS

HSN, INC. HSNi, LLC, and QURATE
RETAIL, INC. d/b/a QURATE RETAIL
GROUP,

        Defendants.

_____

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendants HSNi, LLC ("HSNi"), HSN, Inc. ("HSN, Inc."), and Qurate Retail, Inc. ("QRI") (collectively, "Defendants"), by and through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 56(c), hereby submit their Motion for Summary Judgment and Incorporated Memorandum of Law with Respect to the Complaint of Plaintiff Gordie Daniels ("Motion"), and in support thereof, state as follows:

## FACTUAL BACKGROUND

### A.    Factual Background to Plaintiff's Overtime Claims

HSNi is a retailer that markets its vendors' products through multiple platforms, including the HSN television network.[1] On June 6, 2016, Plaintiff was hired as an on-air casting and training specialist for HSNi.[2] As part of his employment with HSNi, Plaintiff was provided access to its corporate policies and "Orienteering Guide," the latter of which functioned as HSNi's employee handbook.[3] These policies were maintained on the company's intranet and were accessible to all

---

[1] Fitzharris at 11:25-12:4. Deposition transcripts will be cited as follows: [Deponent Surname] at [Page:Line].
[2] Daniels at 27:9-28:21.
[3] Daniels, Ex. 2.  Deposition Exhibits will be cited with respect to the depositions during which they were introduced, i.e., [Deponent Surname], Ex. [#].

employees.[4] HSNi also maintained explicit timekeeping and overtime policies on the intranet, the former of which included a specific directive—"Please do not work off the clock…allow yourself the full compensation you have earned!"[5]  At all times during his employment with HSN, Plaintiff reported to VP of Talent Timothy Bruno.[6] Bruno never provided Plaintiff with a fixed schedule, and although Plaintiff generally worked from 8 a.m. to 4 p.m., he was free to come and go as he pleased, provided that he completed his work.[7]

In 2017, Plaintiff was promoted to supervisor of on-air development.[8] After his promotion, Plaintiff began supervising Casting Specialist John Camacho, and began handling guest trainings and tape reviews.[9] On March 17, 2018, at Plaintiff's request, Plaintiff was promoted to the position of "Manager of On-Air Talent,"[10] was re-classified as a non-exempt for purposes of the Fair Labor Standards Act ("FLSA"), and began receiving a $63,000 annual salary.[11]

HSNi also required Plaintiff, as a supervisory employee, to attend a "Leadership and the Law" training covering HSN's legal obligations under various employment laws, including the FLSA.[12]  Specifically, participants reviewed a case scenario that involved the prohibition of off-the-clock work.[13] While Plaintiff was at work, his hours were recorded by swiping in/out using an identification badge, logging hours worked into HSNi's Kronos timekeeping system.[14] Plaintiff had access to Kronos via his HSNi desktop computer, allowing him to track his weekly hours

---

[4] Carter at 39:14-24; 54:19-55:12; Owens at 18:4-12; Bruno 39:2-8.
[5] Daniels at 41:12-23, Exs. 3, 4; Bruno at 69:13-70:1; 72:23-72:7.
[6] *Id.*
[7] *Id.* at 28:22-29:14.
[8] *Id.* at 29:15-31:4.
[9] *Id.*
[10] Plaintiff's actual position title as of March 18, 2018 was Talent Training & Recruitment Manager. Daniels at 34:24-35:5.
[11] Daniels at 31:23-32:3; 35:12-18, Ex. 6 (Plaintiff's pay stubs).
[12] Bruno at 88, Ex. 54; Bruno at 83, Ex. 53 (Plaintiff informing Bruno that he attended the course); Carter Decl. ¶ 3, Ex. B; Carter at 40:8-41:11, Ex. 71.
[13] Owens at 129, Ex. 132; Owens at 32, Case Scenario # 7, Ex. 133; Bruno Ex. 54.
[14] Daniels at 41:12-42:8, Ex. 3; Bruno 70:17-71:22.

worked.[15]   Plaintiff could also report time worked to Bruno's administrative assistant, Denise Miller, who could input Plaintiff's time into Kronos.[16] If Plaintiff missed a punch or there was an error with his timesheet, Miller could correct Plaintiff's hours in Kronos.[17]

Plaintiff was able to work from home using his personal computer and phone, through access to his HSNi e-mail account.[18] Plaintiff did not have remote access to his HSNi desktop, so he would send documents to his HSN e-mail account to access from home.[19] Plaintiff did not copy anyone at HSN on those emails.[20] While working from home or travelling, Plaintiff could record his time and send the hours to Miller; which Plaintiff did on many occasions.[21]

HSNi's policies require employees to seek authorization prior to working overtime. Yet, Bruno was flexible with Plaintiff; allowing him to work overtime as needed.[22] Plaintiff admittedly received compensation for approximately 250 hours of overtime from June, 2016 to March 17, 2018 (promotion to the exempt role), which Bruno approved.[23]

Plaintiff admitted working from home for various reasons, including illness or when his dogs had veterinarian appointments.[24] Plaintiff would report his hours worked from home to Miller via e-mail,[25] generally without copying Bruno on the e-mails.[26] Plaintiff was not required to submit

---

[15] Daniels at 54:23-55:12.
[16] *Id.* at 51:10-52:12, 57:8-23.
[17] *Id.* at 57:1-20.
[18] Daniels at 43:19-45:19.
[19] *Id.*
[20] *Id.*
[21] *Id.* at 48:14-19; 51:8-52:12; 63:17-68:20, Ex. 7 (composite of e-mails corroborating that plaintiff worked from home (excluding HSNi00007420)),68:9-72:12 Ex. 8 (composite of e-mails where plaintiff informed Miller he would be working from home)
[22] *Id.* at 46:21-47:11.
[23] *Id.* at 53:2-20, Exs. 5, 6; 61:8-15.
[24] *Id.* at 65:13-66:19; 68:9-72:12 Ex. 8;
[25] *Id.* at 48:14-19; 68:9-72:12 Ex. 8 (composite of e-mails where plaintiff informed Miller he would be working from home)
[26] *Id.* at 69:22-70:5, 71:15-72:12 (the transcript incorrectly references a Mr. "Brown" instead of "Bruno" at line 72:3)

any documentation to support his hours worked from home.[27] Plaintiff testified that he would only report his hours worked up to 40 hours a week to Miller, but when questioned as to whether he ever reported overtime to Miller, he said he was not "100% sure."[28]  Indeed, Plaintiff never reviewed Kronos to determine whether he worked 40 hours in a given week, and would simply report his actual time worked from home to Miller without checking.[29]  Plaintiff *never* matched up his hours worked on Kronos to the time he reported or the time for which he was compensated.[30]

Although Plaintiff could not recall when, he claims Bruno and Miller told him to "watch [his] hours," and "make sure you stay under 40 hours" during verbal conversations.[31]  When asked whether Bruno ever told him not to work overtime, Plaintiff responded that Bruno said "40 hours, don't go over 40 hours, don't go into overtime."[32] When asked whether Plaintiff interpreted that to mean he could still work overtime but not report the hours worked, Plaintiff responded: "**No**. I interpreted that as I needed to get as much done within the 40 hours that I could and everything outside of that that still needed to get done, I needed to get done because I worked in a 24/7 department."[33] Despite this alleged directive, Plaintiff could not recall checking his hours on Kronos to determine whether or not he was approaching overtime in *any* week.[34] Plaintiff was also never disciplined for working overtime.[35]

Despite the 250 hours of paid overtime, Plaintiff now alleges that every day, 365 days a year, he would review his e-mail, watch videos of past HSN airings, and work on "guest strategy"

---

[27] *Id.* at 70:11-71:14.
[28] *Id.* at 51:13-52:12.
[29] *Id.* at 51:13-52:12.
[30] *Id.* at 58:15-58:22.
[31] *Id.* at 48:20-49:22.
[32] *Id.* at 62:8-62:21.
[33] *Id.*
[34] *Id.* at 48:20-49:22.
[35] *Id.* at 62:22-25; Bruno 74:6-74:20.

from home for 1 ½ to 2 hours that he wasn't paid for.[36] Plaintiff alleges that he would watch past airings on HSN's YouTube page.[37] Plaintiff admitted that Bruno never gave him a directive to review these videos at home or after working hours.[38] For those e-mails that Plaintiff allegedly sent after hours to Bruno, Bruno never gave explicit instructions that Plaintiff respond after hours or at home[39] and, had Plaintiff felt compelled to respond, HSN's explicitly conveyed expectation was that Plaintiff record his hours in the same manner he had done while working from home on other occasions.[40] Plaintiff alleged that his alleged verbal conversations with Human Resources Director Normand Carter about "responding to e-mails at home," was sufficient notice that he was working "off-the-clock"—even with Plaintiff's 250 hours of paid overtime and flexible work schedule.[41] Plaintiff admitted that he never complained in writing, about working off-the-clock until **after** his termination in a May 27, 2018, e-mail to Senior Vice President of Broadcast Strategy Dave Caputo.[42] Caputo forwarded the e-mail to Owens, and Carter attempted to contact Plaintiff to discuss his claims.[43] *Id.* Plaintiff responded that he had already retained an attorney.[44]

### B.    Factual Background to Plaintiff's Defamation Claims

In early 2018, HSN, Inc. and HSNi were acquired by QRI.[45]  Following the acquisition, there was an objective among the brands—in particular HSN and QVC—to borrow and adopt the best practices of each company with respect to on-air guest and host performances.[46] In particular,

---

[36] Daniels at 72:13-73:18; 76:5-18; *see also* Pl.'s Resp. to Court's Interrogs., Daniels Ex. 12.
[37] *Id.*
[38] *Id.* at 75:15-76:4
[39] *Id.* at 80-97, Ex. 9 (composite of sample e-mails after 5:00 p.m. between Plaintiff and Bruno).
[40] Bruno at 113:12-19; Carter 73:4-13.
[41] 98:12-102:15, Ex. 11.  Plaintiff then changed his testimony and said that he specifically informed Carter that he was working off-the-clock, but could not recall when that conversation occurred.  *Id.* at 102:23-103:10.
[42] Daniels at 103:11-105:2, Ex. 12.
[43] Daniels, Ex. 11.
[44] Carter at 77:14-21; Daniels at 106:21-107:21.
[45] Carter at 17:25-18:4 (explaining that QRI is a parent holding company of QVC, HSNi, HSN, Inc., Zulily, and the Cornerstone Brands); Fitzharris 9:21-12:4.
[46] Fitzharris at 13:12-14:16.

one of HSN's goals was to borrow QVC's more conversational sales presentation while maintaining HSN's distinct identity.[47] HSN was also entertaining the idea of adopting a "guest certification process" similar to QVC's to provide guidance to HSN guests regarding best practices for presentations.[48]  In order to gain a better understanding of QVC's guest certification process, Plaintiff, VP of Production Elyse Zaccaro, and Talent Relations Manager Cameron Morris attended a QVC Guest Excellence training seminar at QVC headquarters in April of 2018.[49]

Upon Plaintiff's return from his visit to QVC, Plaintiff sent an e-mail to Bruno and Zaccaro on April 24, 2018, asking that they proofread the e-mail's attachment.[50]  The attachment to the e-mail was entitled "New Direction" and contained a message to HSN guests regarding HSN's alleged "new" approach to on-air performances.[51] In response to the e-mail, Bruno asked several questions, including how this communication fit into Plaintiff's guest certification process plan, and a proposed timeline for the communication.[52] Plaintiff responded that he wanted to get the e-mail out "ASAP," but if Bruno did not want to send the e-mail, "that was fine."[53] Plaintiff admits that Bruno told him not to send the April 24 e-mail.[54] According to Plaintiff, Bruno suggested shortening the April 24 e-mail, and Plaintiff then proposed to make the e-mail into a "dos and don'ts list."[55] Even assuming this was true, which Bruno denied,[56] by May 17,  2018, Plaintiff had made significant changes to the tone and substance of the April 24 e-mail—altering it from a

---

[47] *Id.;* see also Daniels, Ex. 18 (orientation materials for new HSN guests).
[48] Bruno at 148:8-150:24; 171:8-21; 173:2-174:13.
[49] Daniels at 152:15-153:3;  Bruno at 126:6-17; 128:19-129:5 (testifying that he was supposed to go but did not end up going); Zaccaro 26:2-18, 76:8-77:7; Daniels Ex. 20 (QVC Guest Excellence Presentation).
[50] Daniels at 156, Ex. 21.
[51] *Id.*
[52] *Id.* at 156, Ex. 22.
[53] *Id.*
[54] *Id.* at 162:20-163:5; 174:9-14.
[55] *Id.*
[56] Bruno at 168:21-169:15; 175:19-177:15 (testifying that the only thing he told Plaintiff was not to send the April 24, 2018 e-mail).

benign message to an inflammatory missive, complete with red lettering and numerous grammatical errors.[57],[58]

On May 16, 2018, Plaintiff alleges that Bruno approached him around 4:30 p.m. and informed him of a meeting he had with HSN President Mike Fitzharris, Zaccaro and Caputo, during which Fitzharris' expressed concern about a certain guest's and host's performance that day.[59] Plaintiff alleges that in response, Plaintiff proposed sending out his previous April 24 e-mail as a "dos and don'ts list" the two allegedly discussed, to which he claims Bruno responded, "Okay."[60]  No one else heard or was aware of this conversation.[61]  Ironically, on May 16, 2018, Bruno approached VP of People[62] Dan Owens to discuss Plaintiff's lack of professionalism in corporate communications, and any training that could be provided to Plaintiff.[63] Bruno had also previously advocated against the use of blanket policy e-mails to guests.[64]

That night, on May 16, 2018, Plaintiff began working on a document from his home outlining the "dos and don'ts" of how HSN's guests should behave while on air.[65]  Plaintiff admitted this was *the first time* he began working on the list.[66]  Plaintiff e-mailed a truncated version of this "dos and don'ts" list from his personal e-mail to his work e-mail at 1:05 a.m. on May 17, 2018.[67]  Plaintiff continued to draft this "dos and don'ts" list after he reported to work

---

[57] Plaintiff admitted that the communication had several grammatical errors during deposition.  *See* Daniels at 187:6-15; 194:6-14; 200:6-14.  When asked whether he should have proofread the e-mail again before sending, Plaintiff only responded, "possibly."  Daniels at 200:23-201:2.
[58] Compare Daniels Ex. 21 with Ex. 29, Carter Decl. ¶ 4 Ex. C (original New Guest Direction attachments with color).
[59] Daniels at 174:15-176:18
[60] *Id.*
[61] *Id.*
[62] This is synonymous with human resources at HSN.
[63] Owens at 41-43, Ex. 134.
[64] Daniels at 164:4-165:2, Ex. 23.
[65] Daniels at 171:19-172:21, Ex. 28.
[66] Daniels at 171:18-172:21.
[67] *Id.* at Ex. 28.

on May 17, 2018.[68] Plaintiff agreed that this version of the message was very different from the New Direction attachment he sent to Bruno on April 24.[69]

On the morning of May 17, 2018, ***without ever showing the e-mail to his supervisors, without passing it through vendor communications, and  without sharing the e-mail with anyone else at HSN***,[70] Plaintiff e-mailed nearly all of HSN's on-air guests *and* vendors the completed "dos and don'ts" list he began working on the night prior, titling it "New Guest Direction" (the "New Direction E-mails" or "E-mails").[71] Plaintiff did not copy any member of HSN management or any HSN employees on his E-mails.[72] Plaintiff also sent the E-mails while he knew his supervisor, Bruno, was occupied in a vendor advisory board meeting.[73]  Plaintiff failed to blind copy the recipients of the E-mails, thereby disclosing all of their e-mail addresses to the entire distribution list.[74] Plaintiff admitted that his failure to blind copy the recipients was a mistake.[75]

Plaintiff testified that HSN's buying team generally handled communications with vendors, and Plaintiff admitted that he was not even aware he had included HSN's vendors in the distribution lists for his E-mails.[76]  In fact, Plaintiff had never before sent a mass communication like the New Direction E-mails and didn't have the guests' e-mail addresses accessible to him in a format that allowed such a communication.[77]  Plaintiff testified that he had to request the

---

[68] *Compare* Daniels, Exs. 28 and 29; Daniels at 184:16-1:17.
[69] Daniels at 172:22-173:16; 187:23-188:3; Compare Daniels Ex. 21 with 29.
[70] Daniels at 187:16-22.
[71] Daniels at 172:22-173:16; 187:23-188:3.
[72] Daniels at 203:5-9.
[73] Bruno at 214:10-216:9; 217:14-217:23; Carter Decl. ¶ 7, Ex. F (Bruno's calendar entries showing he was in a vendor advisory board meeting at the time the New Direction E-mails were sent by Plaintiff).
[74] Daniels Ex. 29 (In order to protect the personal contact information of its on-air guests and vendors, many of which are high profile celebrities and entertainers, HSNi redacted these personal e-mail addresses from the New Direction E-mail. However, it is undisputed that the e-mail addresses were disclosed.  *See* Daniels at 183:8-15, 206:10-14, 225:4-18 ).
[75] Daniels at 225:4-18, Ex. 38;.
[76] Daniels at 181:21-182:12; 224:20-22.
[77] *Id.* at 178:17-183:7.

distribution lists from HSN's Talent Relations team the morning of May 17, *and* that he informed them of the reason he needed the information.[78]   However, Plaintiff actually lifted the emails from the Talent Relations team's "guest newsletters" that he requested and didn't disclose the reason for his request.[79]   Plaintiff also went around the Talent Relations team's manager, Cameron Morris, to request the newsletters.[80]   Plaintiff also inexplicitly failed to copy Bruno on his e-mails to Talent Relations.[81]   Plaintiff failed to look at the dates of the e-mailed newsletters or the distribution list to determine whether it contained the individuals to whom he wanted to send the New Direction E-mails.[82]   The e-mails from Talent Relations clearly show that some of the newsletters had not been sent out in years.[83]   Accordingly, the New Direction E-mails went to HSN's guests, vendors, and even past guests and vendors that no longer had a business relationship with HSN.[84]   Plaintiff blamed Talent Relations for his oversight.[85]

The New Direction E-mails were poorly received, and did not reflect the professionalism that HSN requires of its representatives.  Plaintiff's E-mails told the recipients: to "get rid of the hard sell;"[86] to take their "used car salesman, in your face delivery and throw it out;[87]" to act and carry themselves in a professional manner on and off air;[88] that they were being "rude and

---

[78] *Id.*
[79] *See* Carter Decl. ¶¶ 5, Ex. D.
[80] *Id.*; *see* Daniels at 65:2-12 (identifying Morris as the Talent Relations Manager, and identifying talent relations as a "different department."); *see* Carter Decl. ¶ 5, Ex. D (failing to copy Cameron Morris on his request).
[81] Carter Decl. ¶ 5, Ex. D; Daniels at 180:9-12.
[82] Daniels at 180:17-183:1.
[83] Carter Decl. ¶ 5, Ex. D.
[84] *Id.*
[85] *Id.* at 180:17-181:9.
[86] This directive does not appear in the April 24 e-mail to Bruno, and despite Plaintiff's claims that he and Bruno discussed this "*ad nauseum*", he could not explain why he did not include it in his April 24 e-mail to Bruno.  Daniels at 192:22-193:4.
[87] Plaintiff agreed that this was not part of his April 24 e-mail to Bruno. Daniels at 188:23-189:7.
[88] Plaintiff admitted that this was not part of his April 24 e-mail to Bruno. Daniels at 193:5-13.  Plaintiff then claimed that he did include this in his e-mail to Bruno, albeit in a completely different format which bears no resemblance to what appeared in the New Direction E-mail. Daniels at 195:5-196:8.

set[ing] a bad tone;" that "you don't listen;"[89] that they had "[their] own agenda;"[90] "**Don't-Talk over the host, I want to make sure that we are all clear on this one[.]** Do not [] talk over the host;" not to "try and hijack the show;" to "stay in [their] lane;" and threatening that if they did not "you and I will be having a conversation;"[91] and to stop making "false claims" about their products, adding this was a "new direction for the company."[92] While Plaintiff alleges discussing these items with Bruno, Plaintiff admitted Bruno never approved many of these items.[93]  Plaintiff also claimed that some of these items were "pretty much the same thing" as what he included in his April 24 e-mail to Bruno that was **not** approved for distribution.[94]

HSN employees received several e-mails from vendors and on-air guests expressing their disbelief and anger over the unprofessional tone/content of Plaintiff's E-mails.[95]  Others were upset that Plaintiff disclosed their e-mail addresses, which resulted in unsolicited e-mails from the media.[96]  Plaintiff's unauthorized disclosure included the e-mail addresses of several high profile celebrities or their representatives; the media pounced on Plaintiff's inattention to detail.[97]

After receiving negative responses, Plaintiff began circulating the New Direction E-mail to his co-workers; sending it to two (2) of his subordinates with the subject line "**Is this bad?**"[98],

---

[89] Plaintiff admitted that this was not part of his April 24 e-mail to Bruno. Daniels at 194:15-195:12.

[90] Plaintiff again admitted that this was not part of his April 24 e-mail, but claimed telling guests they had their own "agenda" was similar to the statement in his April 24 e-mail that guests should engage in conversation with the hosts.  Daniels at 196:23-198:8.

[91] Daniels at 186:23-187:5 (Plaintiff admitting this was not part of his April 24 e-mail to Bruno, and that Bruno did not tell him to include his threat of "you and I will be having a conversation).

[92] *See* Daniels Ex. 29.

[93] Daniels at 186:23-187:5; *See generally* Daniels at 185-200.

[94] Daniels at 189:21-190:23. Plaintiff claimed that the language in his draft April 24 e-mail that "when you are out there with the host, there needs to be a conversation between you and the host," was "pretty much the same thing" as what was in the New Direction E-mail when he said "Don't ignore your host because that's rude and sets a bad tone" and "This is their house and you are the guest, so follow their lead." Daniels at 189:21-190:23.

[95] Daniels at 208, Ex. 32, Ex. 34

[96] Bruno at 221-224, Ex. 63; ECF No. 25-1 (HSNi0000288, 365-366, 446-452, and 819).

[97] Daniels at 183:2-7; TheBlast, *HSN Exec Revealed Celebrity E-mail Addresses in Contentious Memo*, https://theblast.com/c/hsn-qvc-celebrity-email-addresses (last visited Dec. 1, 2019); ECF No. 25-1 (HSNi0000423-426).

[98] Daniels at 215, Ex. 35.

and to a QVC employee with the subject line "**I messed up**."[99]  In the latter e-mail, Plaintiff

explained why he drafted the New Direction E-mail:

> Based on the on air issues from yesterday and the slow process of
> getting the gest [sic] summits[100] together, **I wanted to address the**
> **guest and give them some do's and don'ts.  I sent this out** and
> so that is what Dave [Caputo] called me in for.  **I feel bad because**
> **I was trying** to do the right thing...Let me know what you think.[101]

More than an hour after he sent out his first New Direction E-mail,[102] at 12:27 p.m.,

Plaintiff finally e-mailed a copy of the E-mail's *New Direction attachment* (only) to HSN

management, including Bruno, and included some positive responses.[103]  In this e-mail, Plaintiff

informed management as follows:

> FYI. This [attachment] is what I sent to all of our current guests as
> a follow up and I have received some positive feedback so we are
> on the right track.

*Id.*  None of the recipients of this 12:27 p.m. e-mail had seen any draft of the dos and don'ts list

prior to it being sent.[104]  Plaintiff's 12:27 p.m. e-mail included only the New Direction Emails'

*attachment*—not the actual E-mails showing the breadth of the E-mails' distribution.[105]

Accordingly, management would not have known the extent of Plaintiff's distribution, and

Plaintiff himself didn't realize he included HSN vendors by this point.[106]  Plaintiff also admitted

that by the time of his 12:27 p.m. e-mail, *he had already realized* he failed to blind copy the E-

---

[99] Daniels at 217, Ex. 36.

[100] Guest summits are meetings where the Network invites all of its on-air guests to HSN, Inc. headquarters in St. Petersburg, Florida, to discuss any updates regarding the business, as well as performance and production guidelines.  The guest summits have only taken place one time previously, in July of 2017.  Plaintiff never attended a guest meeting during his time with HSN.  Daniels at 166:1-7.

[101] Daniels, Ex. 36 (emphasis added); *see also* Daniels Ex. 33 (informing one guest "I just can't win.  I'm sure they may try and fire me over this.")

[102] The first New Direction E-mail went out just after 11:00 a.m. Daniels Ex. 29.  Subsequent e-mails were sent out as Plaintiff received the newsletters from the Talent Relations team.  Daniels at 183:15-184:15.

[103] Daniels at 202, Ex. 30.

[104] Daniels at 211:7-15.

[105] Daniels at 202:11-203:8.

[106] Daniels at 205:17-206:9.

mail's recipients, but he didn't inform Bruno because he "didn't think [it was] an issue"—despite having already received at least one complaint about it.[107]

At 1:48 p.m., Bruno responded to Plaintiff's 12:27 p.m. e-mail, stating:

Looks good, *but please send to me in advance of wide distribution.* ***Need to be made aware that this communication is being sent <u>before</u> it goes out.*** Also *we've been using* [the] *Vendor Communication Team to send out email for consistent messaging.*[108,109]

Plaintiff responded to Bruno's e-mail as follows:

Thanks Tim. I just spoke to Dave [Caputo] and **my apologies**. **I was trying to be proactive** based on how yesterday went. I'm just trying to do the right thing and help turn things around. **This will not happen again and I will run any and all communications through you <u>beforehand</u>. Sorry once again**.[110]

When asked why he did not remind Bruno in this e-mail that he had allegedly authorized the E-mails, Plaintiff responded that he did not want to "throw anybody under the bus" and he did not want to have a "back and forth with Tim [Bruno]."[111] Plaintiff also alleged that he "used the wrong word" when he said he was being "proactive," since he claims he had approval to send the E-mails.[112] When asked why he said "this will not happen **again**" and he would "run any and all communications through [Bruno] **beforehand**," Plaintiff responded that he was just trying to "save face," and that he used the wrong wording when saying it would "not happen *again*."[113]

Bruno responded by reiterating that HSN had established procedures for vendor communication

---

[107] Daniels at 206:10-25; Daniels at 225 Ex. 38.

[108] Bruno at 225, Ex. 37 (emphasis added).

[109] Bruno later admitted that he had not reviewed the E-mail attachment when he sent this response to Plaintiff, and he was merely responding to the positive responses received in response to the subject line "guest messaging that went out." Bruno 228:3-229:6. Regardless of whether Plaintiff disputes this, the words of the e-mail itself indicate that Bruno was not aware of Plaintiff's communication being sent, which is important for purposes of the subsequent investigation.

[110] Daniels at 220, Ex. 34 (emphasis added).

[111] Daniels at 220:15-221:17.

[112] Daniels at 222:6-19.

[113] Daniels at 221:13-223:23; *see id.* at 228:14-16 (admitting that he did not accuse Bruno of approving the E-mail).

that Plaintiff failed to use, and that the tone of the e-mail was not appropriate.[114]  Plaintiff again apologized for his error.[115,116]

Plaintiff then reached out to Carter[117] to discuss the New Direction E-mail.[118]  Carter memorialized his conversation with Plaintiff in an e-mail to Owens on May 18, 2018.[119]  During their conversation, Plaintiff informed Carter that Bruno reviewed the substance of an original e-mail, but Bruno wanted it revised and *asked to review the e-mail again before it was sent out.*[120]

On May 18, 2018, HSN President Mike Fitzharris called for an investigation of the matter, and placed Owens in charge.[121]  The same morning, Carter requested from Plaintiff the e-mail he allegedly provided to Bruno for review before sending the E-mails.[122]  In this exchange, Plaintiff informed Carter that "this was my mistake and my mistake alone and I will accept whatever comes next."[123]  Plaintiff testified that he said this because he was "trying to save [his] job", and admitted that he *did not* inform Carter that Bruno had allegedly approved of the E-mails before it was sent because "I'm not the type of person to throw people under the bus."[124] In a subsequent e-mail to Carter, Plaintiff again admitted his mistake of including the vendors on the e-mail distribution list.[125]

---

[114] Daniels Ex. 34, 37.

[115] *Id.*

[116] Plaintiff claimed that he was "unaware" of the vendor communications department. *Id.* However, Bruno sent an e-mail to Plaintiff just two weeks prior, on May 1, 2018, wherein Bruno discussed using the vendor communications team for messaging to guests.  Daniels at 165-168, Ex. 24.  Although Plaintiff admits to seeing the May 1, 2018, E-mail, he simply assumed that the vendor communications team "didn't have anything to do with him" because the talent department generally did not deal with vendors. Daniels at 167:21-168:6

[117] Owens was Carter's direct supervisor as of May 2018. Carter at 17:6-11.

[118] *See* Carter Ex. 84; Daniels at 225:19-226:17, Ex. 39; Carter Ex. 82.

[119] Carter Decl. ¶ 6, Ex. E; Carter Ex. 82; *see also* Owens at 64:9-65:2, Ex. 134 (HSNi0009425).

[120] Carter Decl. ¶ 6, Ex. E; Carter Ex. 82; Carter Ex. 86; Owens at 64:9-65:2, Ex. 134 (HSNi0009425); Carter at 143:16-24.

[121] *See* Fitzharris 53:16-55:5; Owens, Ex. 135; Owens at 39, Ex. 134

[122] Daniels, Ex. 39; Carter Ex. 84.  Despite Carter's request, Plaintiff did not send the original April 24 e-mail to him—likely because it bore no resemblance to what was sent out.  *See* Daniels, Ex. 39.

[123] Daniels, Ex. 39

[124] Daniels at 225:19-228:16.

[125] Carter Ex. 85; Daniels Ex. 40.

As part of his investigation, Owens interviewed both Plaintiff and Bruno.  During
Owens' and Carter's interview with Plaintiff on May 18, Plaintiff admitted sending the E-mails
because he wanted to "get ahead" of the issues Fitzharris raised to Bruno on May 16.[126] Plaintiff
also admitted that he should have reviewed the E-mails with Bruno prior to sending, that he
didn't think vendors were on the distribution list, and that it was Plaintiff's fault he failed to
blind copy the recipients.[127,128] Accordingly, by early May 18, Plaintiff had admitted to Carter on
May 17 by telephone, and again to Carter and Owens in person on May 18, that he should have
reviewed the E-mails with Bruno prior to sending.[129] At minimum, Plaintiff could not refute that
he made these admissions during his call with Carter on May 17, since he "could not recall" the
substance of that conversation.[130]  Owens also interviewed Bruno *twice*—both on May 18 and
May 22—to determine his involvement with the E-mails, and to specifically question why he
initially wrote "looks good" in his May 17 e-mail response to Plaintiff.[131]  Given Plaintiff's
statements to Carter and Owens, and Plaintiff's e-mails with Bruno after the E-mails'
distribution, Owens concluded Bruno was not aware of the E-mails before they were sent out.[132]

Owens kept Fitzharris apprised of the investigation as it progressed,[133] and on May 22,
2018, at 12:59 p.m., he sent Fitzharris an e-mail summarizing his investigation to date,
concluding that "we simply haven't come away with anything indicating that Tim [Bruno] knew

---

[126] Owens, 51:21- 54:1; Ex. 134 (HSNi0009420-9422).

[127] *Id.*

[128] Plaintiff was suspended pending the completion of Owens' investigation. Owens at 80:18-82:3, Ex. 66.

[129] *Id.*; Owens at  52:4-54:1, Ex. 134 (HSNi0009425); Owens at 110:13-111:19; Carter Ex. 89; Owens at 82-83, Carter Ex. 86; Carter Decl. ¶ 6, Ex. E.

[130] Daniels at 225:23-226:6

[131] Owens at 44:16-48:7 (May 18 interview); 66:5-68:5 (May 22 interview), Ex. 134 (HSNi0009416-9418; 9427-9528). Again, both the investigation and Bruno's testimony indicate that he had not reviewed the E-mail attachment in its entirety when he sent this response to Plaintiff, and was merely responding to the positive responses Plaintiff received in response to the subject line "guest messaging that went out." Bruno 228:3-229:6.  Bruno's words in the e-mail itself indicate that he was not aware of Plaintiff's communication being sent.

[132] Owens at 110:13-111:19, Ex. 89; 112:21-114:6; Daniels Ex. 40; Carter Decl. ¶ 6, Ex. E.

[133] *See* Owens at 80:18-81:9, Ex. 66;

14

more about the content before Gordie sent it (and in fact, have Gordie's clear statement Tim did not)."[134]  Shortly after receiving this e-mail, Head of Corporate Affairs Jill Kermes, who was with Fitzharris at an investor day event at QVC headquarters in West Chester, Pennsylvania, was alerted that a *Page Six* reporter was e-mailing HSN employees to inquire about the "substantial discord" caused by the E-mails.[135]  Kermes had been involved in the matter since May 18, and worked closely with Fitzharris and others, including Carter and Owens, to craft an apology to vendors and guests and manage inquiries.[136]  Kermes informed the reporter that the E-mail was not "authorized, reviewed or approved for distribution" (the "Statement").[137]  The *Page Six* article was published on May 22, 2018,[138] and six other outlets, including AOL.com and TheBlast.com, picked up the story.[139]  Plaintiff was terminated on May 23.[140]  On May 27, four days after the *Page Six* article was published, Plaintiff e-mailed Fitzharris and *again* apologized for sending the E-mail; never noting that he previewed, received approval, or sent the New Direction E-Mail to Bruno prior to its distribution, and never claiming any overt or tacit approval to use/disclose HSN's vendors' and guests' (or prior vendors'/guests') email addresses to others."[141]

## MEMORANDUM OF LAW

### A.    Legal Standard for Motion for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.[142]  The moving party bears the burden of meeting this standard. *Id.*  "Equally clear, however, is the principle that the nonmoving party

---

[134] Owens at 110:13-111:19, Ex. 89.
[135] Kermes at 95:4-95:21, Ex. 126.
[136] Kermes at 52:17-53:11; 99:3-16, Exs. 115, 116; Owens at 88:24- 89:19; Bruno Exs. 65, 68.
[137] Fitzharris, Ex. 107; Kermes 96:25-97:6, Ex. 106.
[138] Daniels at 235-236, Ex. 41.
[139] Giddens, Ex 2 at p. 11; ECF No. 25-1 (HSNi0000423-426).
[140] Daniels at 235:3-5.
[141] Daniels at 233:19-235:5, Ex. 47.
[142] Fed. R. Civ. P. 56(c); *Celetox Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

bears the burden of coming forward with evidence of each essential element of their claims, such that a reasonably jury could find in his or her favor."[143]. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."[144] Conclusory and unsupported allegations by a plaintiff at deposition are insufficient to defeat a well-supported motion for summary judgment.[145]

## B.      HSN's Statement Was Not Defamatory *Per Se*

Under Florida law, to assert a claim for defamation, whether libel or slander, plaintiff must establish that: (1) the defendant published a false statement, (2) about the plaintiff, (3) to a third party; and (4) the falsity of the statement caused the plaintiff injury.[146]  The next question the Court must determine is whether the Statement is actionable *per se* or *per quod.*[147] Here, Plaintiff has only alleged an action in **defamation *per se*** for a written statement to *Page Six* reporter Oliver Coleman.[148]

A written publication rises to the level of libel *per* se "if, when considered alone and without innuendo, it (1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure him in his trade or profession."[149] In a libel *per se* action, the Court may only consider the "four corners" of

---

[143] *Tedford v. United States*, Case No. 8:05-cv-1017-T-30TGW, 2007 U.S. Dist. LEXIS 27062, *5 (M.D. Fla. Apr. 12, 2007)(citing Earley *v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990))
[144] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).
[145] *Earley,* 907 F.2d at 1081.
[146] *Alan . v. Wells Fargo Bank, N.A.,* 604 Fed. App's, 863, 865 (11th Cir 2015)(applying Florida law).
[147] *See Owner's Adjustment Bureau, Inc. v. Ott,* 402 So. 2d 466, 468 (Fla. 3d DCA 1981).
[148] Pl.'s Compl. ECF No. 1-2, ¶¶ 88-89; Kermes at 96:25-97:6, Ex. 106.
[149] *Alfalo v. Weiner,* Case No. 17-61923-CIV-MORENO, 2018 U.S. Dist. LEXIS 110134, *4 (S. D. Fla. July 2, 2018)(citing *Wolfson v. Kirk,* 273 So.2d 774, 776 (Fla. 4th DCA 1973)).

the statement itself, and may not look to external factors to determine if the statement is injurious. [150]

In contrast, libel *per quod* requires the statement to be put in context so as 'to demonstrate [its] defamatory meaning or that the plaintiff is the subject of the statement.'" *Id.* (citations omitted).  That is because statements actionable *per quod* are not injurious on their face and require additional proof to show how they injured the plaintiff. [151] In other words, defamation *per quod* requires an explanation of context because the "words used, given their natural and common meaning, are not inherently injurious, but rather are injuriously *only as a consequence* of extrinsic facts."[152]

To illustrate the distinction, statements have been found by Florida courts to be actionable *per se* where the defendant accused a plaintiff of being drunk on the job and this accusation was repeated to co-workers;[153] a defendant told patients that a doctor's work quality was "not good," he "rushed procedures," and his procedures required subsequent corrective work;[154] a former supervisor told a prospective employer that an interviewee was "bad news," was "sexual harassment material," and "you don't want her in your company,"[155] a law firm allegedly stated that "if you wanted to influence Judge Hoch, you should send men in tight shorts before him," thereby suggesting the judge could be improperly influenced.[156]

In contrast, Florida courts have found that statements did not constitute libel *per se*, and thus required additional proof of actual malice and special damages, where defendant made a

---

[150] *Alfalo,* 2018 U.S. Dist. LEXIS 110134 at *4 (citing *Ortega Trujillo v. Banco Central Del Ecuador,* 17 F. Supp. 2d 1334, 1339 (S.D. Fla. 1998)).
[151] *See Campbell v. Jackson Kennel Club,* 66 So. 2d 495, 497-98 (Fla. 1953).
[152] *Paulson v. Cosmetic Dermatology, Inc.,* Civil Action No. 17-20094-Civ-Scola, 2017 U.S. Dist. LEXIS 88031, *6-7 (S.D. Fla. June 8, 2017)(citing *Leavitt, D.O. v. Cole,* 291 F. Supp. 2d at 1342 (M.D. Fla. 2003)).
[153] *Glynn v. City of Kissimmee,* 383 So. 2d 774, 775-76 (Fla. 5th DCA 1980)
[154] *Leavitt v. Cole,* 291 F. Supp. 2d 1338, 1345-46 (M.D. Fla. 2003).
[155] *Thompson v. Orange Lake Country Club, Inc.,* 224 F. Supp. 2d 1368, 1381 (M.D. Fla. 2002)
[156] *Hoch v. Rissman, Weisberg, Barrett, Hurt, Donahue & McClain, P.A.,* 742 So. 2d 451, 457 (Fla. 5th DCA 1999).

statement that the plaintiff *was not authorized* by the company to file a criminal complaint or Florida Bar grievance and acted without its knowledge;[157] circulated a notice stating that a plaintiff had resigned and his duties had been assumed by other staff members—which plaintiff disputed—because it was "necessary to go out of the four corners of the notice" to determine whether plaintiff was fired rather than having resigned;[158] and published a statement that an employee had been terminated for violating company policy.[159]

Here, the alleged defamatory nature of HSN's Statement cannot be determined without taking into account facts that are extrinsic to the Statement itself.  HSN's Statement merely provided that the New Direction E-mail was not "authorized, reviewed, or approved for distribution."  In order to determine whether the Statement was defamatory in nature, the Court would have to look outside its four corners to the sender and content of the E-mail, the context of the *Page Six* article, the recipients' comments included within the *Page Six* article, and whether Plaintiff was, indeed, authorized or not to send the E-mail.[160] Plaintiff's Complaint is consistent with the fact that the Statement could have only been defamatory by innuendo or implication, as he claims the Statement branded him as an "insubordinate, unprofessional, rogue employee who launched an 'insulting,' 'condescending,' and 'disrespectful' e-mail to on air-talent"—words that do not appear in the Statement and were derived from the comments of the E-mail's recipients. Simply put, the eight words that comprise the Statement, on their face and without consideration of these external factors, are not defamatory *per se* and would not subject Plaintiff to distrust, hatred, ridicule, or injure Plaintiff in his trade or profession.[161]

---

[157] *Rohleder v. Wiberg,* Case No. 12-CA-010986, 2016 Fla Cir. LEXIS 22578, **3-5 (Cir. Ct. Dec. 19, 2016)
[158] *Barry College v. Hull,* 353 So.2d 575, 577, 578-579 (Fla. 3d DCA 1977).
[159] *Paulson,* 2017 U.S. Dist. LEXIS 88031 at *7-10.
[160] *See Barry College*, 353 So.2d at 578-579; *Paulson,* 2017 U.S. Dist. LEXIS 88031 at *7-10; *Rohleder.* 2016 Fla Cir. LEXIS 22578 at **3-5.
[161] *See, e.g., Paulson,* 2017 U.S. Dist. LEXIS 88031 at *7-10; *Rohleder,* 2016 Fla. Cir. LEXIS 22578 at **3-5.

This distinction is fatal to Plaintiff's defamation claim.  To allege that words are actionable *per quod*, a plaintiff must plead and prove actual malice and special damages proximately caused by the publication of the statement, and cannot simply rely on general reputational and garden variety emotional distress damages.[162]  Plaintiff has failed to plead or prove any special damages here with specificity, as his Complaint and responses to his interrogatories are void of any specific allegations of said damage.[163]

### C.  Plaintiff Cannot Prove HSN Acted With Actual Malice

To plead actual malice, Plaintiff must allege facts sufficient to give rise to a reasonable inference that the Statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not."[164]  The question turns on whether the defendant, instead of acting in good faith, "actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false."[165]  Plaintiff must establish actual malice by clear and convincing evidence.[166]

Here, Plaintiff merely pleaded that Defendants published the Statement "knowingly, intentionally, and/or without reasonable care as to the truth or falsity of the statements.[167]"  Plaintiff does not plead that the Defendants acted in reckless disregard as to the truth or falsity of the Statement.  Even assuming Plaintiff had properly pled actual malice, any alleged failure to investigate by the Plaintiff is insufficient to establish actual malice.[168]  Rather, a plaintiff must

---

[162] *Barry,* 353 So.2d at 578 (citing *Harris v. Metropolis Co.,* 160 So. 205, 207 (1935)).
[163] *See generally,* ECF No. 1-2, ¶¶ 95-101; Plaintiff's Suppl. Ans. and Objs. to Defs.' First Set of Interrogs., Resp. No. 4.
[164] *New York Times v. Sullivan,* 376 U.S. 254, 280 (1960).
[165] *Id.; Silvester v. Am. .Broad. Cos*., 839 F.2d 1491, 1493 (11th Cir. 1988)
[166] *Klayman v. City Pages,* 650 Fed. Appx. 744, 750 (11th Cir. 2016)(citations omitted).
[167] Defendant references "statements" in the plural here, but, as pleaded elsewhere, there is only one alleged defamatory statement.
[168] *See Michel v. NYP Holdings, Inc.,* 816 F.3d 686, 703 (11th Cir. 2016).

produce evidence "showing that the defendant purposely avoided further investigation with the intent to avoid the truth."[169]

Plaintiff cannot do so here.  Plaintiff spoke with human resources twice during HSN's investigation as to the circumstances surrounding the New Direction E-mail, and during both conversations he failed to inform the investigators that he had prior approval to send the E-mail. Even assuming Plaintiff's allegations are true, and he did have some authorization from Bruno to send the E-mail, Plaintiff's e-mails subsequent to the New Direction E-mail, which contained several apologies and admissions of guilt, as well as his verbal admissions to Owens and Carter on May 17 and 18, are fatal to his claim.  Plaintiff's alleged refusal to "throw [Bruno] under the bus" prevented Owens and Carter from reaching any conclusion other than the one they reached. Plaintiff cannot now allege that HSN purposefully ignored any obligation to investigate the circumstances surrounding the E-mail. Even assuming that Plaintiff need not prove actual malice, Plaintiff cannot establish that Defendants acted "without reasonable care as to whether the statements were true or false" for the same reasons cited herein.[170]

### D.    Plaintiff Was A Limited Public Figure Requiring Proof of Actual Malice

Alternatively, even if the Court finds that HSN's Statement constituted defamation *per se,* Plaintiff must still prove that HSN acted with actual malice because he was a limited public figure pursuant to *Waldbaum v. Fairchild Publications,* 627 F.2d 1287 (D.C. Cir. 1980) cert. denied, 449 U.S. 898 (1980).  Determining whether an individual was a limited public figure for purposes of the actual malice analysis is an issue reserved for the Court.[171]

---

[169] *Id.*
[170] *See Egwuatu v. Burlington Coat Factory Warehouse Corp.,* No. 11-12976, 2012 U.S. App. LEXIS 20307, *2 (11th Cir. Sep. 28, 2012).
[171] *Michel,* 816 F.3d at 702.

To determine whether or not a party is a private or public figure as set forth in *Waldbaum,* the Court must: "(1) isolate the public controversy, (2) examine the plaintiff's involvement in the controversy, and (3) determine whether 'the alleged defamation [was] germane to the plaintiffs' participation in the controversy."[172] A "public controversy" is a matter that is openly debated and affects more than its direct participants, and the Court can determine whether a controversy existed by analyzing whether the press was covering the issue, reporting what people were saying and uncovering facts and theories to help the public formulate an opinion.[173]

Here, it is undisputed that the New Direction E-mail caused enough controversy to be picked up by at least seven (7) different news outlets,[174] of which there was sufficient public debate for Plaintiff to now claim that he is entitled to damages for "repairing his reputation online and otherwise." Compl., ECF No. 1-2, ¶¶ 99-101. The controversy involved (unfounded) allegations that QVC—the largest home shopping network in the US—was unhappy with the performance of HSN's on-air guests and was allegedly taking over, "memo-by-memo."[175] The press solicited comments from HSN and recipients of the E-mail in preparing the *Page Six* article, which were re-published in later news articles. This then morphed into another controversy about how Plaintiff disclosed the e-mail addresses of several high profile celebrities by failing to blind copy the recipients of the E-mail.[176] Each of these controversies generated engagements by the general public in the form of comments, likes and shares on online news

---

[172] *Silvester v. Am. Broadcasting Companies, Inc.,* 839 F.2d 1491 (11th Cir. 1988)(quoting *Waldbaum,* 627 F.2d at 1297).

[173] *Bruce v. Wiod, Inc.,* Case No. 94-6985-CIV-Gonzalez, 1996 U.S. Dist. LEXIS 21979 (S.D. Fla. Oct. 25, 1996); *Waldbaum,* 627 F.2d at 1297.

[174] *See* Giddens, Ex. 2 at p. 11; Kermes Ex. 128 (*Page Six* Article); Kermes Ex. 129 (*AOL* article).

[175] Daniels at 235-236, Ex. 41; Kermes Ex. 128.

[176] TheBlast, *HSN Exec Revealed Celebrity E-mail Addresses in Contentious Memo,* https://theblast.com/c/hsn-qvc-celebrity-email-addresses (last visited Dec. 1, 2019); ECF No. 25-1 (HSNi0000423-426).

media and social platforms.[177]   Moreover, the controversy pre-dated HSN's Statement, and

would have been covered by the press regardless of whether or not HSN made the Statement.

*See* Kermes Ex. 127.[178] Accordingly, this was a public controversy for purposes of *Waldbaum.*

The second prong of the *Waldbaum* test analyzes a plaintiff's role in the controversy, and

either the plaintiff: (1) must have purposefully tried to influence the outcome of the controversy,

or (2) could have realistically expected, due to his position in the controversy, to have an impact

on its resolution.[179] It is not sufficient for a plaintiff to say that he did not choose to be a public

figure, particularly where, as here, his actions were bound to invite attention and comment.[180]

The third and final prong of the test examines whether the alleged defamatory statement was

"germane to the plaintiff's participation in the controversy."[181] Here, Plaintiff's New Direction

E-mail was the genesis for the controversy, and HSN's Statement was germane to Plaintiff's E-

mail.  Accordingly, both the second and third *Waldbaum* prongs are satisfied, and Plaintiff was

required to plead and prove actual malice, which, for the foregoing reasons, Plaintiff failed to do.

### E.     HSN's Statement Was True

A required element of a defamation claim in Florida is a false statement made about

another.[182]  "Under the substantial truth doctrine, a statement does not have to be perfectly

accurate if the 'gist' or the 'sting' of the statement is true."[183]

---

[177] *See* Giddens Ex. 2, pp. 36-52.
[178] Plaintiff's counsel failed to include the entirety of the e-mail chain in Exhibit 127 between Kermes and reporter Coleman, and instead included only the first page.  Accordingly, the e-mail, in its entirety, has been provided to the Court as Exhibit 127.
[179] *Waldbaum,* 627 F.2d at 1297.
[180] *Waldbaum,* 627 F.2d at 1298 (citing *Rosanova v. Playboy Enters. Inc.,* 580 F.2d 859, 861 (1978)).
[181] *Bruce,* 1996 U.S. Dist. LEXIS 21979 at *12.
[182] *Cape Publ'ns. v. Reakes,* 840 So. 2d 277, 280 (Fla. 5th DCA 2003).
[183] *Smith v. Cuban Am. Nat'l Found.,* 731 So. 2d 702, 705-6 (Fla. 3rd DCA 1999), rev. denied, 753 So. 2d 563 (Fla. 2000)."

Here, even taking the facts in a light most favorable to Plaintiff and accepting as true Plaintiff's allegation that Bruno okayed the sending of a shortened version of his April 24 e-mail to HSN's guests, Plaintiff: (1) admitted that the New Direction E-mail was very different from his April 24 e-mail, and that Bruno had not reviewed the E-mail prior to distribution, (2) admitted that it was a "mistake" to fail to blind copy the recipients of the E-mail, and (3) admitted that he failed to verify the distribution list, thereby including vendors *and* past guests and vendors who HSN had no business relationship with and who had no reason to maintain the E-mail as confidential. Accordingly, Plaintiff cannot dispute that the New Direction E-mail was not "authorized, reviewed, or approved" for distribution in the manner in which it was sent, and Plaintiff's claim fails as a matter of law.

### F.    Plaintiff's FLSA Claims Fail as a Matter of Law

In order to establish a claim for violation of the FLSA, Plaintiff must prove he was suffered or permitted to suffer work without compensation. *Allen v. Bd. of Pub. Educ.,* 495 F.3d 1306, 1314 (11th Cir. 2007)(citing 29 U.S.C. § 201 et seq.).  To do so, Plaintiff must demonstrate that: (1) he worked overtime without compensation, and (2) Defendant knew or should have known, through reasonable diligence, of the overtime work. *Id.* at 1314-135 (citations omitted)." There is no violation of the FLSA where the employee performs uncompensated work but deliberately prevents his or her employer from learning of it."[184] An employer can exercise diligence by establishing a reasonable process for the employee to report uncompensated work time.[185]

---

[184] *Id.* at 1319 (citing *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir. 1981)).
[185] *Allen v. City of Chicago,* 865 F.3d 936, 938 (7th Cir. 2017); *White v. Baptist Mem'l Health Care Corp.,* 699 F.3d 869, 876 (6th Cir. 2012)("if an employer establishes a reasonable process for an employee to report uncompensated work time the employer is not liable for non-payment if the employee fails to follow the established process.")

Here, there is no dispute that Defendants had an established procedure for Plaintiff to report time worked away from HSN's office, as Plaintiff was able to report his hours worked to Miller who would then enter the hours into HSN's Kronos system.[186]  Indeed, Plaintiff availed himself of this process on those occasions he saw fit.[187]  Plaintiff also would not copy his supervisor, Bruno, on those communications to Miller when he reported his hours, so Bruno would have had no way of knowing that Plaintiff was not reporting his time worked, aside from affirmatively accessing Plaintiff's Kronos records to determine that he was, indeed, logging his hours on those limited occasions where Plaintiff sent e-mails after hours.[188]  HSN went through great lengths to ensure that its employees were aware of and followed their obligations under the FLSA.[189]  By allowing Plaintiff a flexible work schedule, Plaintiff was given significant freedom in determining when and how he performed his work, with the reasonable expectation that he would follow the company's procedures for reporting any work completed at home.  Indeed, Plaintiff logged and received compensation for 250 hours of overtime during the course of twenty-one (21) months. Plaintiff's deliberate failure to follow HSNi's time and attendance reporting procedures must preclude him from recovery under the FLSA.

## CONCLUSION

For the foregoing reasons, Defendants HSNi, LLC, HSN, Inc., and Qurate Retail Group, Inc. respectfully request that summary judgment be entered in their favor with respect to both counts of Plaintiff's Complaint, in addition to any other relief the Court deems appropriate.

---

[186] *Id.* at 48:14-19; 51:8-52:12; 63:17-68:20, Ex. 7 (composite of e-mails corroborating that plaintiff worked from home (excluding HSNi00007420)),68:9-72:12 Ex. 8 (composite of e-mails where plaintiff informed Miller he would be working from home).
[187] *Id.*
[188] *Id.* at 69:22-70:5, 71:15-72:12 (the transcript incorrectly references a Mr. "Brown" instead of "Bruno" at line 72:3).
[189] See.n. 3-5, 12-17, 19, and 25, *supra.*

Dated this 4th day of December, 2019.

Respectfully submitted,

By: /s/ *Dawn Siler-Nixon*
Dawn Siler-Nixon
Florida Bar No. 993360
E-mail:  dsiler-nixon@fordharrison.com
Nicholas S. Andrews
Florida Bar No. 0105699
E-mail: nandrews@fordharrison.com
FORD & HARRISON LLP
101 E. Kennedy Blvd., Suite 900
Tampa, FL  33602
(813) 261-7800  Telephone
(813) 261-7899  Facsimile
Attorneys for Defendants

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on December 4, 2019, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system will which send a notice of electronic filing

to all parties of record.

/s/ *Dawn Siler-Nixon*
Dawn Siler-Nixon

WSACTIVELLP:10966318.2