## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

GORDIE DANIELS,

        Plaintiff,

v.

HSN, INC.; HSNi, LLC; and
QURATE RETAIL, INC., d/b/a
Qurate Retail Group,

        Defendants.

_____/

Case No. 8:18-cv-03088-SCB-JSS

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
## TO EXCLUDE EXPERT OPINIONS OF CRAIG KRONENBERGER

Plaintiff, Gordie Daniels, files his Opposition to the Motion to Strike and/or Exclude Expert

Testimony and Report of Craig Kronenberger [Doc. 39] (the "Motion") filed by Defendants, HSN,

Inc., HSNi, LLC, and Qurate Retail, Inc., d/b/a Qurate Retail Group (collectively, "Defendants"),

and states as follows:

## INTRODUCTION

Craig Kronenberger is a highly qualified expert in the fields of public relations, advertising,

reputation management, and online reputational repair.  Defendants seek to exclude his opinions

based solely[1] on his methodology, but their arguments fail to account for the experienced-based

nature of his testimony, mischaracterize how he used industry-recognized formulas, and merely

attack the weight (not reliability) of his opinions.   There is no basis to support the extraordinary

remedy[2] of striking Mr. Kronenberger's opinions.

---

[1] Defendants do not contest Mr. Kronenberger's qualifications nor the relevance of the subject matter of his opinions.
[2] *Geico Cas. Co. v. Beauford*, 2007 WL 2412974, *3 (M.D. Fla. Aug. 21, 2007) ("Rejection of an expert's testimony is the exception rather than the rule…"); *Kemm v. Allstate Property and Casualty Ins. Co.*, 2010 WL 11507365, *4

Mr. Kronenberger evaluated and qualified the impacts of Defendants' defamatory statement, then estimated the cost of an effective reputational repair campaign to fix those impacts. His analysis, calculations, and resulting opinions will assist the jury in understanding an individual's online reputation, the scope and impact of Defendants' defamatory statement online, and what it will take to repair the resulting harm. To support his methods, Mr. Kronenberger explained how his experience and the tools he used led to his conclusions, why those tools and his experience are a sufficient basis for his opinions, and how his experience reliably applies to the facts of this case. *U.S. v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004). Consequently, Mr. Daniels satisfies his burden to support the admissibility of Mr. Kronenberger's testimony, and the Motion should be denied.

## I.    DEFENDANTS' FLAWED APPROACH TO KRONENBERGER'S OPINIONS

Defendants' Motion is flawed in several respects. First, Defendants fail to assess Mr. Kronenberger's opinions under the proper legal framework. Second, Defendants fail (or refuse) to appreciate why Mr. Kronenberger selected, modified, and used certain formulas to estimate the harm to and cost of repairing Daniels' reputation.

### A.    Defendants Rely on the Wrong Legal Principles

This Court is well-versed in the standards governing the admissibility of expert testimony.[3] Defendants' Motion generally recognizes these standards (Motion pp. 2-3), but incorrectly suggests peer review, rate of error, and general acceptance are the exclusive means of testing the

---

(M.D. Fla. May 14, 2010); *Ramirez v. E.I. Dupont De Nemours and Co.*, 2010 WL 2921619, *3 (M.D. Fla. July 3, 2010).

[3] This Court has routinely exercised its "gatekeeper" role under Rule 702 and applied *Daubert*'s three-part test for assessing the admissibility of expert testimony. *See, e.g.*, *Mulbauer*, 2015 WL 8160136 at *1 (citing *Frazier*, 387 F.3d 1244 at 1260). This Court also knows an expert's proponent's burden of proof and the considerable discretion Her Honor is afforded when evaluating an expert's proffered testimony. *Id.* (citing *McDowell v. Brown*, 2004 WL 2809309 (11th Cir. Dec. 8, 2004) ("[D]istrict court has considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.")

reliability of an expert's methodology (Motion p. 4). As explained below, experienced-based experts such as Mr. Kronenberger need not satisfy the rigorous scientific factors set forth in *Daubert*. *Evanston Ins. Co. v. Xytek Tissue Services, LLC*, 378 F.Supp.3d 1267, 1279 (S.D. Ga. 2019) (citing *U.S. v. Valdes*, 681 F.App'x 874, 881 (11th Cir. 2017)).

There is no "definitive checklist or test" for assessing reliability because "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). A court's gatekeeping inquiry[4] **must be tailored to the facts of the case and the type of expert testimony at issue.** *Id.* at 150; *Dopson-Troutt v. N ovartis Pharm. Corp.*, 2013 WL 1339739, *2 (M.D. Fla. Apr. 3, 2013).[5] This guiding principle is key in cases (such as this one) where the *Daubert* standard may be difficult to apply. *See generally, Latele Television, C.A. v. Telemundo Communications Group, LLC,* 2014 WL 7150626, at *5 (S.D. Fla. Dec. 15, 2014).

Arguments (such as Defendants') raising the limitations of theories or studies upon which an expert relies do not render the expert's opinions unreliable. *Waite v. All Acquisition Corp.*, 194 F.Supp.3d 1298, 1308 (S.D. Fla. 2016) (citing *Federal Judicial Center, Reference Manual on Scientific Evidence* 553 (3d Ed. 2011) (noting that "all studies have 'flaws' in the sense of

---

[4] The Court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Allison v. McGhan Medical Corporation,* 184, F. 3d 1300 (11th Cir. 1999) (quoting *Daubert,* 509 U.S. at 596. To this end, "the Court 'must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately accorded such testimony by the fact finder." *Carideo v. Whet Travel, Inc.,* 2018 WL 1367444 at *6 (S.D. Fla. Mar. 16, 2018) (emphasis removed) (quoting *In re Trasylol Products Liab. Litig.,* 2010 WL 1489793, at *7 (S.D. Fla. Feb. 24, 2010)). Courts also must be mindful of the distinction between the reliability of a field generally and the application of that field in a particular case. *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333 (11th Cir. 2003).

[5] As this Court noted in *Oil Consulting Enterprise, Inc. v. Hawker Beechcraft Global Customer Support, LLC,* 2018 WL 834929 (M.D. Fla. Feb. 13, 2018), "[w]hen considering the qualifications and methodology of an expert, the court must be mindful [that]… exactly *how* reliability is evaluated may vary from case to case…" Logically, "[s]ometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Frazier*, 387 F.2d at 1262; *see also Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2013).

limitations that add uncertainty about the proper interpretation of results")).   Likewise, an argument that an expert should have used different *formulas* in computing damages is not a basis for excluding the expert's testimony.  *Health & Sun Research, Inc. v. Australian Gold, LLC*, 2013 WL 6086457, *3-4 (M.D. Fla. Nov. 19, 2013).   An expert's testimony should not be excluded because his opinions differed from the other party's expert's (including using a different formula). *Taylor, Bean & Whitaker Mortgage Corp. v. GMAC Mortgage Corp.*, 2018 WL 3819752, *5 (M.D. Fla. Aug. 12, 2008).[6]  Whether an expert includes certain variables in their calculations does not establish their opinions are unsound either.  *Bustick v. State Farm Mutual Auto Ins. Co.*, 321 F.R.D. 414, 417 (M.D. Fla. 2017).[7]  "Such discrepancies go to weight, not reliability.  *Id*. (citing *Rosenfeld v. Osceania Cruises, Inc.*, 645 F.3d 1190, 1193 (11th Cir. 2011).[8]

The reliability inquiry is field-specific.  "Generally, if an expert utilizes methods that are consistent with his or her scholarship and research *in the particular field*, courts will find the methodology sufficiently reliable under *Daubert.  Latele Television, C.A.,* 2014 WL 7150626, at *5 (emphasis added).[9]

---

[6] In *Taylor*, the expert testified that he relied upon MIAC indexes to form his opinions, which the defendants characterized as "never used before in the mortgage valuation profession." *Id*. at *4.  Although the expert testified he had never used that precise calculation in valuing mortgage servicing rights, he testified he believed he used the logic displayed by the formula many times in valuing various contract rights.  *Id*.  The parties' disagreement as to which formula should have been used did not provide a basis for exclusion.  "The Court need not determine that the expert testimony… is irrefutable or certainly correct." *Id.* at *5.

[7] An argument against data or facts used in calculations does not discredit the methodology."  *Id*.  Also, experts are not required to take every conceivable step in reaching their conclusions to establish reliability.  *Masforce Europe, BVPA v. Mastry Marine & Industrial Design, Inc.*, 2013 WL 8148666, *5 (M.D. Fla. 2013).

[8] *See Kearney v. Auto-Owners Ins. Co.*, 2007 WL 3231780, *3 (M.D. Fla. Oct. 30, 2007)( "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.")  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Id*. (citing *Hartley v. Dillards, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002)).  Thus, the argument that an opinion is flawed because it fails to account for certain facts does not render expert testimony inadmissible.  *Id.*

[9] Where the expert "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has a 'reliable basis *in the knowledge and experience of [the relevant] discipline*.'" *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592)(emphasis added).  "[T]he inquiry for the Court is not whether the expert is correct, but whether the proponent of expert testimony has established by a preponderance of the evidence that the testimony is reliable *in the context of the methodologies*

### B.    Kronenberger's Opinions are Experienced-Based

Mr. Kronenberger's testimony is in a field recognized as experienced-based.  *Johnston v. Borders*, 2018 WL 8244335, *3 (M.D. Fla. May 2, 2018) (admitting expert testimony concerning reputational harm based on experience); *Edmonson v. Caliente Resorts, LLC*, 2017 WL 10591833, *5 (M.D. Fla. Aug. 31, 2017) (same).  In these types of cases, "relevant reliability concerns may focus on personal knowledge and experience," and "the expert's principles and methodology, not the conclusions they generate."  *Edmonson*, 2017 WL 10591833, at *4 (citing *Daubert*, 509 U.S. at 595)).  The requirements for admissibility are less stringent in experienced-based cases.[10]  In fact (contrary to Defendants' assertion), experienced-based experts need <u>not</u> satisfy the factors set forth in *Daubert*.[11]  Reliance on the reliability factors in *Daubert* is "misplaced" where the expert's opinions "do not rely on experimental testing or scientific methodology."[12]

Defendants endeavor to vastly oversimplify online reputational repair—equating it essentially to no more than Internet advertising costs (Motion p. 20) – to advance the narrative that absolute certainty and scientific verification should be required.  This misguided position is rooted in the opinions of Defendants' expert—who admittedly is <u>not</u> an expert in public relations, has **<u>NEVER</u>** repaired someone's reputation online, and has <u>no</u> experience placing online ads, disseminating content through media outlets, or running an advertising campaign.[13]  It comes as no surprise that Ms. Giddens' limited approach to reputational repair narrowly focuses on her field

---

*or techniques applied within the appropriate field*."  *Fortran Group International Inc. v. Tenet Hospitals Limited,* 2011 WL 13176213 (M.D. Fla. 2011)(emphasis added).

[10] *TRA Farms, Inc. v. Sygenta Seeds, Inc.*, 2014 WL 3844838, *1 (N.D. Fla. Apr. 14, 2014) (citing *In re. K.L.R.*, 162 SW3d 291, 303 (Tex. App. 2005) ("Where.. the trial court must address… a field based primarily upon experience and training as opposed to the scientific method, the requirement of liability applies but with less vigor than to the hard sciences.")).

[11] *Id*. (citing *Valdes*, 681 Fed.App'x. at 881).

[12] *Id*. at 1283; *see also Nature's Products, Inc. v. Natrol, Inc.*, 2013 WL 11275370, *2 (S.D. Fla. Oct. 8, 2013) ("Accordingly, '[t]o the extent that expert opinions are derived from literature review, witness interviews and data analysis, they are not automatically rendered unreliable by their non-susceptibility to empirical verification.")

[13] Giddens Depo. 11:16-25, 12:13-15, 49:5-8 [Doc. 39-14]

of expertise (search engine optimization).[14]

This, however, ignores many other important aspects of an effective reputational repair campaign and does nothing to address the defamation victim's right to inform the public potentially exposed to a defamatory statement that its content is false. Although Ms. Giddens agrees that a defamed person has the right to tell the same audience potentially exposed to the defamatory statement that it is false,[15] Defendants' minimalist spin on reputational repair does nothing to accomplish this important goal. Simply stated, buying a bunch of ads on *Page Six* is not an *effective* means of repairing Mr. Daniels' reputation.

Estimating what it will cost to effectively reach the potential audience exposed to the defamatory statement is an area that does not lend itself to one-size-fits-all formulas and falls squarely within Mr. Kronenberger's wheelhouse. It requires real world experience applied to a mechanism for determining the value of the online conversation surrounding and impacts of a defamatory statement. Mr. Kronenberger drew on his experience to estimate the cost of a campaign[16] to repair Mr. Daniels' online reputation based on the assessed impacts of organically created "earned"[17] media coverage surrounding the defamatory statement.[18] Mr. Kronenberger's decades of experience actually running these types campaigns is central to assessing the reliability of his opinions. This knowledge base is essential to predict and reliably estimate what it will cost to counteract the effects of a defamatory statement based on that statement's potential reach, the types of publications in which it appears, and the particular individual whose reputation was harmed.

---

[14] Giddens Depo. 16:6-18, 43:11-46:13 [Doc. 39-14]
[15] Giddens Depo. 50:6-13 [Doc. 39-14]
[16] Kronenberger Depo. 193: 16-194: 25, 203: 3-25 [Doc. 39-2, 3-3]
[17] "Earned media" is news coverage that is earned or pitched, and shared by people without the influence of money behind it. Kronenberger Depo. 20:8-21 [Doc. 39-2]
[18] Kronenberger Depo. 116:4-19 [Doc. 39-2]

Presumably, Defendants ignore the importance of Mr. Kronenberger's experience and try to minimize what reputational repair entails because they did not retain a reputational repair expert. They retained an expert who (although qualified in a discrete area of online technology) has never worked in Mr. Kronenberger's field.[19]  Compounding this problem, Ms. Giddens primarily works in computer sciences and academia—where absolutes and scientific methods are the norm.[20] Therein lies the crux of Defendants' inability (or perhaps refusal) to accept Mr. Kronenberger's opinions, as well as the explanation for their unfounded attack on the "reliability" of Mr. Kronenberger's methods based on incorrect legal standards and perceived flaws explained away by Defendants' lack of understanding of what Mr. Kronenberger did and why he did it.

Mr. Kronenberger used *Meltwater's*[21] Advertising Value Equivalency ("AVE") formula to estimate the cost of counteracting the publicity and online conversation generated by the defamatory statement.[22]  Mr. Kronenberger did <u>not</u> use AVE to determine the return on investment,[23] which is *one* application of AVE the PR industry takes issue with.  (Motion pp. 10-11).[24]  AVE reliably indicates what a campaign designed to reach the same audience exposed to a defamatory statement with a message carried through similar authority publications will cost. Mr. Kronenberger used AVE in a manner in which it is intended.[25]  As set forth below, the same

---

[19] Giddens Depo. 43:11-44:9; 9:24-12:4; 49:5-8 [Doc. 39-14]

[20] Giddens Depo. 5:14-6:5 [Doc. 39-14]

[21] Meltwater is a media monitoring, analytics, and business intelligence software tool. [www.meltwater.com/products/media-intelligence/]. Ms. Giddens agreed that Meltwater is a reliable source. Giddens Depo. 116:6-10 [Doc. 39-14]

[22] Kronenberger Report p. 15, 23

[23] Kronenberger Depo. 114:18-115:2, 115:17-19, 193:16-194:25, 149:3-150:9 [Doc. 39-2]; Depo. Ex. 10 [Doc. 39-11]

[24] Some segments of the PR industry take issue with AVE when it is used to determine ROI, which is understandable. [Doc. 39-11]  PR professionals want to legitimize their profession and the fees they charge by demonstrating benefits their efforts achieved for clients through methods which may not lend themselves to the AVE formula.

[25] Notably, Defendants offer no argument and cite to no sources demonstrating that Mr. Kronenberger's use of AVE to estimate the *cost* of a reputational repair campaign was improper.  Likewise, Defendants offer no alternative explanation for what an effective reputational repair campaign would cost.  Their expert did not (nor was she asked to) determine what it would cost to repair Mr. Daniels' reputation.  Giddens Depo. 127:2-13 [Doc. 39-14]

holds true for CPA.

## II.    KRONENBERGER'S QUALIFICATIONS

Although Mr. Kronenberger's qualifications have not been challenged, they still play an important role in evaluating the reliability of his methods. *Frazier*, 387 F.3d at 1261 (expert's qualifications bear on reliability of proffered testimony but are by no means a guarantor of reliability). Given the subject matter of his opinions, his extensive experience directly ties to the reliability of his methods.

Mr. Kronenberger is the President of Stripe Reputation, Inc. ("Stripe Reputation"), a leading consultancy for online reputation management that offers digital marketing and reputation management strategies and services.[26] Those services include digital measurement and analytics, paid media management, crisis and issues management, new media analysis and monitoring, and search engine optimization, among other services. (Report pp. 2-3) Kronenberger has significant experience in promoting and protecting reputations for brands, organizations, executives and individuals.[27] Prior to working at Stipe Reputation, Kronenberger was the Global Managing Director of Strategic Growth at Edelman, the world's largest public relations firm.[28] At Edelman, he was responsible for leading global teams in the areas of Search Engine Management, Digital Crisis and Risk, Paid Media, and Research and Insights, and at the forefront of the public relations field, helping create industry certifications and training courses in areas such as search engine optimization, paid and online media, analytics, understanding data as it relates to online media, content strategy, how to leverage resources on the Internet, and how to use data to inform

---

[26] Kronenberger Depo. 19:4-20:7 [Doc. 39-2]
[27] Kronenberger Depo. 16:20-20:21, 22:2-26:10 [Doc. 39-2] (confidential portions regarding client names can be filed under seal if necessary).
[28] *Id.* at 23:1-22

communications strategies.[29]

Throughout his career, Mr. Kronenberger handled numerous crisis and reputational management situations for private individuals, companies, celebrities, and high profile clients. While noting that all these situations are different, Mr. Kroneberger explained how he obtains and assesses data and uses his own independent analysis to understand online conversation, engagement, sentiment, volume, and authority in each specific situation.[30]    On average, Mr. Kronenberger handles ten reputation management and crisis assignments per week.[31]    Mr. Kronenberger developed his methodology for assessing and addressing the impact and damage caused by the dissemination of online over many years, and it constantly evolves with changes in technology.[32]  His methodology is a culmination of decades of working on reputation management projects and studying the impact and damage caused by the dissemination of online content and the effectiveness of strategies to repair online reputational harm.[33]  His practical, real world experience repairing reputations and observing what actually happens in the digital marketing and PR space allows him to determine the most effective ways to deal with online reputation management and what it will cost.[34]  His experience is diversified across PR, advertising, and reputation management, which gives him a broad field of knowledge from which to understand and estimate the costs associated with repairing reputation:

- **Advertising Experience.**
  Kronenberger has practical, real-world experience building, planning and managing advertising campaigns with the goal of bringing awareness around issues, individuals, and products.  His experience includes work for companies such as Delta Airlines, Nissan, Amazon, and Starbucks, as well as on political and issue campaigns.  [Report p. 3]

---

[29] *Id.* at 11:15-14:9
[30] *Id.* 25:20-27:17
[31] *Id.* at 43:20-44:25; Report p. 2
[32] *Id.* 45:1-47:25
[33] *Id.* at 45:1-47:25
[34] *Id.*; Report p. 2

- **Public Relations Experience.**
  Kronenberger spent decades building strategies to land stories with the media, and learning and understanding the value of a story in the media. This experience helped him develop a unique understanding of how stories spread online and through social media. He also has significant experience influencing, planning, pitching, and landing press coverage in media outlets such as CNN, New York Times, and Good Morning America. [Report p. 3; Kronenberger Depo. 22:2-25]

- **Crisis and Reputation Management Experience.**
  Kronenberger also has decades of experience suppressing negative content in search engines, running campaigns to change perception through advertising and PR strategies, and helping companies, individuals, and brands handle media and communications crises. In this area, his experience includes work for celebrities, entrepreneurs, athletes, governments, and private individuals with no established online reputation. [Report p. 3; Kronenberger Depo. at 24:1-26:10, 44:1-25][35]

Through all his experiences, Mr. Kronenberger developed a deep understanding of what methods work in the reputational repair field and how much those methods will cost. In this case, as in all cases, Mr. Kronenberger used his experience across PR, advertising and reputation management to arrive at a reasonable estimate of the cost of a campaign that will have the best chance of effectively repairing reputation.

## III. THE RELEVANCE OF KRONENBERGER'S AREA OF EXPERTISE

In order to understand how Mr. Kronenberger's opinions will assist the jury and why they are reliable, his opinions also should be examined in proper context (which Defendants do not do). Every person's reputation is unique; as are the circumstances surrounding how their reputation has been harmed. Naturally, reputational repair campaigns and their associated costs vary based on the visibility of the person and issues involved, as well as the volume and authority of the online

---

[35] Due to the confidential nature of Kronenberger's services and NDAs, he can provide names and more specific details about his clients under a protective/sealing order or through protected testimony at a *Daubert* hearing. However, Defendant's counsel did not circle back to these specifics at his deposition. Kronenberger Depo. 44:1-25 [Doc. 39-2]

conversation about them.[36]  People with high visibility and public figures have to be looked at and weighted differently than someone with no visibility.[37]  Someone with little or no visibility will suffer greater impacts from a sudden and broadly disseminated negative story than a public figure or high-visibility person would.[38]

    The law recognizes the unique power public figures have to protect their reputation through ready access to the media and an ability to defend themselves in the press.[39]  The law also recognizes that reputational harm is inherently difficult to ascertain with mathematical precision.  "The unique nature of [defamation] cases is well established.  In actions for other torts there is generally… some standard by which the reasonableness of an award of damages may be tested, but it is seldom so in actions for libel and slander where the elements of wounded sensibilities and the loss of public esteem play a part."  *Bouveng v. NYG Capital LLC*, 176 F.Supp.3d 280, 335 (S.D.N.Y. 2016) (citations omitted).  "For that reason, the amount of such damages is peculiarly within the jury's province[,] requiring prudence and restraint by a trial court in the exercise of its discretion over these awards."  *Id*.  Florida's standard jury instruction on damages in defamation actions recognizes these concepts.[40]

    "In the internet age in which we live, an individual's online presence is important…"[41]

---

[36] Depo. 46:24-49:19 [Doc. 39-2]

[37] *Id*. at 47:1-25

[38] *Id*.

[39] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974) ("Public officials and public figures usually enjoy substantially greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals…")

[40] "[I]f you find for (claimant), you should award (claimant) an amount of money that will fairly and adequately compensate (claimant) for such [loss] [injury] or [damage] as the greater weight of the evidence shows was caused by the [statement] [publication] in question."  § 405.10.  Among the elements of damage the jury "shall consider" is "injury to reputation," for which "[t]here is no exact standard for fixing the compensation to be awarded on account of such elements of damage."  *Id*. § 405.109(a).

[41] This is one reason why an expert in the field of managing and rehabilitating online reputation is helpful for a jury in a defamation case. *Johnston v. Borders*, 2018 WL 8244335, *3 (M.D. Fla. May 2, 2018).  "The average juror will not be versed in management and rehabilitation of one's online reputation."  *Id*.

*Buoveng*, 175 F.Supp.3d at 343.  Accordingly, it is reasonable for juries to consider the media used

to transmit, disseminate, and store the defamatory statements, the accessibility of this media to

anyone with an interest – including prospective employers – the permanence of the material, and

the likelihood of future harm to reputation.  *Id*. at 339.  "Internet publications have the potential to

have great reach." *Id*.  "We live in a highly competitive, information-drive world…" *Id*. at 342.

In calculating damages in a defamation action, juries may consider a number of factors – including

the extent to which the statement about the plaintiff was circulated.  *Id.* at 335.

## IV.    KRONENBERGER'S TESTIMONY IS BASED ON RELIABLE METHODS

Mr. Kronenberger used his experience and generally accepted PR, advertising, and

marketing tools to: (1) assess the impacts and the potential reach (*i.e.,* the dissemination) of the

defamatory statement across news outlets and social media; and (2) estimate the reasonable and

necessary cost of a campaign to repair Daniels' reputation and correct the defamatory narrative

disseminated about him.  [Report p. 5]  The methods he used to address these issues are reliable.

### A.    Mr. Kronenberger Reliably Evaluated the Impacts of the Defamatory Statement

Mr. Kronenberger's first step was assessing Mr. Daniels' online reputation before and after

the publication of the defamatory statement using authoritative, reliable, generally accepted

methods [Talkwalker[42], Ahrefs[43], Moz[44], and Google[45]] to determine the volume of conversation about Mr. Daniels and the velocity, authority, engagement, and sentiment of the conversation surrounding him.[46]  The totality of the mentions, engagements, and outlets allowed Kronenberger to evaluate the "volume" of people exposed to the defamatory statement.[47]  Defendants' expert testified all of the software and tools Kronenberger used are generally accepted and relied upon in the industry.[48]  Kronenberger also evaluated the "authority" of the people and news outlets that mentioned or engaged with the defamatory statement, noting that higher "authority" sources have more credibility, more influence, and more exposure.[49]  For example, a *Page Six* story is more significant than an anonymous, unknown person tweeting.[50]  The higher the authority sources disseminating the defamatory statement, the more influence it will have.[51]

Looking at the baseline of the conversation around Daniels preceding the defamatory statement and the overall volume of conversation after it was published, as well as the authority of the sources involved in the conversation, Mr. Kronenberger opined that there was significant

---

[42] Kronenberger utilized Talkwalker—a widely recognized software tool in his industry—to search for and analyze online, social media, print, and TV/radio content from publicly available sources, such as news media, blogs, and social media.  Kronenberger used specific search criteria so that the results generated by the software would be narrowly focused.  [Kronenberger Depo. 38:6-40:22, 52:2-55:17, 98:2-23, 103:18-133:3]  The data compiled by Talkwalker included news media that contained or linked to the defamatory statement, as well as social media activity, such as "mentions" and "engagements." [*Id.*]  After understanding the volume of online conversation, Kronenberger used Talkwalker and his own independent analysis to evaluate the "sentiment" of those conversations.  Talkwalker provides a sentiment score for each of the search results indicating whether the article or commentary was positive, negative, or neutral.  Talkwalker's sentiment analysis is based on deep learning algorithms and advanced pattern recognition. Talkwalker is able to provide a 90% accuracy for sentiment analysis. [*Id.* at 150:12-151:6]  Nonetheless, Kronenberger independently reviewed all of the engagements and mentions for sentiment.  [*Id.* at 36:24-41:21; Report p. 21-22]

[43] Kronenberger used AHRefs—a search and analytics tool—to identify all of the media outlets that contained links to the defamatory statement.  [Report p. 14-15; Kronenberger Depo. 113:23-114:11; Giddens Depo. 72:11-73:11]

[44] Kronenberger used Moz to determine the authority of domains and subdomains.  [Report p. 14-15; Kronenberger Depo. 92:19-93:22; Giddens Depo. 72:11-73:11]

[45] Kronenberger used Google trends to evaluate search volume over time.  [Report pp. 14, 19-20; Depo. 97:3-110:23]

[46] Report p. 11; Kronenberger Depo. 48:1-50:25

[47] Report pp. 11-13

[48] Giddens Depo. 72:11-22 [Doc. 39-14]

[49] Kronenberger Depo. 53:9-55:17, 60:14-62:19

[50] *Id.*

[51] *Id.*

damage to Daniels' reputation, particularly since Daniels had virtually no visibility before the defamatory statement.[52] Ms. Giddens agreed Mr. Daniels was not a public figure or celebrity and had no negative online reputation before May 17, 2018.[53] Mr. Kronenberger's analysis of the volume, authority, velocity, and engagement on the conversation surrounding Daniels demonstrated that the defamatory statement was heavily circulated[54] online, and there was a spike in interest surrounding Daniels associated with the defamatory statement.[55] As Kronenberger explained, the *Page Six* article and conversation it drove *significantly* impacted Daniels' reputation because he had little to no visibility before May 17, 2018.[56] Ms. Giddens confirmed this conclusion, aptly summarizing the situation as follows: "It may only take one thing to be a substantial increase on somebody that has nothing [about them online]."[57]

Mr. Kronenberger also calculated the potential reach of the news media surrounding the defamatory statement using reliable methods.   [Report p. 15-16]   The data collected and Kronenberger's induval analysis showed a significant volume of news media coverage.  *See* Doc. 39-5.  Defendants launch several attacks on Mr. Kronenberger's potential reach calculations (Motion pp. 14-16), but they fail to apprise the Court that their own expert confirmed Kronenberger's potential reach numbers are accurate. [58]

As for these potential reach numbers, Mr. Kronenberger explained why multiple URLs for the same website are included.[59] Kronenberger explained there are two URLs for *Page Six* because

---

[52] Report p. 11-12; Kronenberger Depo. 57:16-60:25; Giddens Depo. 61:25-62:21, 64:11-16
[53] Giddens Depo. 62:9-21, 64: 11-16
[54] "Circulation" includes the number of outlets talking about a topic in addition to the potential reach they have. [Kronenberger Depo. 61:6-16]
[55] Report p. 11-17; Kronenberger Depo. 48:1-49:10, 50:5-19, 61:1-64:13
[56] Kronenberger Depo. 61:21-62:19
[57] Giddens Depo. 64:17-65:1
[58] Giddens Depo. 73:15-24 (**"I'm assuming this is potential reach.  I don't doubt the numbers, no."**)
[59] Kronenberger Depo. 80:12-88:14

it published a written article **and video report**, both of which include the defamatory statement.[60] Kronenberger explained multiple URLs for the *Tampa Bay Times* based on different URL structures, which are used because websites share content in different ways and through different distribution mechanisms to try to reach as many people as possible.[61]  Ms. Giddens confirmed the same thing.[62]  Defendants may disagree with how Kronenberger calculated his potential reach totals and what he included, but that is an issue for cross-examination, not a basis to exclude Mr. Kronenberger's opinions.  *Bustick*, 321 F.R.D. at 417.

Defendants attack Kronenberger's sentiment analysis because they think Kronenberger should have included an assessment of the substance of "comments."   (Motion pp. 22-23). Kronenberger explained the flaw in this attack.  He reviewed all of the comments and explained how they provide "context" for the analysis, but not a meaningful measurement of sentiment in this case.[63]  Kronenberger also explained the primary relevance of the comments:  they *all* are "negative" because they show people read the story and saw the defamatory statement.[64]

### B.   Kronenberger's Reliably Estimated Reputational Repair Costs

Based on the results of this analysis concerning Mr. Daniels' online reputation and the level of dissemination of the defamatory content[65], Mr. Kronenberger relied upon his experience and recognized industry formulas to estimate the costs associated with a combination of methods to counteract the impact of the defamatory statement.[66]  Kronenberger estimated the cost of the campaign to reach the audience potentially exposed to the defamatory content using Meltwater's

---

[60] Kronenberger Depo. 145:14-146:10; Giddens Depo. 86:4-21
[61] Kronenberger Depo. 86:18-87:22
[62] Giddens Depo. 73:25-77:1
[63] Kronenberger Depo. 75:5-17, 77:12-78:8
[64] Kronenberger Depo. 73:8-74:20, 77:1-5
[65] Kronenberger compiled his results in a "Digital Audit" for Mr. Daniels, which Defendants and their expert did review.  [Opp. Ex. 3]
[66] Kronenberger Depo. 19:16-22:22, 32:23-33:5, 194:8-25, 203:3-204:7, 215:17-217:25.  A general overview of efforts included within a reputational repair campaign is attached hereto as **Appendix A**.

AVE formula for news media and CPA for social media.[67]

### 1.    AVE

Defendants attack Kronenberger's use of AVE based on a mischaracterization of what the formula does and how Kronenberger used it.    AVE is appropriate for Kronenberger's purposes. As Kronenberger explains, AVE formulas "provide an industry benchmark to help PR professionals understand the value of earned media.[68]    Kronenberger did <u>not</u> (as Defendants suggest) use AVE to determine ROI.  He used AVE to "estimate how much it would cost to reach the same potential audience with a correction about Gordie Daniels and allow us to inform audiences that may have seen the defamatory statement that it is untrue."[69]

The materials Defendants site as support for the supposed invalidity of AVE attack its use as a method of determining ROI.[70]  These same sources, however, support  Kronenberger's use of the formula in the manner in which he used it – **TO DETERMINE COST**.[71]

As Defendants note, there is no standard industry formula to calculate the cost of correcting and repairing reputational harm caused by a defamatory statement.  This is why Mr. Kronenberger used his experience to select a formula he considered to be an accurate and reliable indicator of the cost of a reputational repair campaign.   Ms. Giddens confirmed Meltwater is a credible source.[72]  Mr. Kronenberger's methodology is clearly stated, all data inputs clearly provided, and he even altered the formula to make it *more* accurate and reliable.[73]

Defendants attack Kronenberger for using potential actual reach figures rather than the

---

[67] Report pp. 23-26
[68] *Id*. at p. 23
[69] *Id*.
[70] Doc. 39-5, 39-10, 39-11
[71]  Giddens Depo. Ex. 10 [Opp. Ex. 2]; Principle 5 of the Barcelona Principles notes that "Advertising Value Equivalents (AVEs) measure **the cost** of media space or time and do not measure the value of PR." (Emphasis added)
[72] Giddens Depo. 116:6-10
[73] Report pp. 23-24; Kronenberger Depo. 161:21-167:24

"monthly unique visitors" stated in the formula (Motion pp. 14-15), but Kronenberger explained that using actual potential reach figures provides a more accurate indication of the audience exposed to the defamatory statement.[74]  This decision was not "arbitrary." Regardless, it is not a basis to exclude Kronenberger's testimony.  *Health & Sun Research*, 2013 WL 6086457 at *3-4; *Taylor, Bean & Whitaker*, 2018 WL 3819752 at *5; *Bustick*, 321 F.R.D. at 417.

### 2.    Frequency

Kronenberger included a frequency multiplier in his analysis because messages need be disseminated frequently enough to generate multiple interactions in order to change perceptions.[75] Kronenberger opined—based on his expertise in and familiarity with the industry, and industry research on the subject—that  one would need to increase the frequency by 5 times to obtain the same level of exposure as the defamatory statement due its reach and authority.[76]  This increased frequency improves the likelihood of exposure, engagement with, and awareness of the positive content.

Frequency in the PR and advertising industries is not a novel concept.    "Effective Frequency" is well-known.[77]  Kronenberger's opinion, based on his experience and a *Nielsen* study, that a frequency multiplier of 5 is appropriate is reliable.[78]  *See PODS v. U-Haul*, 126 F.Supp.3d at 1283-84 (recognizing use of multipliers to correct misimpressions).  This merely is another cross-examination area.

---

[74] Report pp. 23-24; Kronenberger Depo. 161:21-167:24

[75] Report p. 24

[76] *Id*.  This method has been recognized in corrective advertising cases.  *PODS Ent., LLC v. U-Haul Intern., Inc.*, 126 F.Supp.3d 1263, 1283-1284 (M.D. Fla. 2015).

[77]    *See    e.g.,*    https://adage.com/article/cmo-strategy/frequency-advertisers-deal-conflicting-data/315496; http://www.journalofadvertisingresearch.com/content/early/2018/10/17/JAR-2018-031.article-info.

[78] Report p. 24; Kronenberger Depo. 204:8-206:9, 208:4-210:4

### 3. CPA

Kronenberger used a "cost-per-action" or CPA[79] model to estimate the cost of social media reputational repair efforts.  [Report p. 25]  He used this model because CPAs are comparable to the goal of a reputational repair campaign (as they are based on viewer reaction).  Kronenberger felt they accurately measure the goal of engagement, as opposed to reverse engineering a standard cost from Facebook.[80]

As set forth above, there are numerous pricing models but none that specifically apply to fixing a reputation, particularly a reputation impacted by a non-advertising (earned media) campaign.  The goal in reputation management is to reach the same amount of people that may have been influenced by the negative content and hopefully change their perception.  Cost-per-action advertising is advertising for which an advertiser pays for a specified action.[81]  This model equates to quantifiable engagement and is the closest comparison to advertising that will generate the *results* sought through a reputational repair campaign.[82]

Once again, an experts' decision to use one formula over another is not a basis to exclude their testimony.  *Health & Sun*, 2013 WL 6086457 at *3-4; *Taylor, Bean & Whitaker*, 2018 WL 3819752 at *5.    Accordingly, Defendants' CPA argument does not warrant striking Kronenberger's opinions.

## V.  **KIFLE, MILLER, AND DANIELS ARE SIGNIFICANTLY DIFFERENT CASES**

Defendants also seek to discredit Mr. Kronenberger by pointing out that he used different

---

[79] Kronenberger Depo. 212:1-215:11.  Defendants note Kronenberger used CPE in the Kifle case. (Motion 6).  As set forth below, the Kifle case is incomparable to the facts of this one.  Moreover, things have significantly changed since Mr. Kronenberger's opinions in Kifle.  It's harder to reach people on social media so it takes more money to make it happen due to increased costs.  Visibility in the feed of Facebook is more competitive and pricing has gone up.  Costs overall have gone up.  The platforms do not share the data in the same way.
[80] Kronenberger Depo. 213:9-214:8
[81] Doc. 39-16
[82] *Id.*

formulas in drastically different cases. *See* Motion pp. 5-15. However, Mr. Kroneberger's decision to use different formulas in different cases highlights the reliability of his opinions. *Frazier*, 387 F.3d at 1260. Mr. Kronenberger relied on his experience and an analysis of the specific facts and data available on a case-by-case basis to select and use formulas that provide the most reasonable and reliable estimate of costs in each case. The decision to use different formulas is not a basis to exclude an expert's opinion. *Health & Sun*, 2013 WL 6086457 at *3-4; *Taylor, Bean & Whitaker*, 2018 WL 3819752 at *5. Moreover, the facts of this case, *Kifle*, and *Miller* are incomparable:

- *Kifle*: This case involved the publication of a defamatory article by the operator of a website, Etheopian Review. [*See* Opp. Ex. 5] Thus, it involved a defamatory statement on owned, not earned media. Moreover, at the time of the Kifle case, certain social media data was publicly available, which is not true now, and the primary focus of Kronenberger's opinions was search results, not a comprehensive reputational repair campaign like the one at issue here. [Kronenberger Depo. 218:1-219:8, 182:16-184:14, 185:7-18]

- *Miller*: This case involved a news outlet's publication of a sealed court filing containing false allegations about a high-profile public figure. The defamatory statement was disseminated exponentially higher than this case.[83] Consequently, Kronenberger used a much more comprehensive and case-specific tool, Cision, to gather and analyze the massive volume of media and social media data, and used that tools' AVE formula as a result. [Kronenberger Depo. 169:6-172:4, 175:23-182:6]

- Daniels: Mr. Daniels' case is distinct from both. Unlike *Miller*, Mr. Daniels is a private figure who had <u>no</u> media coverage prior to the defamation. Unlike *Kifle*, the media coverage generated regarding Daniels was high volume and authority, including national publications. Unlike *Miller*, the coverage was not so massive that Cision was needed to evaluate its scope, and Daniels is a private figure the media is much less likely to cover. [Kronenberger Depo. 193:16-194:25, 203:3-25]

---

[83] Defendants question Kronenberger's potential reach calculations in *Miller*, but their expert recognized the concept of potential reach. [Opp. Ex. 4]

## VI.  **DEFENDANTS' MISGUIDED CAUSATION ARGUMENT**

As this Court recognized in *Ameritox, Ltd. v. Millenium Labs, Inc.*, 2014 WL 1779283, *4 (M.D. Fla. May 5, 2014), experts are not permitted to opine regarding an allocation of damages because that is the function of the jury.   In *Five for Entertainment S.A. v. Rodriguez*, 2014 WL 12503331, *3 (S.D. Fla. Aug. 14, 2014), the court recognized that in a defamation action the jury is entitled to draw reasonable inferences and decide between two asserted causes of harm, one of which is the defamatory statement.  In fact, where a defamatory statement is repeated numerous times on the Internet, it is reasonable to infer that a widely disseminated statement causes damage. *Id.*  Florida's Standard Jury Instructions for Defamation cases put the issue of causation, including concurrent causation, exclusively within the hands of the jury.  § 405.6.

Defendants argue Mr. Kronenberger's opinions are unreliable because he did _**not**_ seek to usurp the role of the jury.  (Motion pp. 20-21)  Kroneberger explained, consistent with the above cited law, that the did <u>not</u> usurp the jury's role, and that separating the defamatory statement from the stories as a whole would be inappropriate.[84]

### CONCLUSION

Based on the foregoing, the Court should deny the Motion in its entirety, and permit Kronenberger to present his opinions and testimony to the jury.

Respectfully submitted,

*/s/ Shane B. Vogt*
Shane B. Vogt
Florida Bar No. 257620
E-mail:  shane.vogt@bajocuva.com
BAJO CUVA COHEN & TURKEL, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602-5853
Telephone: (813) 868-6650
Facsimile: (813) 443-2193

---

[84]  Kronenberger Depo. 78:23-79:15

and

Cynthia N. Sass
Florida Bar No. 0691320
E-mail: csass@sasslawfirm.com
Amanda L. Biondolino
Florida Bar No. 1008493
E-mail: abiondolino@sasslawfirm.com
SASS LAW FIRM
601 West Dr. Martin Luther King, Jr. Blvd
Tampa, Florida 33603
Telephone: (813) 251-5599
Facsimile: (813) 259-9797

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 18, 2019, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

/s/ Shane B. Vogt
Attorney