# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

GORDIE DANIELS,

      Plaintiff,

Case No. 8:18-cv-03088-SCB-JSS

v.

HSN, INC.; HSNi, LLC; and
QURATE RETAIL, INC., d/b/a
Qurate Retail Group,

      Defendants.

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Gordie Daniels ("Daniels"), responds to the Motion for Summary Judgment and Incorporated Memorandum of Law [Doc. 40] (the "Motion") filed by Defendants, HSN, Inc. ("HSN"), HSNi, LLC ("HSNi") and Qurate Retail, Inc. ("Qurate") (collectively, "Defendants"), and states as follows:

## INTRODUCTION

For nearly two years, Defendants overworked Daniels while *knowingly* failing to pay him for work at home on nights and weekends. Then, they fired him for sending an e-mail his boss instructed him to send and defamed him in the national press, falsely telling a reporter Daniels' e-mail was not "authorized, approved or reviewed for distribution." Defendants used Daniels for free labor and then sacrificed him to protect their "brand," knowing their defamatory statement would be prominently published and Daniels would be personally named. Daniels will forever be falsely depicted online as an insubordinate and untrustworthy employee, destroying his professional reputation and career in the highly-competitive talent industry.

As the Court considers Defendants' request to summarily dispose this case, one must be mindful that words, particularly those spoken in the press, are incredibly powerful; the primary limitation against the excesses of which is the defamation action. *Miami Herald Pub. Co. v. Ane*, 423 So.2d 376, 387-88 (Fla. 3d DCA 1982) (defamation action is the "individual's sole remedy" against those who abuse free speech).[1] Defendants ask to leave Daniels powerless to right their wrongs based on a materially incomplete and slanted version of disputed materials facts, outdated and distinguishable case law, and arguments requiring the Court to adjudicate issues of fact, weigh evidence, decide credibility, and draw inferences in Defendants' favor. Summary judgment is not appropriate and should be denied.

## I.    STATEMENT OF DISPUTED[2] MATERIAL FACTS[3]

### Overview of Plaintiff's Employment and Uncompensated Overtime

On June 6, 2016 , Daniels joined the Home Shopping Network as a Casting Specialist[4] and was paid hourly.[5] His supervisor, Tim Bruno, joined HSN at the same time.[6] They participated in the same orientation session,[7] at which Defendants presented no FLSA content.[8]

Defendants rely on a "link" to additional company policies, but it was never sent to

---

[1] Since *Ane*, the Internet has exponentially increased the power and impacts of speech. *Bouveng v. NYG Capital LLC*, 175 F.Supp.3d 280, 339 (S.D.N.Y. 2016).

[2] Due to space limitations, additional disputed facts have been omitted from the record but can be provided if oral argument or additional briefing are permitted.

[3] Deposition transcripts are cited as: [Deponent Surname] at [Page:Line(s)]. Deposition exhibits are cited as: "Depo. Ex. ___." All deposition exhibits were numbered sequentially except for those used in expert depositions (Kronenberger and Giddens) which are cited as "Kronenberger Depo. Ex. ____" or "Giddens Depo. Ex. ___." If deposition transcripts or exhibits were already filed by Defendants, the docket number also is provided. Citations to new exhibits also include reference to their exhibit number relative to this Opposition, cited as "Opp. Ex. ___."

[4] HSNi 88-90 [**Opp. Ex. 1**]; Daniels Depo. 27:27-28:1 [Doc. 40-2]; Answer ¶ 19 [Doc. 9]

[5] HSNi 88-90; Answer ¶ 19 [Doc. 9]

[6] Daniels Depo. 28:28-15-18 [Doc. 40-2]; HSNi 9517 [**Opp. Ex. 2**]

[7] Bruno Depo. 37:21-21 [Doc. 40-34]; Carter Depo. 35:25-36:3 [Doc. 40-41]

[8] Defendants did not go to "great lengths to ensure… employees were aware of and followed their obligations under the FLSA." (Motion p. 24) The timekeeping training consisted of how to badge in and out. Daniels Depo. 40:5-10 [Doc. 40-2] Bruno did not recall any FLSA training. Bruno Depo. 37:18-20 [Doc. 40-34] No training materials were produced in response to Plaintiff's Request for Production No. 2 asking for the same, except for Doc. 40-4 and Doc. 40-5.

Daniels.[9]  An "Orienteering Guide" containing a few lines of script (which Daniels also never received) is also suggested proof of timekeeping obligations and FLSA rights.[10]  Defendants' cursory timekeeping "policies" tucked away on the intranet admonish against the manual reporting procedures they now claim (see Motion p. 24) entitle them to summary judgment.[11]  Other supposed directives (Motion pp. 3-4, 24) were routinely disregarded by Bruno, such as "management and supervisors" monitoring time and pre-approving overtime to avoid discipline.[12]  Defendants' "Leadership and the Law" training did not occur until a year after Daniels was hired and was as bare bones as the other supposed FLSA training materials.[13]

Defendants used an on-site, electronic badge system to record Plaintiff's work hours in its Kronos timekeeping system,[14] maintain no written policies regarding its use; either co-workers educate new hires or employees (like Daniels) figure it out on their own.[15]  HSN employees cannot manually adjust their own time, and must report missed punches or adjustments to a supervisor, who then corrects the time.[16]

---

[9] See Depo. Ex. 2 [Doc. 40-3]; Daniels Depo. 36:11-16; 21:21-24 [Doc. 40-2].

[10] The Acknowledgment Form signed by Daniels at the outset of his employment (Depo. Ex. 2) merely states that policies are available for review and he will be sent a reminder email with a link (which was never produced). The Form does not acknowledge receipt of the Orienteering Guide, which is disputed. Daniels Depo.41:18-21 [Doc. 40-2]. Daniels did not even know if the Orienteering Guide was on the intranet. Daniels Depo 41:18-42:1. [Id.] He testified that he had vaguely seen the timekeeping policy (Depo. Ex. 3) but was not sure if it was during his employment. Daniels Depo. 41:18-23 [Doc. 40-2].  The only other hourly employee in Daniels' department, John Camacho, testified he had not been given any FLSA training since his orientation 14 years ago. Camacho Depo. 8:7-17; 24:16-19; 21:10-14 [**Opp. Ex. 3**]

[11] Depo. Ex. 3 [Doc. 40-4] merely states to be sure to clock in and work when clocked in. Otherwise, "Please do not work off the clock…allow yourself the full compensation you have earned." It also admonishes an employee against making a "habit" of notifying management of corrections. [Id.]

[12] Doc. 40-4; Doc. 40-5; Daniels Depo. 46:16-47:2; 48:4-10; 49:18-50:2 [Doc. 40-2]; Motion p. 3 ("Bruno… allow[ed] [Plaintiff] to work overtime as needed.").

[13] Daniels may have received a non-exempt training on May 1, 2017 [Doc. 40-66, page 64 of 137]; but he does not recall this happening and the written training materials were never produced.

[14] Although Defendants also utilized a time-keeping software (known as "Kronos"), Plaintiff did not have access to this software to record or alter his own time.  Bruno Depo. 63:8-17, 30:1-31:12 [Doc. 40-34]; Carter Depo. 45-21-46:2 [Doc. 40-41]

[15] Daniels Depo. 40:11-41:2 [Doc. 40-2].  Carter Depo. 14:17-19; 46:25-47:12 [Doc. 40-41].  Defendants produced no policies describing Kronos procedures.

[16] Daniels Depo. 41:3-11 [Doc. 40-2].  See also Depo. Ex. 3 [Doc. 40-4].  Even after Daniels eventually supervised another hourly employee (Camacho), he still could not adjust his own hours.  Daniels Depo. 41:3-11 [Doc. 40-2]

Throughout his employment, Daniels' regular work hours were Monday through Friday between 8:00 a.m. to 4:00 p.m. or 5:00 p.m.[17] While he was given some flexibility, his job duties required him to be on-site Monday through Friday during the day shift.[18] Daniels rarely worked from home during the weekday.[19] On these very rare occasions or if he travelled on behalf of HSN, he reported these work days for manual entry into the Kronos system.[20]

Defendants note their payment of 250 hours of overtime[21] over nearly two years and Daniels' reporting of *regular* time to Bruno's administrative assistant to falsely portray a scenario in which Daniels was neglecting to report overtime. (Motion pp. 3, 24) However Daniels only was paid overtime when he worked **on-site** more than 8 hours on a given day.[22] The time Daniels reported for work away from company offices was for work performed ***during his normal day-shift work hours***.[23] He did not report his overtime for work performed off-site because his supervisor, Bruno, told him to work off-the-clock, because he did not want his department logging overtime due to budget concerns.[24]

Daniels worked a grueling schedule to perform his considerable workload surrounding recruiting, training, and managing the significant number of guests (also referred to as "talent")

---

[17] Depo. Ex. 5 (time records) [Doc. 40-6]; Carter Depo. 57:12-16; 111:24-112:4 [Doc. 40-41].

[18] Daniels had flexibility as to his start/end times. Daniels Depo. 29:2-6 [Doc. 40-2]. Bruno testified that business needs was the key factor in scheduling. Bruno Depo. 66: 3-7 [Doc. 40-34]. Bruno admitted that he expected his employees to complete their work on their own scheduling. Bruno Depo 69: 1-3 [*Id.*]

[19] See Depo Exhibit 7 [Doc. 40-8].

[20] Daniels Depo. 48:14-20; 51:13-15. Daniels time records contain limited evening or weekend entries. See Depo. Exhibit 5 (time records) [Doc.40-6].

[21] Overall, Plaintiff accumulated only a few minutes of *on-site* overtime on any given day, consistent with his badge swipes in and out of the HSN building. See Depo. Exhibit 5 (time records) [Doc.40-6]. Daniels was only paid overtime consistent with his **on-site** work time, as recorded when he badged in and out of the building. Daniels Depo. 48:11-13. Daniels would only report time within his regular 40 hour work week. Daniels Depo. 51:16-18.

[22] Depo. Ex. 5 [Doc. 40-6]

[23] Motion p. 3 (noting work from home due to illness or pet veterinary appointments); FN 21, above.

[24] Bruno told Daniels he only had 40 hours to get his work done but still had to get the job completed regardless of how long it took, even if that meant completing work at home. Daniels Depo. 48:20-50:15, 46:16-47:11, 45:20-46:8 [Doc. 40-2]; Camacho Depo. 28:20-29:8 [Opp. Ex. 3]; Zacarro Depo. 58:11-19, 25:4-11 [**Opp. Ex. 4**]; Bruno Depo. 68:23-69:10 [Doc. 40-34]

who appeared on the 24/7 Network.[25]  Defendants gave him remote access to his HSN email and

a company phone[26] to perform these tasks, but he never had remote access or the ability to record

off-site work time into the Kronos system.[27]

    To keep up, Daniels constantly worked from home evenings and weekends.[28]  Daniels

**<u>sent</u>**[29] over 2,000 emails outside of his compensated work time, many actively involving Bruno

and other HSN executives.[30]  At home, Daniels reviewed and responded to emails from co-workers

and third parties such as the talent he managed or their agents, made and received calls on his work

and personal phone[31] watched on-air presentations (either on the Network or YouTube, to review

and critique performances and note areas where training was needed,[32] and received reports and

planned appropriate action.[33] If he needed to work on or review company documents, he would

attach those to an email, and thus have access to the document when he was at home.[34] He also

spent substantial time sourcing, vetting and compiling talent.[35]  Defendants routinely commended

Daniels for his ability to identify, secure and nurture the best talent.[36]

---

[25] Daniels Depo. 28:6-14 [Doc. 40-2]; Bruno Depo. 23:20-25:22; 123:20-125:22 [Doc. 40-34]

[26] Daniels Depo. 43: 43:16-44:1; 76:5-78:21 [Doc. 40-2]; Daniels testified he used his *personal* phone for work-related calls (Daniels Depo. 109:8-12) and produced phone bills with work related after hours calls (Daniels Depo. 111:9-11). Bruno even called Daniels on his personal phone in the evening. Daniels Depo. 115:23-116:11. [Doc. 40-2]  *See also* Depo. Ex. 13 (phone records produced by Defendants for Daniels work-issued phone); Bruno Depo. 108-11-20 [Doc. 40-34].

[27] Daniels was limited to only accessing his email. Daniels Depo. 44:12-15; 44:22-24 [Doc. 40-2]

[28] Daniels could not accomplish all he was tasked with doing during his regular work day. Daniels Depo. 76:19-24 [Doc. 40-2]  Due to the 24/7 nature of the network and his role overseeing the talent, Daniels had to work after-hours to promptly respond to inquiries about airings, trainings and the like.  Daniels Depo. 123:25-124:22 [Doc. 40-2]; Camacho Depo. 25:2-14 [Opp. Ex. 3]; Carter 72:7-10; 79:8-16 [Doc. 40-41].

[29] The volume of Daniels' after hours e-mails cannot be disputed.  *See* 9/13/19 Order [Doc. 30]  Defendants designated these e-mails "CONFIDENTIAL."

[30] Daniels Depo. 91:18-92:5; 94:10-95:24 [Doc. 40-2]

[31] *See* Depo. Ex. 15 [**Opp. Ex. 5**]; Daniels Depo 118:20-124:22 [Doc. 40-2] (Daniels explaining the amount of work that would go into a single email from Camacho regarding scheduling).

[32] Daniels Depo. 72:1-18; 73:1-18 [Doc. 40-2]

[33] Daniels Depo 75:19-22 [Doc. 40-2]

[34] Daniels Depo. 45:5-12 [Doc. 40-2]

[35] *See* Daniels Depo 76: 5-18 [Doc. 40-2]

[36] *See* Daniels 2017 performance review, Manager Comments: "Gordie has an exceptional eye for identifying and nurturing new on-air talent…" Depo. Ex. 16 [**Opp. Ex. 6**]; *See also* 2016 Review Manager Comments (HSNi000009-17) [**Opp. Ex. 7**].  Bruno Depo. 139:5-11; 140:9-17 [Doc. 40-33]

Daniels regularly complained to Bruno that he was working evening and weekend overtime without pay.[37] Bruno recognized that Daniels was overworked,[38] but never adjusted Daniels' tasks or removed any duties; rather, additional duties were added.[39] Although Daniels complained, he did not report his evening and weekend work for payroll because he understood this work time would not be compensated in addition to his on-site pay.[40]

Daniels also complained to Human Resources over the course of his employment; specifically about "overtime" and working excess hours, to no avail.[41] Defendants' HR also knew about an October 2017 e-mail Daniels sent to Bruno in which Daniels complained about being "basically an hourly supervisor who performs the job of a manager but is viewed as nothing more than a workhorse."[42] No one, even the Director of HR, asked why Daniels was working so much or whether he was recording those hours, nor did they instruct him to only work while on the clock or ask him to stop.[43] Defendants' HR did not even recognize Daniels was non-exempt.[44]

Before Bruno's promotion to Vice President in 2017, he was directly responsible for monitoring Daniels' time.[45] After that, Bruno relied solely on his newly assigned administrative assistant, Denise Miller, who had no FLSA training.[46] Her duties were primarily to add missed

---

[37] Daniels Depo. 73:19-25; 79: 10-21; 99:2-17; 106:3-10 [Doc. 40-2]; Camacho Depo. 24:8-12 [Opp. Ex. 3]; Bruno Depo. 123:10-19 [Doc. 40-34]. Daniels even complained to Denise Miller, the alleged timekeeper. Daniels Depo. 60:13-23.

[38] Daniels Depo. 59:17-23, 62:8-21 [Doc. 40-2]; Bruno Depo. 68:23-69:3 [Doc. 40-34]. Bruno told Daniels he worked "too much" overtime with just the few minutes per day that HSN was paying him. Daniels Depo. 48:20-22 [Doc. 40-2] In Daniels' 2016 review, Bruno recognized the need to streamline Daniels' workload and remove some administrative tasks. In the 2017 review, Bruno recognized that Daniels needed help with time management. Depo. Ex. 16 [Opp. Ex. 6].

[39] Daniels began supervising Camacho in 2017, and took over additional guest training and tape review tasks. Daniels Depo. 30:21-31:4; 33:9-34:2 [Doc. 40-2]

[40] Daniels 47:3-11 [Doc. 40-2]

[41] Daniels Depo 100:11-25, 102:23-103:5 [Doc. 40-2] (Daniels testified that he complained to Carter before he became a manger.); Carter Depo. 77:22-78:21 [Doc. 40-41]

[42] Carter Depo. 105:4-107:6 [Doc. 40-41]; Depo. Ex. 58 [**Opp. Ex. 8**]

[43] HR would not interfere in "department norms." Carter Depo. 110:20-111:12 [Doc. 40-41]

[44] Carter Depo. 80:13-81:1 [Doc. 40-41]

[45] Bruno Depo. 106:12-107:8 [Doc. 40-34]

[46] *Id.*; Carter Depo 58:15-18 [Doc. 40-41]

punches and enter PTO.[47] HSN approved this delegation.[48]

## Qurate's New Direction for HSN

After Qurate acquired HSN/HSNi,[49] it began its "integration," including the placement of QVC's Mike Fitzharris as Home Shopping Network President.[50] To bring HSN's sales more in line with the success enjoyed by QVC, Fitzharris was tasked with changing HSN's presentation style from its long-standing over-the-top selling style to QVC's more conversational approach.[51] While implementing this new direction, HSN's Broadcasting and Talent Departments regularly discussed common problems and changes to be addressed,[52] including: guests stepping outside the roles QVC wanted them to play;[53] hosts controlling their shows effectively;[54] guests talking over hosts;[55] talent discussing topics such as pricing, flex, and shipping (which QVC did not want discussed);[56] guests making overaggressive sales presentations;[57] and guests' poor treatment of hosts and HSN employees.[58] Viewers also complained about and management specifically discussed on-air presentations akin to "used-car" sales.[59] Defendants  initially planned to utilize large-scale meetings with guests called

---

[47] Motion p. 3; Carter Depo 58:9-14 [Doc. 40-41]

[48] Carter Depo. 46:8-12 [Doc. 40-41]

[49] Bruno Depo. 53:20-55:11 [Doc. 40-34]; Depo. Ex. 48 [**Opp. Ex. 9**]; Depo. Ex. 112 [**Opp. Ex. 10**].  Collectively, Defendants comprise "Qurate Retail Group," a multi-billion dollar national and international retail enterprise that operates QVC, Home Shopping Network, and other brands.  *See* Depo Ex. 104 (2017 Annual Report, p. 1, n. 1, p. F-5) [**Opp. Ex. 11**]; Bruno Depo 55:2-11 [Doc. 40-34].  HSN and HSNi comprise the Home Shopping Network: HSN serves the commerce function (broadcast, creative, digital) and HSNi serves the operations functions (IT, finance, HR).  Carter Depo. 75:12-15 [Doc. 40-41].

[50] Depo. Ex. 48 [Opp. Ex. 9]; Depo. Ex. 113 [**Opp. Ex. 12**]

[51] Bruno Depo. 14:11-16; 17:1-13, 148:1-151:2; 161:19-162:17 [Doc. 40-34]; Camacho Depo. 13:5-14 [Opp. Ex. 3]; Depo. Ex. 59 [**Opp. Ex. 13**]; Bruno Depo. 17:1-13; Camacho Depo. 13:5-14.

[52] Bruno Depo. 148:8-151:2 [Doc. 40-34]; *see generally* Camacho Depo 13:5-22 [Opp. Ex. 3].

[53] Daniels Depo. 186:4-187:5 [Doc. 40-2]

[54] Bruno Depo. 208:7-209:21[Doc. 40-34]; Fitzharris Depo. 45:13-46:4 [Doc. 40-48]

[55] Bruno Depo. 150:2-24 [Doc. 40-34]; Depo. Ex. 61 [**Opp. Ex. 14**]

[56] Caputo Depo. 72:8-17 [**Opp. Ex. 15**]; Fitzharris Depo. 46:5-17 [Doc. 40-48]

[57] Caputo Depo. 70:23-71:4 [Opp. Ex. 15]; Daniels Depo. 191:3-3-7; 192:22-25 [Doc. 40-2]; Camacho Depo. 33:16-34:12 [Opp. Ex. 3]

[58] Zacarro Depo. 62:2-63:25 [Opp. Ex. 4]

[59] Camacho Depo. 13:23-14:15 [Opp. Ex. 3]; Depo. Ex. 61 [**Opp. Ex. 16**]

"summits" to convey the new direction, but planning for the summits moved slowly[60] even though the new direction was considered "urgent."[61]

As sales at HSN continued to disappoint.[62] Fitzharris grew increasingly frustrated and regularly "chewed out" Bruno.[63] Daniels travelled to QVC to learn its best practices, and was instructed to prepare written correspondence to talent outlining the agreed upon direction for fixing the problems, which he did.[64]   On April 24, 2018, Daniels forwarded this draft correspondence to Bruno and Elyse Zacarro (VP of Production) for review.[65]   The next day, Bruno and Daniels discussed the draft communication.[66]   Bruno decided against a mass email at that time, and Daniels followed his instructions.[67]   During Daniels' discussion with Bruno about this draft correspondence, Bruno expressed concern that talent may not read it and suggested shortening it, using some bullet points, and maybe making it into a power point.[68] Daniels suggested a "do's and don'ts" list, which Bruno liked and "approved."[69]

### Bruno Instructs Daniels to Send out the New Direction Email

On May 16, 2018, the "Today's Special" once again tanked.[70]   Sales were dismal, and the host and guest demonstrably failed to follow the new guidelines, so Fitzharris called Bruno,

---

[60] Daniels Depo 165: 12-16, 158:22-159:1 [Doc. 40-2]; Bruno Depo 129:6-18, 177:16-178:10 [Doc. 40-34]; Caputo Depo. 61:7-24 [Opp. Ex. 15]; Carter Depo. 107:21-109:13 [Doc. 40-41]; Owens Depo. 24:10-25:25[Doc. 40-59]

[61] Carter Depo. 107:21-109:20 [Doc. 40-41]; Owens Depo. 24:10-25:25 [Doc. 40-59]

[62] Caputo Depo. 60:3-9 [Opp. Ex. 15]; Fitzharris Depo. 32:5-19 [Doc. 40-49]; Zacarro Depo. 43:14-44:5 [Opp. Ex. 4]

[63] Bruno Depo. 161:19-164:25, 174:20-24 [Doc. 40-34]; Caputo Depo. 38:5-39:9, 43:22-44:17, 60:3-61:1 [Opp. Ex. 15]   Daniels Depo. 158:11-19 (describing in April 2018 the ball was starting to get rolling on moving the HSN training to mimic QVC's) [Doc. 40-2].

[64]   Daniels Depo. 148:20-149:2 (describing trip to QVC regarding training), 152:15-153:11, 154: 18-21 (describing document drafted after trip to QVC) [Doc. 40-2]; Depo. Ex. 22 [Doc. 40-16]; Daniels 156:23-157:2 (Daniels and Bruno spoke about getting communication out to guests); Bruno Depo. 129:6-18, 177:16-178:10 [Doc. 40-34]; Caputo. Depo. 61:7-24 [Opp. Ex. 15]; Carter Depo. 107:21-109:13 [Doc. 40-41]; Owens Depo. 24:10-25:25 [Doc. 40-59].

[65] Depo. Ex. 21 [Doc. 40-15]

[66] Bruno Depo. 175:19-177:15 [Doc. 40-34]; Daniels Depo 161:3-17 [Doc. 40-2].

[67] Daniels Depo 18-24 [Doc. 40-2]

[68] Daniels Depo. 161:10-13; 173:4-174:8 [Doc. 40-2]

[69] Daniels Depo. 173: 4-23 [Doc. 40-2]

[70] The Today's Special is a featured retail item promoted throughout each day on the Network, and is used as a marker for sales performance.

David Caputo, and Zacarro into his office and chewed them out.[71]  Fitzharris' frustration was heightened by an impending "Investor Day" at Qurate headquarters scheduled for May 22nd.[72]

Importantly, Bruno reacted poorly to high pressure situations and impulsively under stress.[73]  Predictably, he rushed to action after the May 16th meeting with Fitzharris, pulling Daniels aside and instructing him to take immediate action.[74]  Daniels vividly recalls the exact time, location, and substance of this conversation – whereas Bruno claims no recollection.[75]  During that conversation, Bruno instructed Daniels to send out the "do's and don'ts list" e-mail they previously reviewed and discussed.[76]

Based on Bruno's instruction, Daniels worked until after 1:00 a.m. revising the e-mail Bruno instructed him to send.[77]  Defendants try to create a false narrative by comparing Daniels' April 24 draft e-mail to the New Direction E-mail (Motion pp. 9-10), but Daniels actually spoke with Bruno about the April 24 draft, how it should be changed, the do's and don'ts list, and all of the directives to the guests.[78]  "[Bruno] approved everything that was in

---

[71] Bruno Depo. 191:12-25, 192:17-22, 193:6-194:11, 197:8-198:2, 198:23-200:10, 201:9-22 [Doc. 40-34]; Owens Depo. 55:6-56:1 [Doc. 40-59]; Daniels Depo. 174:18-175:19 [Doc. 40-2]

[72] Fitzharris Depo. 39:5-22 [Doc. 40-48]

[73] Owens Depo.127:7-128:6 [Doc. 40-59]; Depo. Ex. 137 [**Opp. Ex. 17**] (Bruno's 2018 Review, noting that: "There have been   times of miscommunication and confusion in the Talent team this year [2018] that [Bruno] could have handled better and with more focus on the messaging, accuracy and perspective of his audience… [Bruno] needs to focus on maintaining balance in times of high stress or emotion…"

[74] Daniels Depo. 174:18-178:13 [Doc. 40-2].  In addition to addressing the talent issues through Daniels, Bruno also called an emergency host "flash" meeting to correct the hosts' deficiencies. Consistent with the urgency conveyed to Daniels, Bruno's flash meeting with the hosts was harsh, particularly for Jeni Bond and Adam Freeman, who were involved in the Today's Special presentation Fitzharris reviewed in the May 16 meeting and left Mr. Freeman "really upset" and Ms. Bond "in tears."  Owens Depo. 56:17-61:3, 118:20-120:7 [Doc. 40-59]; Fitzharris Depo. 73:14-25 [Doc. 40-49]; Depo. Ex. 140 [**Opp. Ex. 19**]  The texts between Daniels and Debbie Denmon can be reduced to admissible form at trial, as she can be called to testify and refers to an admission of a party opponent – and Adam Freeman and Jeni Bond (who work for/with Defendants) can be called.  *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-1294 (11th Cir. 2012).

[75] *Id.*; Bruno Depo. 197:8-17, 198:23-199:3, 199:24-200:10; 201:9-15 [Doc. 40-34]

[76] Daniels Depo. 176:4-177:9, 176:6-14, 178:3-13.  Daniels explained, "This email wouldn't have gone out – like the last email wouldn't have gone out if Time did not approve it."  Daniels Depo. 201:19-21 [Doc. 40-2].

[77] Daniels Depo. 171:20-172:5, 186: 20-22; 189:19-20; 191:3-11 [Doc. 40-2]; Depo Ex. 28 [Doc. 40-19]

[78] Daniels Depo. 161:10-13, 173:4-174:8, 173:4-23 [Doc. 40-2]

here… We also had verbal confirmation on everything that's in this e-mail."[79]  On May 17th, Daniels sent out the New Direction E-mail using contacts provided by the Guest Relations Department.[80]

Contrary to Defendants' spin, Daniels did not "lift" the guest contacts from "guest newsletters" (Motion p. 9).  At HSN, "Newsletters" are synonymous with "distribution lists."[81] Defendants also disingenuously attack Daniels for the currentcy of the distribution lists (Motion p. 9), but Daniels requested the "most up to date newsletter" and testimony confirmed the Guest Relations team was supposed to keep these distribution lists updated and current.[82]

Defendants also falsely portray the reaction to the New Direction E-mail.  (Motion pp. 9-10)  Daniels' e-mail received an overwhelmingly positive response, while just *two* people complained about its message.[83]  Likewise, Defendants raise the issue of celebrity e-mail addresses (Motion p. 10)[84], but this is not legitimate.[85]

### Bruno Authorized, Reviewed, and Approved the New Direction Email a Second Time

After Daniels sent the New Direction E-mail, Bruno once *again* reviewed, authorized, and approved its distribution:

- At 11:34 a.m. on 5/17/18, one of the recipients of the New Direction E-mail (Skip Borghese) forwarded it to Bruno, stating he was looking forward to the changes, but asking to be removed from the bulk e-mail list. It is apparent on the face of this e-mail that all recipients are included

---

[79] Daniels Depo. 177:14-178:13 [Doc. 40-2].

[80] Daniels Depo. 178:22-179:13 [Doc. 40-2].

[81] Camacho Depo. 19:22-21:13 [Opp. Ex. 3]; Daniels Depo. 178:17-179:13 [Doc. 40-2].  In fact, one member of the guest relations team who provided her "newsletter" even indicated she "updated" her list – a reference to contact information not the content of the Newsletter.  [Doc. 40-66, p. 115/137]. Defendants' depiction of the newsletters issue is misleading, if not outright false.

[82] Camacho Depo. 20:14-25 [Opp. Ex. 3]

[83] A representative sample of the hundreds of positive responses to the New Direction E-mail is found at **Opp. Ex. 18.** (HSNi 727, 731, 733, 734, 747, 759, 767, 770, 792, 795) Defendants only produced two negative responses.  [Doc. 40-22, 40-24]

[84] Bruno also confirmed that sending e-mails to guests and vendors was an ordinary and necessary part of Daniels' carrying out his job, for which he was authorized by company policy to disclose confidential information.  Bruno Depo. 80:3-81:1 [Doc. 40-34]; Depo. Ex. 52 [**Opp. Ex. 22**]

[85] Kermes Depo. 129:7-132:21 [Doc. 40-52]

in the "TO" line of the New Direction E-mail. At 1:46 p.m. on 5/17/18, Bruno replied to Skip Borghese's 11:34 a.m. e-mail by apologizing that Borghese was not blind cc'd.[86]

- At 12:27 p.m. on 5/17/18, Daniels e-mailed a copy of the New Direction E-mail to Bruno under the subject "Guest Messaging that *Went Out*," in which Daniels states "This is what I *sent* to *all of our current guest* as a follow-up…"[87]

- At 1:46 p.m. on 5/17/18, Bruno forwarded Borghese's 11:34 a.m. e-mail (referenced above) to Daniels and told him "Please BCC all guests for future.  Please also send to me before sending out wide for review."[88]

- At 1:48 p.m. on 5/17/18, after Bruno clearly had reviewed the New Direction E-mail, he responded to Daniels' 12:27 p.m. e-mail (referenced above) by saying (among other things) "*Looks good.*"  The language Bruno uses in this 1:48 p.m. e-mail makes clear that he is referring to the New Direction E-mail (not guest comments).[89]

## Self-Preservation Kicks In

Later in the day on May 17th, once Bruno got wind of concerns over the New Direction E-mail, he backtracked and tried to create an impression that Daniels acted on his own and was "overzealous."[90]  Raising serious jury questions about his credibility, Bruno flat-out lied to Caputo to cover for what he directed Daniels to do.[91]  Upon seeing the New Direction E-mail, Caputo immediately spoke to Daniels about it and then went to speak to Bruno.[92]  Caputo spoke with Bruno in Bruno's office "late in the afternoon" on May 17th, and is "positive" it was *after* Bruno's 1:46 p.m. and 1:48 p.m. e-mails to Daniels.[93]  When they spoke, Bruno incredibly

---

[86] Depo Ex. 34 [**Opp. Ex. 20**]

[87] Depo Ex. 30 [Doc. 40-21]

[88] Depo. Ex. 34 [Opp. Ex. 20]. Obviously, Bruno was aware at this time Daniels had not blind cc'd the recipients. Yet, Bruno's only reaction was asking Daniels to " please BCC all guests for future."

[89] HSNi 864, 281 [**Opp. Ex. 21**]; Depo. Ex. 37 [Doc. 40-28].  Carter testified that Mr. Bruno's 1:48 p.m. "Looks good" e-mail [Depo. Ex. 37] was an "**approval**." Carter Depo. 219:21-220:3 [Doc. 40-42]

[90] Depo Ex. 65 [**Opp. Ex. 23**] (Bruno 5/17/18 e-mail to Fitzharris at 6:18 p.m.).

[91] Caputo Depo. 90:12-93:15, 94:19-25, 95:10-20, 96:2-97:2, 98:12-22, 100:10-101:5, 113:15-114:11 [Opp. Ex. 15] Bruno also was known for "lack of transparency," "miscommunication and confusion," as well as "forgetting" directives he gave to employees.  Camacho Depo. 25:25-26:10 [Opp. Ex. 3]; Depo. Ex. 137 [Opp. Ex. 17].

[92] Caputo Depo. 92:21-94:18 [Opp. Ex. 15]; Daniels Depo. 210:4-13 [Doc. 40-2].

[93] Caputo Depo. 100:24-101:5 [Opp. Ex. 15]

acted like he had "no idea" what Caputo was talking about, claimed he had not seen Daniels' e-mail, and actually feigned reading it for the first time in front of Caputo![94]  Even worse, Bruno never told Caputo about his "Looks Good" and "please BCC guests in the future" e-mails to Daniels.[95]

## The Perfunctory "Investigation"

Defendants tout their supposed "investigation" (Motion pp. 13-14, 20), but on the morning of May 18, 2018, Fitzharris already had decided to fire Daniels for the New Direction Email – before the investigation began.[96]  Bruno – who should have been the one fired for instructing Daniels to send the e-mail[97] and the subject of the "investigation," participated in the May 18 meeting with Fitzharris, Normand Carter (Dir. of HR), and Dan Owens (VP of HR) about the incident, when Fitzharris announced his decision.[98]

To keep the appearance of following company policy, Carter and Owens supposedly launched the investigation into the New Direction E-mail.  Daniels had already called Carter the night before (May 17) and told him Bruno "OK'd the email."[99]  Carter confirmed Bruno's May 17th "**looks good**" e-mail was an **approval**,[100]  Bruno even confirmed to Owens that he "**reviewed**" the "do's and don'ts" list with Daniels.[101]  Carter agreed that Daniels' May 18th e-mail at 8:44 a.m. (which says "I'm not one to place any blame") meant Daniels was trying not to throw other people under the bus and trying to save his job.[102]

Defendants' claim Bruno was "preoccupied" in a meeting when he received Daniels'

---

[94] Caputo Depo. 95:10-97:7; 114:8-11 [Opp. Ex. 15]
[95] Caputo Depo. 98:12-22 [Opp. Ex. 15]
[96] Bruno Depo. 240:18-242:8 [Doc. 40-34]
[97] Owens Depo. 126:11-21 [Doc. 40-59]
[98] Carter Depo. 163:18-164:15 [Doc. 40-42]; Owens Depo. 125:10-126:10 [Doc. 40-59]
[99] Carter Depo. 217:13-218:6 [Doc. 40-41]
[100] Carter Depo. 219:21-220:3 [Doc. 40-41]
[101] Owens Depo. 67:9-68-5 ("do's and don'ts were something he and Gordie **reviewed** before"); Depo. Ex. 134
[102] Carter Depo. 218:1-219:5 [Doc. 40-42]; Depo. Ex. 84 [Doc. 40-45]

e-mail and never opened it, but this claim is highly suspect.[103]  In fact, Fitzharris, Owens, and Carter seriously doubted[104] Bruno's claim that he did not review and approve the New Direction E-mail.[105]  Owens confirmed they did not believe Bruno.[106]  In fact, neither Owens or Carter could say whether Bruno "reviewed [the e-mail] thoroughly."[107]  They and Fitzharris ignored obvious reasons to doubt Bruno because Fitzharris' decision had long-since been made (before the facts were gathered).[108]

Defendants try to spin several subsequent e-mails Daniels sent to friends or HSN management as proof he acted alone (Motion pp. 10-12), but Daniels explained he was carrying out Bruno's directive, trying to save his job, and avoiding throwing others under the bus.[109] Camacho testified that he and Daniels spoke immediately after the email was sent, and Daniels told him Bruno approved it.[110] Carter also acknowledged Daniels' intent in the subsequent e-mails.[111]  Importantly, those who worked closely with Daniels (but <u>not</u> interviewed by

---

[103] First, the e-mail is short, includes bold and underlined text, and red font.  Owens Depo. 122:15-123:24 [Doc. 40-59]; Doc. 40-66, pp. 66-67.  Others read it in minutes, if not seconds.  Fitzharris Depo. 52:1-11 [Doc. 40-48]; Owens Depo. 122:12-22 [Doc. 40-58]; Caputo Depo. 96:2-10 [Opp. Ex. 15]; Fitzharris Depo. 52:1-5 [Doc. 40-49].  Second, Bruno told Carter he did open the New Direction E-mail, saw the header, and saw it had the "do's and don'ts."  Bruno also admitted to Fitzharris that opened the e-mail.  Third, Defendants claim Daniels strategically chose to send the email while Bruno was in a meeting (without competent evidentiary support), but that meeting was scheduled to end at 12:30, long before Bruno's 1:46-1:48 p.m. e-mails to Daniels; followed by another brief meeting before he was free until 2:30.  [Doc. 40-66, pp. 133-137 (calendared meeting time 10:30 a.m. to 12:30 p.m.); HSNi 9372-9373 (Bruno meeting with Lesley Machado from 12:30 p.m.-1:00 p.m., then no other meetings until 2:30 p.m.  [**Opp. Ex. 24**]  Caputo and Fitzharris don't recall seeing Bruno at the vendor advisory board meeting.  Caputo Depo. 82:16-84:18 [Opp. Ex. 15]; Fitzharris Depo. 49:15-17 [Doc. 40-49].  The time of Bruno's emails and his calendar entries support the inference that he was not preoccupied at a meeting, but between meetings, when he reviewed the Email.
[104] Fitzharris "struggl[ed] to understand why [Bruno] said '[looks] good'" when he was aware of the New Direction E-mail Plaintiff sent.  Owens believed Bruno knew what was in Daniels' New Direction E-mail, and even stated he and Carter were "perplexed" by Bruno's claim that he only skimmed Daniels's New Direction E-mail (especially since it was bold, underline, red font, etc.) and not read it, and then respond in the positive without knowing what he had responded to.  Depo. Ex. 89 [Doc. 40-48]
[105] Depo. Ex. 89 [Doc. 40-48]
[106] Owens Depo. 121:8-124:2; 121:8-124:20, 118:1-19 [Doc. 40-59]
[107] Carter Depo. 126:1-127:25 [Doc. 40-42]
[108] Bruno Depo. 240:18-242:8; Carter Depo. 65:15-66:15 [Doc. 40-41]; Depo. Ex. 52, Sec. 10 [Opp. Ex. 22]
[109] Daniels Depo. 227:18-228:2, 212: 8-18; 215: 21-215:2; 217:19-218:7 [Doc. 40-2]
[110] Camacho Depo. 9:19-10:2 [Opp. Ex. 3]
[111] Carter Depo. 218:1-219:5 [Doc. 40-42]

Defendants) confirmed Daniels would not have sent the New Direction email on his own.[112]

## Defendants' Defamatory Statement

Initially, Bruno planned on sending an apology to the email recipients, but Fitzharris brought in Defendants'[113] Head of Corporate Affairs, Jill Kermes, to craft an "aggressive" apology e-mail for him to send to vendors and talent.[114]  The carefully-crated apology e-mail was sent May 18, 2018, addressed the concerns of the very few talent and vendors who complained, and did not state anywhere that Daniels' e-mail was "not authorized, approved, or reviewed for distribution."[115]

On May 22, 2018, Fitzharris and Kermes were at Qurate's Investor Day.[116]  During the event, the *New York Post* (*Page Six*) reached out to HSN for comment on a story it was writing about the New Direction E-mail.[117]  The reporter's request specifically named Daniels and referred to his e-mail as "condescending."[118]  Kermes' initial instinct as an experienced PR professional[119] was to respond simply by "ensuring the reporter has [Fitzharris'] email," not issuing a statement.[120]  Approximately 30 minutes later, Kermes wanted to tell the reporter "we took this matter very seriously, which is why [Fitzharris] quickly responded."[121]  Thirty minutes after that, Kermes e-mailed the reporter and forwarded him Fitzharris' apology, but also unnecessarily added the defamatory statement:

---

[112] Weeks Depo. 46:20-47:6 [**Opp. Ex. 25**];  Daniels was not the type of person who would have sent out the New Direction E-mail without it being "authorized," "reviewed," and "approved."  [Weeks Depo. 47:20-48:11]  Mr. Camacho  never saw Mr. Daniels send out a communication that was not approved by Mr. Bruno or do anything at work that was not approved by his supervisors.  Camacho Depo. 49:16-23 [Opp. Ex. 3]

[113] In direct conflict with her sworn Declaration (Depo. Ex. 114, ¶¶ 4, 8)  [*See* Kermes Depo. at 41:21-43:3, 44:14-23]  Kermes worked for Qurate Retail Group.  Fitzharris Depo. 58:5-15 [Doc. 40-49]

[114] Depo. Ex. 65; Fltzharris Depo. 58:16-59:10 [Doc. 40-49]

[115] Fitzharris Depo. 59:19-60:2 [Doc. 40-49]; Depo. Ex. 68 [Doc. 40-40]; Kermes Depo. 73:7-15 [Doc. 40-52]

[116] Fitzharris Depo. 88:8-89:11 [Doc. 40-49]; Kermes Depo. 48:8-49:14, 87:11-92:5 [Doc. 40-52]

[117] Depo. Ex. 126 [Doc. 40-55]

[118] *Id*.

[119] Kermes Depo. 10:5-11:12, 14:21-27:7 [Doc. 40-52]

[120] Depo. Ex. 124 [**Opp. Ex. 26**]; Kermes Depo. 92:6-93:12 [Doc. 40-52]

[121] Depo. Ex. 106 [Doc. 40-50]; Fitzharris Depo. 83:9-84:8 [Doc. 40-49]; Kermes Depo. 95:22-96:19 [Doc. 40-52]

Thank you for reaching out to us about this. The email you referenced below was not authorized, reviewed or approved for distribution. As such, Mike Fitzharris, HSN's president, immediately took action and sent the communication below [Fitzharris' apology email followed].[122]

Kermes also used Daniels to suggest there was no "culture clash" between HSN and QVC.[123]

Despite Defendants' professions of good faith, no one involved has any recollection of who crafted the defamatory statement or the conversations surrounding the statement.[124] What is clear is that Kermes, although authorized by Defendants to make the statement, had no knowledge of the facts surrounding Daniels' New Direction E-mail.[125] This violated company policy.[126] Importantly, Kermes knew when she made the statement that it would be published and Daniels would be named in the story.[127]

Expectedly, *Page Six* published the article (and a video including the defamatory statement) on May 22, 2018, naming Daniels and broadcasting the statement to millions of people.[128] Plaintiff's professional reputation was destroyed.[129] Upon reading the *Page Six* story, Fitzharris expressed surprise that it "call[ed] out Gordy by name," but clarified during his deposition that he ***did not care about Daniels***,[130] he only cared about using Daniels as an example of "how the actions of everyone can cause brand damage."[131] The following day, May 23, 2018, Fitzharris reached out to Kermes to make sure – from a PR perspective – that

---

[122] Depo. Ex. 106 [Doc. 40-50]
[123] Depo. Ex. 127 [Doc. 40-56]
[124] Fitzharris Depo. 81:8-84:8 [Doc. 40-49]; Kermes Depo. 97:1-98:18 [Doc. 40-52]
[125] Fitzharris Depo. 64:3-65:15 [Doc. 40-49]; Carter Depo. 66:16-67:25, 177:14-178:25, 223:11-234:18 [Doc. 40-41 and 40-42]; Bruno Depo. 237:5-9 [Doc. 40-34]; Kermes Depo. 109:9-110-20 [Doc. 40-52]
[126] Carter Depo. 66:16-67:25 [Doc. 40-41]; Depo. Ex. 52 [Opp. Ex. 22]
[127] Kermes Depo. 92:20-93:12, 121:10-122:12 [Doc. 40-52]
[128] A detailed explanation of the impact of the statement is set forth in Craig Kronenberger's Report [Doc. 39-2], also addressed in Daniels' Opposition to Motion to Strike, filed contemporaneously herewith.
[129] After the article, Plaintiff applied to over 100 jobs. [**Opp. Ex. 27**] Potential employers saw the article. [Opp. Ex. 14]
[130] *Id*.
[131] Depo. Ex. 109 [**Opp. Ex. 28**]; Fitzharris Depo. 91:21-92:22

it was okay to let Daniels go.[132] Once she gave the green light, the "investigation" into Mr. Daniels' e-mail ceased and Daniels was officially fired.[133] Although supposedly terminated for violating company policy, no applicable written policy exists and Daniels was never trained on any supposed policy.[134] Incredibly, months after Daniels was fired and defamed, Bruno was terminated because of his poor "judgment" surrounding his review of documents in the Daniels e-mail situation.[135] Nevertheless, Bruno walked away with a 52-week severance package.[136]

## **MEMORANDUM OF LAW**

### I.    This Case Is Riddled[137] With Issues of Fact

Courts must "avoid weighing conflicting evidence or making credibility determinations" and all of Daniels' evidence "is to be believed, and all justifiable inferences are to be drawn in his favor."[138]   "[T]he judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue of fact."  *Masson v. New*

---

[132] Depo. Ex. 98 [Opp. Ex. 28]; Carter Depo. 210:16-212:6 [Doc. 40-42]; Fitzharris Depo. 96:4-97:1 [Do. 40-49]

[133] Carter Depo. 210:1-15 [Doc. 40-49]

[134] Carter Depo. 120:2-122:3 [Doc. 40-42].  Brun confirmed Vendor Communications was something "new" [Bruno Depo. 186:5-18] which Daniels knew nothing about.  [Daniels Depo. 167:13-17]

[135] Carter Depo. 126:2-127:5 [Doc. 40-42]

[136] Bruno Depo. 34:1-7 [Doc. 40-34]

[137] *Pep Boys v. New World Communications of Tampa, Inc.*, 711 So.2d 1325, 1328 (Fla. 2d DCA 1998) ("The questions of whether the broadcast contained false statements and/or statements that could be interpreted as false are questions of fact which should be left for a jury to determine where the communication is ambiguous and is reasonably susceptible of defamatory meaning."); *Perry v. Cosgrove*, 464 So.2d 664, 666 (Fla. 2d DCA 1998) ("Where a communication is ambiguous and reasonably susceptible of a defamatory meaning, it is for the trier of fact to decide whether the communication was understood in the defamatory sense.");  *Palin v. New York Times Company*, 940 F.3d 804, 812 (2d Cir. 2019) (*citing Anderson*) (reaffirming the importance of avoiding credibility determinations in "actual malice" inquiry in defamation case).

[138] *Quigley v. Kerley*, 2001 WL 273253, *2 (M.D. Fla. Jan. 5, 2001) (*citing Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)); *see also Harrell v. Diamond A Entertainment, Inc.*, 992 F.Supp. 1343, 1346-1347 (M.D. Fla. 1997); *Ice Portal, Inc. v. VFM Leonardo, Inc.*, 2010 WL 2351463, *6 (S.D. Fla. June 11, 2010) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) "[A]lthough the court should review the record as a whole, ***it must disregard all evidence favorable to the moving party that the jury is not required to believe***."  (emphasis added)); *Skokan v. Royal Caribbean Cruises, Ltd.*, 2018 WL 5044603, * 2 (S.D. Fla. Oct. 17, 2018) ("If reasonable minds might differ on the inferences arising from undisputed facts, then…[c]ourt[s] should deny summary judgment.").

*Yorker Magazine, Inc.*, 501 U.S. 496, 521 (1991) (citing *Anderson*, 477 U.S. at 255).[139]

## II.    Defendants Incorrectly Assert Daniels Must Plead & Prove Actual Malice

Defendants try to inject the heightened "actual malice" element of fault into Daniels' defamation claim based on outdated "*per se*" defamation law (Motion p. 19) and the unpled,[140] unsupported contention Daniels is a public figure (Motion p. ).  As set forth below, Defendants' arguments contradict black-letter law.

### A.    Defendants Misstate the Import of *Per Se* Defamation

Defendants' suggestion that a private figure defamation plaintiff must allege and prove defamation "*per se*" or otherwise meet the "actual malice" standard of fault[141] is flat wrong and ignores well-established Supreme Court precedent defining the parameters of "actual malice" established in cases such as *Gertz v. Robert Welch, Inc.*[142]  Defendants base this flawed argument on obsolete, pre-*Gertz* caselaw.[143]  Current law provides that a plaintiff who is <u>not</u> a

---

[139] The Supreme Court recognized in *Masson*, 501 U.S. at 520, that in a defamation case all reasonable inferences still are drawn in favor of the nonmoving party, "including questions of credibility and of the weight to be accorded particular evidence."  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…"  *Anderson*, 477 U.S. at 255.  Importantly, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Palin*, 940 F.3d at 812.

[140] Daniels objects accordingly and maintains the supposed "public figure" defense and argument has been waived.

[141] Specifically, Defendants use their "*per se*" argument to suggest (falsely) that "to allege words actionable *per quod*, a plaintiff must plead and prove ***actual malice*** and special damages."  (Motion p. 19) (emphasis added).

[142] Defendants also make the bald assertion (Motion p. 19) that actual malice is a required element of Daniels' claim, which is simply false and invites reversal.  As explained herein, common law nor actual malice are elements of a private figure defamation claim.  Defendants may be implying entitlement to a privilege, but make no such argument. If that is the case, this unexpressed argument should be rejected or, if considered, additional briefing or argument should be allowed.  Regardless, there is no qualified privilege to defame a private individual simply by value of the matter being of public concern (even for the media) and no basis for a common interest privilege.  *Ortega Trujillo v. BaNCO Central Del Equador*, 17 F.Supp.2d 1334, 1338 n. 3 (S.D. Fla. 1998) (*citing Ortega v. Post-Newsweek Stations*, 510 So.2d 972 (Fla. DCA 1987)).  *Falic v. Legg Mason Wood Walker, Inc.*, 347 F.Supp.2d 1260 (S.D. Fla. 2004); *Sholz v. RDV Sports, Inc.*, 710 So.2d 618 (Fla. 5th DCA 1998).; *Glynn v. City of Kissimmee*, 383 So.2d 774, 776 (Fla. 5th DCA 1988).  Statements made to the press by a former employer about an employee are not privileged because there is "no common interest with those members of the media to whom the allegedly defamatory statements were made."  *Scholz*, 710 So.2d at 626; *see also Glynn*, 383 So.2d at 776 (the existence of a qualified privilege vanishes if the statement is made to too wide an audience).

[143] *Barry College v. Hull*, 353 So.2d 575 (Fla. 3d DCA 1977), which cites to a 1935 case, *Harris v. Metropolis Co.*, 160 So. 205, 207 (1935)) [*See* Motion, p. 19, n. 162].

public official or public figure is <u>not</u> required to establish common law[144] nor "actual malice." *Ane*, 423 So.2d at 378; *Egwuatu v. Burlington Coat Factory Warehouse*, 2011 WL 2413833, *5 (M.D. Fla. Jun. 10, 2011).[145]

### B.    Defendants Misconstrue "Special Damages" in the Defamation Context

The only modern significance of the *per se/per quod* distinction in Florida is to the requirement to plead and prove special damages.[146]    Defendants conflate (Motion p. 19) the concept of "special damages" in defamation cases[147] to special damages in other settings.[148]

Even though it is not required in this *per se* defamation case, Mr. Daniels pleaded defamation "special damages."[149]  These damages are also proven—through Daniels' reputational

---

[144] Defendants' argument is based on pre-*Gertz* cases, decided when "malice [was still] an essential element of the [defamation] tort." *Id*. at 578.  At *that* time, words actionable "*per se*" were significant because they provided a presumption of common law malice.  *Id*.  Today, the difference between *per se* and *per quod* defamation lies <u>only</u> in the matter of proof of resulting injury because the common law malice element of defamation was removed following the Federal cases requiring that actual malice be alleged and proved when the plaintiff is a public figure, but only negligence be established in private figure cases.  *Hood v. Connors*, 419 So.2d 742, 743 (Fla. 5th DCA 1982) *(citing Wolfson v. Kirk*, 273 So.2d 744 (Fla. 4th DCA 1973).  This change is confirmed by Florida's standard jury instructions in defamation cases.  § 405.7-405.9.

[145] As *Ane* explains, the older Florida law [such as *Barry College*] requiring the plaintiff to prove malice "has been changed."  423 So.2d at 382-388.  *Ane* includes a detailed explanation of how *Gertz v. Robert Welch, Inc.* changed the level of fault landscape in defamation actions, and how Florida followed suit in cases such as *Karp v. Miami Herald Publ'g Co.*, 359 So.2d 580 (Fla. 3d DCA), *appeal dismissed*, 365 So.2d 712 (Fla. 1978) and *Helton v. United Press Int'l*, 303 So.2d 650 (Fla. 1st DCA 1974)).[145]  The Supreme Court's line of decisions in *New York Times v. Sullivan*, *Curtis Publ'g Co. v. Butts*, *Gertz v. Robert Welch, Inc.*, and *Time v. Firestone* established that "Plaintiffs in defamation actions in Florida and throughout the country are now required to prove that the defendant acted **negligently** in publishing the allegedly false and defamatory materials…"  *Id.* at 383 (emphasis added).

[146] *Id. (citing Tip Top Grocery Co. v. Wellner*, 186 So. 219 (1938)); *Leavitt v. Cole*, 291 F.Supp.2d 1338, 1342 (M.D. Fla. 2003).

[147]  "Typically considered a pecuniary loss, special damages are 'actual and concrete damages capable of being estimated in money, established by specific instances such as actual loss due to withdrawal of trade or particular customers, or actual loss due to refusal of credit by specific persons, all expressed in figures.'"  *Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 188 (3d Cir. 1999); *Restatement (Second) of Torts* § 575 cmt. b; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 372 (1974) (special damage almost always being in the form of material or pecuniary loss of some kind).[147]  A defamation plaintiff may not establish "special damages" using emotional or physical harms, but can recover for those general damages if the statement at issue is defamatory *per se* or where special damages are established .  *Restatement (Second) of Torts* § 623 cmt. a; *see generally Cypress Insurance Co. v. Clark*, 144 F.3d 1435, 1437-38 (11th Cir. 1998).

[148] In the defamation context, "special damage does not denote a singular concept, nor does it engender a set pleading requirement… [it] denotes more the cause of action for actual loss, than the remedy of damages."  *Leavitt*, 291 F.Supp.2d at 1343.

[149] The Motion (p. 19) is wrong.  Specifically, Mr. Daniels alleges that, as a direct and proximate result of Defendants' actions, he suffered pecuniary loss and actual and concrete damages capable of being estimated in money, including "loss of employment" and "significant expenses for repairing his reputation online and otherwise."  [Doc. 1-2, ¶¶ 98-

repair expert (Craig Kronenberger[150]) and Daniels' lost employment opportunities.[151]   Even in cases where defamatory language is *alleged* to be but not *actually* actionable *per se*, a defamation claim should **not** be dismissed where the plaintiff alleges (as Daniels has) special damages.  *Hood*, 419 So.2d at 743 n. 4.  Even if the Court determined Defendants' statement is not "*per se*" actionable, that would not be "fatal" to Daniels' claim.

### C.   Whether Defendants' Defamatory Statement is Actionable *Per Se* Is A Disputed Fact Issue

Defendants' contention that their statement about Daniels is not defamatory *per se* is based on yet another misstatement of defamation law.  Defendants focus solely on the "innuendo" and "extrinsic" language in the "*per se*" standard (Motion p. 17-18), but ignore the "four corners" component, failing to appreciate that their statement still must be viewed in the context of the publication in which it was made.[152]  It would be reversible error to isolate the inquiry to the "eight words that compose the Statement." (Motion p. 18)  Necessarily, Defendants' statement must be considered in the context of the *Page Six* e-mail to which it responded."[153]

Whether Defendants' statement is *per se* actionable is a fact issue.  Courts determine

---

99]  Mr. Daniels further alleges the republication of Defendants' defamatory statement in other publications and through social media, and the permanency of the defamatory statements on the Internet, was reasonably foreseeable[149] and caused Plaintiff to suffer additional damages. [*Id.* at ¶ 100]  "Consequently, Plaintiff is entitled to recover actual, compensatory and ***special*** damages in an amount to be proven at trial." [*Id.* at ¶101 (emphasis added)]

[150] Doc. 39-2, 39-3, 39-4

[151] Opp. Ex. 14; Opp. Ex. 27

[152] *Boyles v. Mid-Florida Telev. Corp.*, 431 So.2d 627, 635 (Fla. 5th DCA 1983) (explaining how standard regarding "innuendo" and "extrinsic" facts is often misconstrued); *AFI Holdings of Illinois, LLC v. Waterman Broadcasting*, 2018 WL 3093452, *4 (M.D. Fla. Jun. 22, 2018).

[153] Depo. Ex. 106 [Doc. 40-50]; Kermes Depo. 110:21-111:9 [Doc. 40-52]  Kermes doesn't recall who crafted with the defamatory statement, but confirmed its intent was to "reinforce" that the New Direction should "never have been sent out because it wasn't authorized, reviewed or approved," [Kermes Depo. 111:22-113:13 [Doc. 40-52]] and she "fully expected [*Page Six*] would call [Daniels] out by name," knowing anything she said to *Page Six* would be published. [Kermes Depo. 92:20-93:12; 121:10-122:12 [Doc. 40-52]]  Viewed in this context, Defendants' statement can reasonably be construed as *per se*. ["In Florida and in many states the rubric runs: a libel per se is 'any publication which exposes a person to distrust, hatred, contempt, ridicule, obloquy.'" *Belli v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579, 582 (5th Cir. 1967).  *Per se* publications include those which have "a tendency to injure such person in his office, occupation, business, or employment." *Id.* If a statement is such that its natural and proximate consequence necessarily causes injury to a person in his personal, social, official or business relations of life, wrong and injury are presumed or implied and such publication is actionable *per se*. *Id.* at 586.]

whether the words at issue are reasonably ***capable[154]*** of defamatory meaning, but it is then for the jury to decide whether the words were in ***fact understood as defamatory***.[155]  Where words are capable of two or more meanings, one of which would be libelous and actionable, it is for the jury to say, under all the circumstances surrounding the publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read.[156]  ***This standard applies to the determination of whether statements are capable of defamatory meaning and whether they are capable of being understood as defamatory per se***.  *Ott*, 402 So.2d at 468, n. 3.[157]  The statement by Daniels' employers that he sent an unauthorized, unapproved, and unreviewed email characterized as "condescending" and poorly received by guests on a major home shopping network is reasonably ***capable*** of being understood as defamatory *per se*.[158]

---

[154] When the court examines whether the words at issue are ***capable*** of being understood as defamatory *per se*, it must read and construe the words at issue in the sense in which the readers to whom they are addressed would ordinarily understand them.  *Belli*, 389 F.2d at 583.

[155] *Id.* at 583; *Owner's Adjustment Bureau, Inc. v. Ott*, 402 So.2d 466, 468 (Fla. 3d DCA 1981).  Whether the statement actually impugns the plaintiff in his or her trade or profession is a matter for the jury.  *Klayman v. Judicial Watch, Inc.*, 22 F.Supp.3d 1240, 1250 (S.D. Fla. 2014) (*citing Belli*, 389 F.2d at 583) (remanding case to the district court for jury to determine whether the "common mind" would understand the publication itself, without reference to extrinsic facts, as having defamatory meaning).  "[T]he jury determines whether language imputes to another conduct, characteristics or a condition incompatible with the proper conduct of his business, trade, profession or office."  *Id.; see also Spears v. Albertson's, Inc.*, 848 So.2d 1176, 1179 (Fla. 1st DCA 2003) ("When the words published concerning a person tend to degrade him, bring him into ill repute, destroy confidence in his integrity, or cause other like injury, such damage is actionable per se.").

[156] *Id.*

[157] *Belli* also recognizes the issue of whether particular words are in fact libelous *per se* is an issue the jury must decide.  393 F.2d at 584 (collecting cases where issue of libel *per se* was submitted to jury).  Where a jury might reasonably conclude that the conduct imputed to the plaintiff is incompatible with the standards of his profession, the issue of whether the challenged statement is defamatory *per se* must be tried.  *Id.*  Importantly, "[a]ny doubt as to the defamatory effect of a publication should be resolved by the common mind of the jury, and not by even the most carefully considered judicial pronouncement."  *Id.* at 585.

[158] "Per se defamatory language may take a variety of forms."  *Paulson v. Cosmetic Dermatology, Inc.*, 2017 WL 2484197, *3 (S.D. Fla. June 8, 2017) (*citing Rubin v. United States News & World Report, Inc.*, 271 F.3d 1305, 1306 (11th Cir. 2001); *Adams v. News Journal Corp.*, 84 So.2d 549, 551 (Fla. 1955)).  "Additionally, language that interferes with one's profession can be per se defamatory."  *Id.*  Two iterations of this form of *per se* defamatory language exist:  (1) language that "tends to injure a person in her office, occupation, business, or employment and which in natural and proximate consequence will necessarily cause injury"; and (2) "language that "imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office."  *Id.*  Likewise, statements are clearly defamatory *per se* where they portray the plaintiff as "one to be distrusted."  *Harwood v. Bush*, 223 So.2d 359, 361-362 (Fla. 4th DCA 1969).

Defendants laundry-list several cases (Motion p. 17-18)[159] to suggest bright-lined rules about whether statements are defamatory *per se*, but such an approach is contrary to law because the *per se* inquiry is obviously case sensitive and fact-intensive.  In any event, *Ellis v. Northern Star Co*, 326 N.C. 219 (1990), although not controlling, is more analogous to the facts at hand. *Ellis* was decided under the same *per se* defamation law Florida follows, 326 N.C. at 223-224, and holds that labeling an agent's dissemination of information provided by their principal "unauthorized" is defamatory *per se*.[160]

### D.    Actual Malice is a Fact Issue

Defendants summarily address the actual malice standard and proof (Motion pp. 19-20), but this inquiry is far more complicated than Defendants suggest, implicates fact issues, and would require additional briefing if the Court entertained Defendants' unpled and unsubstantiated argument.  Actual malice is a subjective inquiry [Here, Defendants cannot even explain how their statement came about, *See* n. 123-125, above], can be proven circumstantially, involves numerous recognized indicia of actual malice Defendants ignore, and is a fact issue.  *See Palin*, 940 F.3d at 812.[161]

---

[159] Most notably, *Rohleder v. Wiberg* is a non-binding Florida trial court summary judgment order involving a dispute over a statement concerning whether authority was given by a board of directors to file a bar grievance, but clearly distinguishable because the plaintiff did not suggest the board in fact authorized him to file the complaints.

[160] A similar decision was reached when a trial court's directed verdict was reversed in *Sholz v. RDV Sports, Inc.*, 710 So.2d 618, 625-26 (Fla. 5th DCA 1998), because an employer's (an NBA team) statements to the press about an employee (a referee), including that the employee "followed [his] own agenda," presented a *prima face* showing of *per se* defamation (*i.e.,* injured the plaintiff in his trade or profession).  *Id.* at 625.  In *Sholz*, the court noted "the finder of fact must first decide whether 'from the language of the comment, it does not seem unreasonable to infer that persons hearing the same and possessed of common mind might have taken it to mean that the plaintiff was a person with whom commercial relations were undesirable."  *Id.* (citing *Wolfson*, 273 So.2d at 778).  Notably, the plaintiff in *Sholz* presented a *prima facie* case "by establishing the context in which the statements were made and the impact they were likely to have on his profession."  *Id.*

[161] *See, e.g., Celle v. Filipino Report. Ent., Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) (citing *Liberty Lobby*, 838 F.2d 1287, 1293 (D.C. Cir. 1988)); *Harte-Hanks Comm, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983) (quoting *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971 ("*Vandenburg I*")); *see also Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1026-27 (5th Cir. 1975) (same) ("*Vandenburg II*"); *Herbert v. Lando*, 441 U.S. 153, 170 (1979); *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987)).

### E.    Defendants Unpled Limited Public Figure Defense Is Unsupported

Defendants' limited public figure argument (Motion p. 20-22) should be summarily rejected because Defendants failed to plead Daniels is a limited public figure as a defense. *See* Doc. 6; *Spear v. Publix Super Markets, Inc.*, 2008 WL 5276441, *4 (S.D. Fla. Dec. 18, 2008)[162]

Even if this defense had been raised and not waived, Defendants' argument fails because "[u]nder the first prong of the *Waldbaum* test, a public controversy[163] must be more than merely newsworthy." *Silvester*, 839 F.2d at 1494.  To cross this hurdle, the controversy must "affect people who do not directly participate in it," and have been "debated publicly" and have "foreseeable and substantial ramifications for non-participants." *Id*. at 1495.[164]  Defendants' argument also fails because there was no public controversy that ***predated***[165] the defamatory statement to *Page Six*.  Lastly (and most practically), Defendants' argument fails because Daniels did not inject himself into any controversy.[166]  The hallmark of a limited purpose public figure are some action by a private person to inject or thrust themselves into the public debate.[167]  That did

---

[162] Failure to plead a defense results in a waiver. *Gottlieb & Gottlieb, P.A. v. Crants*, 657 Fed.Appx. 920, 922-923 (11th Cir. 2016).  Also, Defendants did not state any facts related to this unpled limited public argument in their Interrogatory answers.  **[Opp. Ex. 29]**

[163] As recognized in *Waldbaum*, 627 F.2d at 1297, "courts must exercise care in deciding what is a public controversy." "A general concern or interest will not suffice." *Id*.  "Being an executive within a prominent and influential company does not by itself make one a public figure." *Id*. at 1300.  "Not everyone who participates in activities that affect the public becomes a public figure." *Id*.  Under the *Waldbaum* analysis, the Court must (1) isolate the public controversy, (2) examine the plaintiff's involvement in the controversy, and (3) determine whether "the alleged defamation [was] germane to the plaintiff's participation in the controversy."

[164] For example, a public controversy involves corruption in "the highly regulated… jai alai industry," where "the public has a marked interest" due to violations of "important state regulations," and "potential loss of tax revenue." *Id*. at 1495.  A public controversy also has been defined as "any topic upon which sizeable segments of society have different, strongly held views." *Della-Donna v. Gore Newspapers Co.*, 489 So.2d 72, 76 (Fla. 4th DCA 1986). "Attracting the public's interest is not enough." *Id*.

[165] In fact, Defendants entire argument is predicated on news coverage *after* their defamatory statement (Motion p. 21-22), which as a matter of law does not result in limited purpose public figure status. *Silvester*, 839 F.2d at 1495.

[166] Defendants make <u>no</u> argument that Daniels is an Involuntary Public Figure, which also is not pleaded, so Daniels objects to any consideration of such a defense.  If the Court is inclined to entertain any argument on the involuntary public figure issue—which is complicated and requires far more space to address than what the current briefing limits impose—Daniels respectfully requests that additional briefing be ordered.

[167] *Della-Donna*, 489 So2d at 77; *Saro Corp. v. Waterman Broadcasting Co.*, 595 So.2d 87, 89 (Fla. 2d DCA 1992); *Long v. Cooper*, 848 F.2d 1202, 1205 (11th Cir. 1988); *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979).  Here, Daniels did no such thing.

not happen here.

**F.    Truth is Highly Disputed and Implicates Credibility Issues and Inferences that Must be Resolved in Daniels' Favor**

Defendants' argument that their statement is true (Motion p. 22-23) is based on their slanted, incomplete version of facts that Daniels has shown (above) to be highly contested, while and raises inferences and credibility issues that make summary judgment improper.[168]

**IV.    Fact Issues Regarding Defendants' Knowledge Preclude Summary Judgment on Plaintiff's FLSA Claim.**

Defendants are not entitled to summary judgment on Plaintiff's FLSA claim either.  Under well-settled law:

> [A]n employer may not employ his employee for a workweek longer than forty hours unless his employee receives overtime compensation at a rate not less than one and a half times his regular rate. A person is employed if he or she is suffered or permitted to work. It is not relevant that the employer did not ask the employee to do the work. The reason that the employee performed the work is also not relevant. If the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted.

*Allen v. Bd. of Pub. Educ. for Bibb Cty.,* 495 F.3d 1306, 1314 (11th Cir. 2007) (citations omitted). Moreover, "[i]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough." *Juan v. Hillsborough Cty.,* No. 805CV1171T24MSS, 2006 WL 2868935, at *4 (M.D. Fla. Oct. 6, 2006) (citations omitted). "When an employer's actions squelch truthful reports of overtime worked, or where the employer encourages artificially low reporting, it cannot disclaim knowledge." *Allen,*

---

[168] For example, Defendants completely ignore Mr. Bruno's explicit May 16, 2018 instruction to Daniels to send the New Direction E-mail and the substantial evidence concerning his actions after the e-mail was sent supporting that the instruction was given. *Owner's Adjustment Bureau, Inc. v. Ott*, 402 So.2d 466, 468 (Fla. 3d DCA 1981), provides that "in the absence of conclusive evidence" of truth, summary judgment is inappropriate. *See also Pep Boys*, 711 So.2d at 1328; *Perry*, 464 So.2d at 666; *Saro Corp.*, 595 So.2d at 89; *Smith v. Cuban American Nat. Foundation*, 731 So.2d 702 (Fla 3d DCA 1999).

495 F.3d at 1319. Whether an employer has actual or constructive knowledge of unpaid work is a question of fact. *Id.* at 1321.

The record evidence demonstrates Defendants required and/or allowed Daniels to perform duties outside the 40-hour work week without compensation. Therefore, Daniels was suffered and/or permitted to work the overtime alleged and must be compensated for this time. Defendants gave Daniels the tools and authorization to work remotely, but no ability to contemporaneously record his work time in its Kronos system.[169] Instead, if Daniels was out of the office during the weekday for personal reasons or off-site travel, he reported his time to Miller, but only within his 40-hour week as instructed by Bruno.[170] Bruno actively discouraged Daniels from reporting his overtime, yet required Daniels to complete an ever-increasing workload.[171] Daniels reasonably understood this to mean his evening and weekend work would not be compensated in addition to his straight time pay.[172] Daniels' co-worker, Camacho confirmed Bruno's directives; and Bruno's counterpart confirmed Defendants' budget concerns.[173]

The record also demonstrates Defendants had actual and constructive knowledge of Daniels' work. Daniels vocally complained about his unpaid overtime and night and weekend work, including without limitation, to Bruno, Miller, and Carter.[174] Bruno and other management routinely engaged in emails and calls with Daniels after hours, and knew he was working on

---

[169] Carter Depo. 45-21-46:2 [Doc. 40-41]; Daniels Depo. 41:3-11 [Doc. 40-2]; Bruno Depo. 63:8-17 [Doc. 40-34]. Defendants happily accepted Daniels' work.

[170] Daniels 48: 14-19; 51:13-15; 60:13-23 [Doc. 40-2]

[171] Daniels 48:20-49:6; 50: 3-15; 62:1-21; Bruno Depo. 68:23-69:3; 123:20-125:22. In Daniels' 2016 review, Bruno recognized the need to streamline Daniels' workload and remove some administrative tasks. In Daniels 2017 review, Bruno recognized that Daniels needed help with time management. Daniels workload increased over time. Daniels began supervising Camacho in 2017, and became responsible for guest trainings and tape reviews. Daniels Depo. 30:18-31:4; 33:9-34:2.

[172] Daniels 47:3-11; 50:3-15.

[173] Camacho 28:20-29:8; Zacarro Depo. 58:11-19, 25:4-11.

[174] Daniels Depo. 73:19-25; 79: 10-21; 106:3-10; Camacho Depo. 24:8-12; Carter Depo. 79:8-16; Bruno Depo. 123:10-19. Daniels even told Denise Miller, the alleged timekeeper, he was working nights and weekends. Daniels Depo. 60:13-23.

evenings and weekends.[175]  No one instructed him to stop sending working after hours or to report this time.[176] Thus, Kronos did not accurately reflect Daniels' work time and Defendants knew or should have known this.  A reasonable jury could conclude that Defendants knew Daniels worked a regular 40 hour shift, knew Daniels worked after that time, knew Daniels never submitted a request to adjust his time to include evening or weekend work and thus, knew Daniels worked uncompensated overtime.

*Allen v. City of Chicago,*[177] a Seventh Circuit case never cited in the Middle District or Eleventh Circuit is inapposite.[178]  Cases such as *Allen v. Bd. of Pub. Educ.*, 495 F.3d at 1315-1322, and *Ebersole v. American Bancard, LLC*, 2009 WL 2524618, *3-4 (S.D. Fla. Aug. 17, 2009) and *Juan v. Hillsborough Cty.* are on point.  There are genuine issues of material fact in this case, including whether Defendants had knowledge, or should have had knowledge, of Daniels' overtime work. Defendants failed to show Daniels performed uncompensated work without their knowledge as a matter of law, and summary judgment on Plaintiff's FLSA claim should be denied.

---

[175] Carter Depo. 79:8-16; Camacho Depo. 25:2-14; Doc 40-10. See generally Daniels Depo. 80-97 (testifying about select emails) Defendants produced over 6,000 pages of after hours emails.  See Doc. 30 page 2 of 4. (Over 2,000 individual emails were produced). See also Daniels Depo. 107:23- 117:17 (discussing use of personal phone); 109:8-11; 117:19-118:10 (discussing after hours use of company issued phone).

[176] Daniels Depo. 62:8-21;  See also, Carter Depo. 110:20-111:12.

[177] *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017).

[178] Defendants cannot point to a single instance where Daniels reported the night and weekend overtime work about which he complained, let alone a pattern and practice of doing so that would have obscured whether and to what extent he reported remote work for payroll, such as in *Allen v. City of Chicago*. Contrary to Defendant's misleading suggestion Daniels hid his time, he routinely discussed how much he worked at home and only omitted time "as instructed." *Allen v. City of Chicago* made it clear that **"**an employer's formal policy or process for reporting overtime will not protect the employer if the employer prevents or discourages accurate reporting in practice." (citing *White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869, 876 (6th Cir. 2012)).Furthermore, Defendants' reporting process is far from reasonable. Bruno took no active part in monitoring compliance when he was admittedly responsible, and once promoted, he wholly delegated this duty to a secretary with no FLSA training [Bruno Depo. 106:12-107:8; Carter Depo 58:15-18. HSNi ratified the delegation; Carter Depo. 46:8-12] in violation of company policies and procedures that required <u>managers</u> to ensure compliance. [Doc. 40-4; Doc. 40-5; Daniels Depo. 46:16-47:2; 48:4-10; 49:18-50:2] Even if Defendants' reporting process was reasonable, a reasonable reporting process does not equal reasonable diligence, which must be left to the finder of fact.

Respectfully submitted,

*/s/ Shane B. Vogt*

Shane B. Vogt
Florida Bar No. 257620
E-mail:  shane.vogt@bajocuva.com
BAJO CUVA COHEN & TURKEL, P.A.
100 North Tampa Street, Suite 1900
Tampa, Florida 33602-5853
Telephone: (813) 868-6650
Facsimile: (813) 443-2193

Cynthia N. Sass
Florida Bar No. 0691320
E-mail:  csass@sasslawfirm.com
Amanda L. Biondolino
Florida Bar No. 1008493
E-mail:  abiondolino@sasslawfirm.com
SASS LAW FIRM
601 West Dr. Martin Luther King, Jr. Blvd
Tampa, Florida 33603
Telephone: (813) 251-5599
Facsimile: (813) 259-9797

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 18, 2019, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

*/s/ Shane B. Vogt*

Attorney